UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

_____

|  |  |  |
|---|---|---|
| EVAN P. LOWNEY, | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | C.A. NO.: |
| HARMON LAW OFFICES, P.C. | ) | |
| ADAM D. MAZONSON, MAZONSON LAW | ) | |
| OFFICES, P.C., DAVID S. FLASHENBURG, | ) | |
| LEGAL EDGE REAL ESTATE, INC., BRIAN A. | ) | |
| JOYCE, BRIAN A JOYCE, ATTORNEY-AT- | ) | |
| LAW, P.C., JOYCE LAW GROUP, LLC | ) | |
| KEVIN B. WALTERS, WALTERS LAW | ) | |
| OFFICES, P.C., DRAGAN M. CETKOVIC, | ) | |
| DRAGAN M. CETKOVIC, P.C. d/b/a | ) | |
| DRAGAN & ASSOCIATES, JULIUS SOKOL, | ) | |
| MICHAEL J. GARRITY, MICHAEL PHILBIN, | ) | |
| JARED T. ZICHER, LARRY S. MAZONSON, | ) | |
| PATRIOT MORTGAGE COMPANY, INC., | ) | |
| DOUGLAS K. SHEFF, SHEFF LAW OFFICES, | ) | |
| P.C. d/b/a SHEFF LAW, MOLLY B. MILLER, | ) | |
| DAVID F. SCIMONE, HORNUNG & SCIMONE, | ) | |
| P.C., METLIFE GROUP, INC., d/b/a HYATT | ) | |
| LEGAL PLANS, SMITH & BRINK, P.C., MARK | ) | |
| V. CIRIGNANO, RESILIENT INVESTMENTS, | ) | |
| LLC, SHAVAR K. DOUGLAS, ELIZABETH | ) | |
| TEVES-MICHAEL, AND JOHN AND JANE DOE | ) | |
| CLIENTS AND ENTITIES RELATED TO | ) | |
| OTHERWISE CONFIDENTIAL INFORMATION[1] | ) | |
| Defendants, | ) | |

_____

## **COMPLAINT**

### JURISDICTIONAL STATEMENT

1. This Court has Jurisdiction of this action pursuant to 28 U.S.C. §1331 and §1367.

---

[1] The JOHN AND JANE DOE CLIENTS AND ENTITIES RELATED TO OTHERWISE CONFIDENTIAL INFORMATION convention is used for the reasons set forth herein and in Plaintiff's Ex-Parte Motion to file Impounded Supplemental Case Opening Materials. These Defendants are not unknown individuals or entities but known individuals whose identities are being protected at the initial stages of this action out of respect for the integrity of the traditional formulation of an attorney-client relationship.

### STATEMENT
### REGARDING STATUTE OF LIMITATIONS

2.  The statute of limitation for civil damages alleged under 18 U.S.C. §1964(c) for violations of the substantive provisions of 18 U.S.C. § 1962(a-d) is four years. *Rotella v. Wood*, 528 U.S. 549, 553 (2000).

3.  Plaintiff anticipates purported affirmative defenses from certain Defendants in this action sounding in statutes of limitations and/or laches, and while Plaintiff acknowledges that certain factual allegations will ultimately prove many years distant and that the Supreme Court has rejected both an "injury and pattern discovery" formulation of when the statute of limitations period begins as well as a "last predicate act" rule, the standard for analysis is nevertheless "injury discovery"—i.e. when Plaintiff knew or should have known of his injury. *Id.* at 553-561.

4.  The analysis set forth in *Rotella* relies upon the concept that causes of action may be pled based upon facts reasonably anticipated after further investigation and discovery. *Id.* at 561.

5.  In this regard, Plaintiff avers the formulation of his claim is exceptional—not only does this Supreme Court guidance predate the reformulation of the balancing test involved in assessing what discovery is appropriate in a civil action, but with regard to several of the identified patterns of racketeering activity, Plaintiff contends that failure to apply principles of equitable tolling under circumstances where Plaintiff alleges rights to his life choices, both personally and professionally, are actually being "sold" amongst what he will characterize herein as "affinity groups" where what to Plaintiff appeared to be mere networking and he knew no more than that he met someone new with whom he was now working, this pattern necessarily would only emerge on a very long timeline, irrespective of Plaintiff's diligence.

6.  As Plaintiff alleges one large association-in-fact enterprise consisting of large corporate interests working locally with these "affinity groups" purportedly acting as borrower advocates when this is not the reality, to reject Plaintiff's claim on statutes of limitations grounds incentivizes a permissive view of an unending chain of abuse and criminal victimization each lasting 3 years and 364 days until the target is "hot-potatoed" to a new "affinity group" employing the same fraudulent schemes in pursuit of illicit goals.

7.  Additionally, Plaintiff freely admits that he knew or should have known of *some form* of injury in December, 2014, and with the benefit of hindsight, Plaintiff certainly was in possession of many of the facts giving rise to a variety of other forms of injury much sooner, though Plaintiff did not and could not have become aware of the *actual injury alleged* in this Complaint until he attempted to obtain employment unaffiliated with the "affinity groups" alleged or that the information upon which he relied to his detriment and provided to him in December of 2014 and a relatively long time thereafter by several Defendants in this action was unlawfully motivated, unlawfully communicated, and, to a

large extent, fictional.  And to the extent this sounds like mere fraudulent concealment, the facts alleged herein are much more—and to the extent the Court disagrees, nevertheless, Plaintiff avers that the methods employed in concealment give rise to no adequate remedy at law as the enterprise is formulated with the "concealers" never retaining actual title to any dollar or asset they do not need.

8.   In this regard, Plaintiff hereby avers that in December of 2014, Plaintiff met several times with Defendant Mazonson and, from December of 2014 until February of 2016, meetings with Defendants Mazonson and Flashenburg occurred, ostensibly with the goal of 1) as regards Defendant Mazonson and his entity Mazonson Law Offices, P.C., "cleaning up the mess" as the language being used as between Plaintiff and Defendant Mazonson and separating the business as between Plaintiff and Defendant Mazonson as, through the years, certain business practices and cases had become quite intertwined, and 2) as regards Defendant Flashenburg, providing Plaintiff with work on a 1099 contract basis, ensuring there were no "loose ends" as regards work which had been performed by Plaintiff as regards Defendant Flashenburg through the years, and ostensibly assisting Plaintiff in getting his practice "back on track."

9.   The documentary record from this time period clearly indicates both that Plaintiff believed the work he had performed with or for these persons and entities was, by and large, on the "up and up" and as regards anything open to question, it was reasonably presumed "client" conduct which called any matters into question, not concerted action.

10.  In sum, Plaintiff believed he was assisting in maintenance of matters which purportedly had potentially created reputational damage or professional responsibility concerns for these persons and entities for which he had to take some responsibility for in pursuing remedies as regards open work and maintenance of client files and attributed Defendant Mazonson's alternately threatening, coercive, suggestive, dismissive and angry manner of communication and action during this period to be the result of his communicated perception that Plaintiff had threatened his livelihood through Plaintiff's conduct.

11.  Strictly speaking, time and discovery have borne this out to have been true, though not because the livelihood of these Defendants was predicated upon running solely legitimate real estate conveyancing practices or law firms or because Plaintiff is actually guilty of the level or type of "mess making" accused or insinuated by these Defendants, but because Defendant Mazonson and his father, Defendant Miller, Defendant Flashenburg, Defendant Garrity, Defendant Zicher, Defendant Sokol, Defendant Philbin, Defendant Cirignano, Defendant Joyce and Defendant Scimone are all running "side-businesses" as flesh peddlers and leverage brokers and Plaintiff's conduct (being way overextended and several items having fallen through the cracks or corners cut as a result of fake work and artificially manufactured leverage that they themselves brought into Plaintiff's life) was drawing attention to their filth racket.

12.  Plaintiff's communications with Defendant Mazonson in the meetings prompted by certain extremely anomalous occurrences in Plaintiff's professional life, occurrences that,

as between Plaintiff and Defendant Mazonson were described as "living in a world with too many coincidences[2]" included:

a. Defendant Mazonson suggesting that there existed some mystical, astrological, occult, or paranormal element to circumstances such as Plaintiff's; this suggestion was later self-servingly repeated by Defendant Teves-Michael in the spring and summer of 2016, an exchange which culminated in Defendant Teves-Michael making completely false and unfounded accusations and threats misrepresenting both Plaintiff's conduct and whereabouts.

b. One conversation wherein Defendant Mazonson told Plaintiff "you're a jew," and then spent months sowing the seeds that Plaintiff was under attack from "the jews" and that, though Defendant Mazonson didn't agree with it, he was born "a jew" and every other spiritual code of conduct is a "fairy tale." Again, as set forth more fully herein, investigation and discovery tend to indicate that what we're dealing with here has nothing to do with Judaism, but "affinity groups" who appear to protect themselves through affiliation with the "in" groups of many different adherents of identity politics who simply employ the system in a manner geared towards a legal positivist use of the law to achieve an end permissibly grounded in some old testament concept, i.e. the Christian adherents of an old testament code in their business dealings, or the Mexican adherents of an old testament code in their business dealings, or the Mormon adherents of an old testament code in their business dealings, African-American adherents, Asian adherents, British adherents, Asian adherents or whatever the case may be—some of these "affinity groups" seem even to identify as "independent," though the methods and reliant affiliations remain the same. Plaintiff has lived his entire adult life as a spiritually experimental lapsed Catholic who attended thirteen years of Catholic school and absent these conversations would know little of anything about which Defendant Mazonson was speaking.

c. Defendant Mazonson even made overtures as to which of "the jews" had taken umbrage with their alleged treatment at Plaintiff's hand.

d. Defendant Mazonson insinuated to Plaintiff during this period that he was some sort of "protected," "made," or "in the know" individual and in the ensuing months Defendant Mazonson stated that Plaintiff "would find him entirely consistent" were Plaintiff to refute Defendant Mazonson's characterization of the circumstances in

---

[2] As to the factual assertions Plaintiff makes that seem to be hearsay, Plaintiff simply makes averments that the statements were made to any extent that their mere utterance is probative. As to those regarding "coincidences" or vaguely ominous statements open to multiple interpretations such as "when grown men fight, people die" it will be up to the fact finder to determine, when viewed through the lens of the sheer volume of anomalous behavior ostensibly without any rational factual or circumstantial basis, what sort of coercive force upon Plaintiff that the mere fact they were made can be said to have had, or whether such behavior rises to a level of criminal harassment under Massachusetts law (see state law definition of harassment and enterprise crime set forth herein). During the timeframe in question with regard to these preliminary averments, Plaintiff also alleges he had a conversation with Defendant Flashenburg ostensibly in the context of casual conversation wherein he repeatedly emphasized the word "dead" in a manner which a reasonable person would find disturbing.

which Plaintiff and Defendant Mazonson found themselves, insinuated that the entirety of Plaintiff and Defendant Mazonson's acquaintance was marked by Plaintiff simply being Defendant' Mazonson's "pet," i.e. some sort of oddity usable for Defendant Mazonson's entertainment and financial gain, the facts of this Complaint will bear out that the circumstances are indeed, much graver. Plaintiff was more akin to a pair of gloves for Defendant Mazonson's (and a number of other named Defendants') filthy dealings, using Plaintiff's ignorance to accomplish transactions a more experienced individual could not.

e. Throughout the years, Defendant Mazonson has engaged in the practice of something which Plaintiff did not understand until certain events transpiring in 2016—making a point of how little he knew about a potential case, client, or person—Plaintiff would have difficulty counting the number of times Defendant Mazonson made a point of drilling in to Plaintiff's head the idea that he barely knew the principals of Harmon Law Offices, P.C., Mark and Andrew Harmon. This becomes pointedly relevant with regard both the lead Defendant in this action and with regard to one fact pattern involving certain of the persons in Plaintiff's Exhibit A of a very dangerous form of incredibility.

f. During this period, Defendant Mazonson also repeatedly used the phrase "when grown men fight, people die[3]," drove his shoulder into Plaintiff during one meeting at Defendant Mazonson's Canton Office, and threatened to call the Board of Bar Overseers on Plaintiff first in response to Plaintiff suggesting that he might make some self-disclosures that would be detrimental to Defendant Mazonson's "business."

g. Both Defendants Mazonson and Flashenburg insinuated during this period that Plaintiff's practice of instituting borrower-initiated litigation against major financial institutions on behalf of morally questionable or societally problematic persons was or had also contributed to Plaintiff's circumstances[4].

---

[3] Obviously Plaintiff can provide no probative evidence as to what Defendant Mazonson intended to convey with this statement, all Plaintiff could testify to would be how Plaintiff interpreted it at the time and the manner in which Plaintiff believes, with the benefit of hindsight, he can illustrate it's veracity today, though for very different reasons—reasons more susceptible to an evidentiary showing—and that, irrespective of Defendant's intention, either interpretation (or any other reasonable interpretation of a statement of that nature,) can only be viewed as coercive and harassing.

[4] As Plaintiff acknowledges this section is becoming lengthy and is thus far largely irrelevant to a preliminary statement regarding statutes of limitations, Plaintiff takes this opportunity to suggest that the point is threefold: 1) Plaintiff spent *YEARS* continuing to protect the interests of these two, as well as several additional Defendants, from the perspective that these individuals were operating certain generally accepted types of legitimate businesses, i.e. real estate conveyancing practices, real estate brokerages, or small general practice law firms when, as set forth more fully in this Complaint, these businesses appear heavily dependent upon "business" of a sort that Plaintiff will demonstrate employs, at least in actual practice, unlawful, fraudulent and even criminal methods—specifically with reference to Defendant Mazonson, Mazonson Law Offices, P.C., his father Larry S. Mazonson and Patriot Mortgage Company, Inc., it is Plaintiff's contention that these individuals and entities, through employment of fraudulently manufactured "leverage" involving the use of complicit "professional clients" are running what Plaintiff can best describe as a shadow Title Insurance Company and Brokerage on human careers involving the purchase and sale of personal and professional "debt," unfortunately with much of such "debt" having been artificially manufactured by conduct of individuals within their very network; 2) strict adherence to traditional formulations of injury discovery on these facts requires a finding even more pronounced than the one about which the *Rotella* court is concerned

h. While Plaintiff seeks not to litigate anything in terms of but-for causation, discovery in this matter will bear out how extraordinarily destructive the foregoing suggestion was—the irony here is that, as set forth in the Exhibit A for which Plaintiff seeks impoundment, there clearly appears to be an accepted practice occurring which involves the use Courts in a manner which, while Plaintiff fails to see its permissibility and has never knowingly agreed to subject himself to the personal jurisdiction of such a system, involves the "shadow litigation" of personal contractual disputes through the use of actual surrogates or, at a minimum, closely analogous fact

---

while nonetheless acknowledging the validity of a general rule that reward is for those who swiftly undertake litigation in the public good. There is nothing general about what Plaintiff is about to describe. What we have here is associates of the enterprise not merely fraudulently concealing the pattern, but actively attempting to manufacture the appearance that Plaintiff was aware of and participating in the activities in question, then, after so duping Plaintiff and running another couple years off of Plaintiff's clock (including the destruction of and tampering with evidence), Plaintiff's obligation was then to go back through every transaction in which he had ever been involved asking "should I have known I was being injured by this?," "what about this?"—in sum, Plaintiff simply identifies between July 2 and July 10, 2013 as a range of dates when *it could be argued* he should have known that he had been injured by activity that resulted from some form of unlawful interference, but even this is a stretch as, in Plaintiff's estimation, most reasonable persons would have, at the time, viewed this as damaging Plaintiff's "clients," but one standing in Plaintiff's shoes would or should have viewed a lower court loss in U.S. District Court docket number 12-11697 and the events and factors contributing thereto as having served to create some form of lifelong employability concern for Plaintiff, which is a category of damages actually alleged, well this is quite speculative and such a formulation of a proper accrual date under RICO on these facts would serve to incentivize a form of permissive "death by paper cuts" employment of fraud and harassment wherein, as long as the damages of each instance, standing alone, are small or obscured enough, these "affinity groups" will effectively be permitted to harass and attack people indefinitely as long as it's a superficially new group of individuals or entities employing the very same tactics every few years, or as long as the enterprise remains sufficiently diffuse—in sum, it was not until years later that Plaintiff even became dimly aware that the events of June and July 2013 were part of a personal attack on the him; and 3) even were one to read *Rotella* strictly under such circumstances, i.e. irrespective of the subsequent changes to the balancing tests employed in discovery in federal civil litigation, *and* looking strictly to injury alone, as set forth in the counts defined herein, what could Plaintiff truly have claimed his damages to be as of July 10, 2013? He had certainly had injury done to his professional credibility, but Plaintiff questions whether such damage was as irreparable as it later became and, even presuming this Court would reject Plaintiff's formulation that the symbiosis and cooperation between association-in-fact enterprises or, more particularly, that one large association-in-fact enterprise exists through the collective "servicing" of "special loans," or "covered individuals" by various local arms working with and at the pleasure of the same large corporations, while Plaintiff does not waive or disclaim any damages sounding in his primary theory that, where what we're talking about is Plaintiff being treated as livestock and entitlement to compensation for every minute wasted and injury inflicted, unbeknownst to Plaintiff, Plaintiff has been tricked through no fault of his own into spending the last decade of his life in training to be a criminal, Plaintiff's most exhaustive and massive category of damages stem from the injury he could not have realized until actually exploring his alternatives, something the Defendants herein delayed considerably through their fraudulent assertions of business injury flowing from what Plaintiff will show were "fake cases" involving complicit actors—i.e. Plaintiff is being held hostage, harassed, victimized and declined work as an attorney outside the confines of some form of dystopian holding tank or engaged in more of the same fraudulent "business" of which he complains and when he attempts to simply walk away and get a "regular job," he is provided with a "supervisor" or "babysitter" who 1) has information about Plaintiff that this individual could not possibly have absent enterprise interference and 2) is actively attempting to drive Plaintiff insane while seemingly judging Plaintiff's performance on one criteria: whether Plaintiff is going to shut up about this massive fraud being perpetrated. The reputational damage and emotional distress Plaintiff has endured in the interim is, quite frankly, incalculable. And these only include the damages up through April 15, 2017; since the occurrence of the facts set forth herein with regard to Defendant Douglas and his perceived network, Plaintiff now could not even make another attempt at tolerating that sort of treatment without potentially facing massive additional liabilities, including the further destruction and manipulation of evidence related to the allegations contained herein.

patterns.  Even were one to acknowledge foundations for the lawfulness of such a
practice, there would necessarily need to be a controversy—and as set forth herein, it
is abundantly clear that had Plaintiff simply been left alone to finish these matters
unmolested and uninfluenced, the pattern in question may not have emerged—
Plaintiff proffers in this action as circumstantial evidence of his allegations the simple
fact that in many matters wherein he terminated representation based upon his well-
founded perception that his "client" was no longer behaving in a manner which found
support in the premise that this "client" was acting of his or her own volition[5], many

---

[5] See Comment 11 to Mass. R. Prof. Conduct 3.3(a). And while Plaintiff appreciates that, at first blush, it might
appear to the Court that Plaintiff is attempting to "have his cake and eat it too," citing professional responsibility
concerns and ethical canons when it suits him and seeking to discard traditional formulations of privilege and
confidentiality when it does not, the distinction Plaintiff is making is more nuanced.  Plaintiff's contention is that in
large swathes of his "practice," his "clients" are not, in any sense which traditionally supports the need for privilege
and confidentiality, his "clients" at all, but instead his Complaint at Exhibit A seeks to illustrate these "clients" are,
in point of fact, associates of and under the "operation and management" of some "affinity group" interfering in the
undersigned's affairs in a fraudulent manner, both unlawfully motivated and in the absence of actual controversy.
Essentially, Plaintiff avers that these "affinity groups" have figured out a gaping loophole in the system, i.e.
"employ" "professional plaintiffs" who understand that is their role, are willing to accept payment and benefits in a
variety of forms and on somewhat vague and informal terms, to use a particular lawyer's practice to run a scripted
scam through, or to secret shop a particular lawyer's practice to gain information about the lawyer's ability to handle
ethically gray situations or to grade such lawyer's performance for purposes of suitability to the "affinity group's"
goals, or, perhaps worst of all, to actively pollute the lawyer's practice with little fraudulently manufactured bombs
that can be blown up later if the lawyer catches on and doesn't want to play ball, "insurance policies," if you will,
but ostensibly these individuals are to be afforded all the benefits of privilege and confidentiality that a true client
would be?—even though one necessary requirement of the foregoing state of affairs is that they dispense with any
recollection of actual events, and simply communicate documents and scripted lines for the benefit of the fact
pattern? It's effectively an organized crime work around to create a mechanism for illicit, coercive or manipulative
communication couched in terms that, were one to merely read the conversation in transcript form, it would appear
relevant to a claim or defense or in pursuit of legal advice. Fine, very clever if the undersigned were a witting
participant or, more importantly, if the information were true, or if the information were actually communications
coming from the "client" as opposed to an exercise in message sending on behalf of others.  But if the undersigned
is not, this is manufactured privilege to use the Plaintiff's practice without his consent to launder and transmit
moneys for fraudulent ends, leverage complicity under threat of a trumped up or artificially exaggerated accusation
of malfeasance, communicate illicit messages in the "grapevining" of information for use in pursuit of violations of
18 U.S.C. §§1960 and 1956, simply harass the Plaintiff, or "test" the undersigned using a compromised individual
improperly incentivized to foster errors and keep Plaintiff beholden to one of these groups for as long as possible—
(preferably until after statutes of limitations had run).  Plaintiff's point is this, first and foremost, privilege is waived
and confidentiality no longer a viable concern when a holder of an evidentiary privilege has disclosed the privileged
communication outside a similarly privileged setting which, absent venturing into the realm of illicit wiretapping or
surveillance of private areas, Plaintiff avers has to be occurring to the exclusion of any other rational explanation.
Secondly, Plaintiff's contention is that the facts described herein are something which, prior to the advent of the
internet, social media, and the technological capability for instantaneous information sharing amongst large numbers
of people, while perhaps transpiring, a complaining party would never compile enough evidence or a large enough
sample size to establish the total absence of reasonable alternatives to illicit group action and therefore Plaintiff
suspects this matter will largely present certain issues of first impression—i.e. that Plaintiff has "clients" who cannot
possibly be viewed as acting of their own volition or on their own behalf, an allegation which would be
extraordinarily difficult to prove in a he-said she-said between Plaintiff and one or two "clients," but several dozen
(as a very conservative estimate,) for the better part of a decade?  Indeed, it is these individuals and "affinity groups"
who are attempting to "have their cake and eat it too," they seek to have their secrets shielded from public scrutiny
merely by finding single points of contact willing to have their homes or social security numbers used as conduits
for illicit funds and communications, protection for "management level" operators of the group to be able to claim a
lack of knowledge of the mechanics of a scheme from which they're benefitting, though in the absence of their
input, whether direct or indirect, the "operative" or "client" in question would never be sophisticated enough acting

of these "made" persons have continued to obtain almost mystically fortuitous windfalls in the ensuing years[6].

i. These Defendants also made repeated overtures that Plaintiff's circumstances were and continued to be the result of Plaintiff's past handling of matters involving as well as his treatment of certain influential members of "the jews." Time and discovery have borne out that to the extent there is any truth to this statement, this matter makes no such distinctions as the "affinity groups" and companies in question appear rarely to so self-identify and, in light of the nonsensical statement by Defendant Mazonson that Plaintiff is "a jew[7]" where there appears to exist no biographical support of which Plaintiff is aware for such an assertion, Plaintiff treats these explanations by any Defendants motivated to benefit from confusing or misleading Plaintiff, well that is precisely how this Complaint so treats them—as a fraudulent fairy tale designed to confuse and mislead Plaintiff to Defendants' benefit.

13. With regard to any proposed argument that Plaintiff was under an obligation in December 2014 to "look back" combing his life's history looking for minor frauds and slights in order to discern a pattern, and acknowledging the Supreme Court's discussion of this issue, as set forth below, Plaintiff argues the facts here are quite distinguishable from *Rotella*, though to the extent that the Court disagrees, Plaintiff respectfully avers that at

---

alone to successfully engineer the necessary narrative. Plaintiff seeks to illustrate enough occurrences of this pattern to establish the absence of any privilege as these matters are clearly "team efforts." And to the extent Defendants attempt to defend on grounds of Plaintiff knowledge or complicity on the very distinguishable grounds that Plaintiff has participated in real estate closings or short sale negotiations in transactional circumstances where interests are generally aligned, this is unpersuasive and, with very limited exception, not the sort of run of the mill practice to which Plaintiff refers. Plaintiff is referring to what, with the benefit of hindsight, appears to have been pre-coached "clients" that fall mainly into two categories 1) "insurance policies" wherein the "client" engages in a highly relevant and purposeful factual omission, fraudulent factual misrepresentation, or a description of their goals and expectations, articulated goals and expectations with which they either actively interfere after the representation has commenced or which they later retract claiming their goals were something totally different from inception; and 2) purportedly adversarial circumstances akin to fake car accidents or insurance fraud where everyone involved in the transaction, i.e. all sides, are in on the scam except Plaintiff. Can privilege and confidentiality reasonably be afforded these individuals in such "team efforts" if as though the individuals in question were truly acting alone?

[6] It is also not lost on Plaintiff that one might argue that Plaintiff was, for all intents and purposes, just such a "management" level beneficiary of the schemes in question referenced in the foregoing paragraph. And while, to a certain extent, this may appear true, Plaintiff avers there is an important distinction to be made between actual lack of knowledge (Plaintiff) and that which is superficially claimed. To the extent anyone named as a Defendant in this action, or others, wishes to assert affirmative defenses in this regard or file counter or cross-claims for the recovery of the "benefits" Plaintiff received as a beneficiary of any such scams, Plaintiff invites them to do so and freely admits that he received monies that, without his knowledge as to why this was true at the time, he should not have received. The foregoing averment obviously attaches to it the caveat that any damages on that side of the ledger are dwarfed by the damages Plaintiff has suffered in the way of emotional distress, long term employability, and the loss of years of his life in training for something which, in light of the facts contained herein, he really could no longer do lawfully in any logistically realistic sense anymore as this status as a "marked" individual and the criminal methods and level of factual manufacture being employed have essentially destroyed Plaintiff's ability to vet a case within the bounds of what would constitute an appropriate level of diligence without any prospective client feeling like they cannot trust their own advocate. One cannot practice law outside the confines of a law firm if every client must be suspected of criminality or conspiratorial motives and the actions of Defendants have effectively left Plaintiff extremely unattractive to legitimate potential employers for reasons which, in reality, are not factually well supported.

[7] This was not communicated in any sort of joking way, but gravely and in a secretive or conspiratorial tone.

no point did he know of the type of injury most forcefully alleged until some point in 2016, and using a standard of when Plaintiff, with the information he had, reasonably should have known of any injury inflicted at all by the lead Defendant of the type contemplated by 1964(c), Plaintiff could not have digested the import of the Harmon Defendant's conduct precipitating any injury until after 6:00PM on July 1, 2013, and certainly could not have been aware that injury had truly resulted until Judgment in 12-11697 entered on July 10, 2013.

14. To the extent that Defendants in this action raise an alternative statute of limitations defense asserting claims that all of the claims asserted herein automatically transferred to Plaintiff's Professional Corporation based upon arguments relating to continuity of Professional Liability Insurance coverage, or other interpretive guidance relating to the corporate veil, Plaintiff concedes that, though Plaintiff had not conceptualized them as such, portions of the categories of damages in this action may appropriately be bifurcated by operation of law based upon a factual inquiry into the totality of Plaintiff's circumstances, however, with regard to the oldest and arguably stalest claims, Plaintiff avers that these claims are a direct personal attack, sounding in crimes against his person, his reputation, and his ability to earn a living, irrespective of the existence of any separate entities, the events underlying these claims occurred prior to any application to incorporate, and that there may be other categories of damages implicated in this action which should have been given different formal treatment by Plaintiff in, for example, filing corporate tax returns, in light of Plaintiff's averments with regard to the true nature of Plaintiff's business and it's inappropriate use by others without his consent or knowledge, the claims and damages relating to the oldest causes are wholly personal.

15. And while Plaintiff further acknowledges that fraudulent concealment of either a pattern of racketeering activity or the enterprise itself is not traditionally a valid tolling defense to assert liability for otherwise time-barred acts, Plaintiff avers that even the Court that made such ruling declined to rule out equitable tolling in the face of an appropriate showing. *Rotella*, 528 U.S. at 560-561.

16. The categories of damages alleged by Plaintiff do not sound in mere wasted time, but instead were proximately caused by a concerted effort to manufacture the appearance of Plaintiff's complicity in something to which he was not complicit, thereby injuring his future employability and, in this process, generating injuries blossoming from the appearance created by Plaintiff repeatedly needing to withdraw, "fire" clients, and, to the outside world, generally create the impression that Plaintiff is a "quitter," when, in point of fact, Plaintiff was simply required either by ethical canon or the necessity of preserving the viability of this claim for the benefit of his legitimate creditors[8] to cease

---

[8] Plaintiff was never complicit in anything more suspect than 1) having a sense that some of his "clients" were somewhat "shady" and whose narratives sometimes suffered from a questionable fluidity in their recollections—and with reference to privilege and confidentiality, Plaintiff freely concedes that were this the extent of that which was transpiring he would be bound by privilege absent waiver, but it isn't—in the most pronounced cases, Plaintiff is asserting a closed system where the lender, lender's counsel, Plaintiff's own client, the referral source, and the loan servicers and predecessor servicers are all acting in concert to create illicit shell docket numbers, litigation files, or bankruptcy cases for the purposes of issuing payoffs and transmitting illicit funds for damages arising from the collision of two or more "affinity groups" that have a connection to the fact pattern alleged only by analogy and, to

those actions which he perceived as potentially creating, as opposed to mitigating, liability.

17. In light of the foregoing, Plaintiff draws the Court's attention to the various statutes of limitations considerations raised by this Complaint. In Massachusetts, "actions in both contract and tort may be tolled until the Plaintiff discovers the facts giving rise to the cause of action." *Szymanski v. Boston Mutual Life Ins. Co.*, 56 Mass.App.Ct. 367, (2002)(citing *Frank Cooke, Inc. v. Hurwitz*, 10 Mass.App.Ct. 99, 106, (1980)). This "discovery rule" tolls a limitations period until a prospective plaintiff learns or should have learned he has suffered some *appreciable harm . . .* Id. at 370-371 (citing *Patsos v. First Albany Corp.*, 433 Mass. 323, 328(2001); *Schwartz. v. Travelers Indem. Co.*, 50 Mass.App.Ct. 672, 678 (2001)).

18. Moreover, where those persons from whom Plaintiff gleaned those things which he was not forced to teach himself[9] consistently adhered to the position that "clients will be clients" or that they had no knowledge or affiliation with particular clients beyond the superficial when, in point of fact, Plaintiff has been under a clandestine assault from these very same persons *because they viewed some of Plaintiff's choices as drawing attention*

---

the extent that one were even to accept this as permissible under circumstances where all involved were in agreement as to the existence of a dispute, Plaintiff can further show a pattern of lack of evidentiary support of actual dispute simply by assessing what transpired after he walked away--it's group money laundering and fraud, plain and simple; and 2) certain specifically identifiable instances where, prior to being able to specifically articulate a pattern of criminality and, as set forth at length herein, at least superficially believing himself bound by some form of privilege or confidentiality, Plaintiff chose to make strides towards closure of a given matter under circumstances where Plaintiff was either expressly or tacitly threatened, whether physically, economically, or by pointed innuendo. Nevertheless, where Plaintiff perceives that a picture could be painted of him, indeed, it appears great pains have been taken to paint such a picture, of Plaintiff as a complicit co-conspirator with intent, Plaintiff has ensured that he has made clear he has abandoned any and all enterprises and their goals. See generally, *United States v. Schussel*, 291 Fed. Appx. 336 (1st Cir. 2008). And while Plaintiff acknowledges that *Schussel* sets forth either disavowal or "full confession" to authorities, as set forth at length herein, Plaintiff's Complaint relies on the standard for civil liability and establishing a pattern of chargeable or indictable offenses by others so extensive and improbable that it cannot be ignored, and Plaintiff self-reported the short list of arguably chargeable infractions he committed with mens rea to the Massachusetts Office of Bar Counsel—an authority which took no action against Plaintiff—and, therefore, with the exception of the larceny by false pretenses charge levied against Defendant Douglas and certain disclosures to various courts and agencies, Plaintiff is unpersuaded that he would have a duty to report to law enforcement the actions of others which, without additional discovery, he would question whether proof beyond a reasonable doubt could be proffered or established.

[9] or learn the "hard way" from "clients" who, from as far as Plaintiff can tell are operating almost entirely outside the law to infiltrate Plaintiff's practice and wreak havoc as ethical barometers or morality warriors and test/entrap/question Plaintiff in a manner designed to place Plaintiff in almost a perpetual state of ethical quandary—these individuals usually present with an extraordinarily sympathetic back story and seem, absent a level of investigation which should be wholly beyond the bounds of appropriate due diligence, to be persons either who repentantly acknowledge the behaviors which landed them in a particular predicament or who, due to the aforementioned sympathetic backstory, present as paragons of unimpeachable morality who simply had tragedy befall them. Then when Plaintiff attempts to move on to another chapter of his life, obtain employment outside of these enterprises, or seek legal redress for the conduct of bad actors, these individuals mysteriously reappear with a complaint or issue with regard to some borderline decision Plaintiff made years distant or corner Plaintiff cut on behalf of someone who appeared sick or tragically misfortunate and deserving, usually to find that the circumstances surrounding such decision often involved these individuals having "tag-teamed" Plaintiff's attention from within these enterprises—multiple individuals or entities all mysteriously in crisis all at the same time and proffering a narrative which, only with the benefit of hindsight, required more inquiry.

*to their particular brand of pseudo-legalized stealing,* well, a fraud of that sort would, by its very nature, require a timeline of considerable length to see.  The Supreme Court has articulated the following considerations when assessing "fraudulent concealment" and from when an 18 U.S.C. 1964(c) statute of limitations should run.

  a.  "We are unconvinced that for statute of limitations purposes a plaintiff's ignorance of his legal rights and his ignorance of the fact of his injury or its cause should receive identical treatment. That he has been injured in fact may be unknown or unknowable until the injury manifests itself; and the facts about causation may be in the control of the putative defendant, unavailable to the plaintiff or at least very difficult to obtain. The prospect is not so bleak for a plaintiff in possession of the critical facts that he has been hurt and who has inflicted the injury. He is no longer at the mercy of the latter. There are others who can tell him if he has been wronged, and he need only ask." *Rotella*, 528 U.S. 555-556 (2000)(quoting *United States v. Kubrick*, 444 U.S. 111, 122 (1979).

19. He need only ask, indeed. Plaintiff respectfully avers that upon review of this Complaint the Court determine what it believes asking would have yielded on these facts, what he was supposed to ask and assess the level of diligence Plaintiff engaged on his own and whether this Court reasonably believes he might have acted more swiftly.  This is not a case of Plaintiff not bringing suit due to ignorance of legal rights, it is a case of Plaintiff not bringing suit because any appreciable harm did not manifest until years later, nor would many of Plaintiff's claims regarding the fraudulent nature of some of the scenarios in question become evident until time and the conduct of others could be examined after Plaintiff walked away.

20. To the extent the Court disagrees with this assessment and believes Plaintiff should have known of appreciable injury sooner, Plaintiff nevertheless avers that the Supreme Court's rejection of a "last predicate act" rule cannot mean that in the event a Plaintiff declines or fails to file suit within four years of when he allegedly should have known of his injury but, through circumstances created by the enterprise itself, is unable to prevent additional, continuing and ongoing injury from elements within the same enterprise, under such circumstances the complained of conduct can simply continue forever—both unchecked and unpunished.

21. That is not the sort of concern that the "last predicate act" rule is meant to avoid—in most circumstances Plaintiff imagines this does not become a concern—Plaintiff imagines in most RICO patterns, once caught or complained of, the conduct would stop in order to avoid liability.  However, as here, where certain of the "operation and management" level actors have the reach and power behind them of massive financial interests and the federal reserve, the enterprise Plaintiff alleges continues to operate and act with merciless and shameless impunity.

22. And on these facts, where Plaintiff alleges the pattern, by its very nature, is not merely hard to see, but actually requires a timeline incompatible with a four year limitations period to see, principles of equitable tolling should be applied.

### PLAINTIFF'S STANDING AND 11 U.S.C. §§101 ET. SEQ.

23. Plaintiff files his Complaint while in an active Chapter 7 Bankruptcy case on grounds that, post-petition, the Sheff Defendants have forborne from reasonable action in pursuit of enterprise goals, CE1-CE6 (See Plaintiff's Exhibit A), JOHN OR JANE DOE CLIENTS 22, 26 &27, 32 & 33, and elements within Defendant Garrity's network and attorneys, agents and other professionals acting on their behalf have taken actions after the filing of Debtor's Petition for an Order of Relief docketed as 17-11609 with an effective date of filing of May 1, 2017 and, as agents, associates or persons acting in pursuit of enterprise goals, Plaintiff has standing to bring this suit on his own behalf with regard to averments as to post-petition conduct, in the interests of judicial economy, sets forth even those claims for which an argument could be made his standing has not revested, and to the extent the Trustee in that action expressed an intent to abandon all claims to the Debtor/Plaintiff, Plaintiff proceeds in advance of such abandonment becoming effective with portions of Plaintiff's claims continuing to be an asset of Plaintiff's Chapter 7 Bankruptcy Estate.

24. Pursuant to 11 U.S.C. §108, a Trustee in Bankruptcy is empowered to commence an action for which the statute of limitations had not expired under applicable non-bankruptcy law for two years after an Order for Relief.

25. The Chapter 7 Trustee filed a Report of No Distribution in the foregoing case on a non-business day, with an effective filing date of July 3, 2017.

26. On July 3, 2017, Debtor moved for an Order from the Bankruptcy Court pursuant to that Court's equitable and administrative powers under 11 U.S.C. §105 to empower the Debtor under §108 to stand in the Shoes of the Chapter 7 Trustee with the same extension of time provided to the Trustee due to the timing of the Trustee's Report of No Distribution in the interests of equity and the potential for additional procedural wrangling as regards the statutes of limitations concerns Plaintiff anticipates in this action. That Court has yet to rule on this issue.

27. The Bankruptcy Court is an Article I Court empowered to act as a unit of this Article III Court pursuant to 28 U.S.C. §151.

28. As such, Plaintiff avers this Court should exercise it's equitable powers and deem as timely filed, to any extent Plaintiff's request under 11 U.S.C. § 108 were subsequently denied and irrespective of the identity of the named Plaintiff, any allegation deemed to have accrued after May 1, 2013 for RICO purposes and after May 1, 2014 for tort purposes be deemed per se timely—such request not constituting waiver of any arguments as to principles of equitable tolling with regard to actions and injuries occurring before these dates.

## PROTECTION OF CERTAIN JOHN/JANE DOE CLIENTS AND THEIR STATUS AS POTENTIAL DEFENDANTS PURSUANT TO 11 U.S.C. §362

29. With regard to CE1, JOHN AND JANE DOE CLIENTS 1&2, 7, 10, 12&13, 14 & 15, 17, 20 & 21, 22, 35 & 36, 40, 41, 48 & 49, 50 & 51, 52, 53 & 54, and 55 a variety of potential issues exist with regard to the permissibility of claims against these persons implicating the timing of accrual as well as issues under 11 U.S.C. §362 and §727.

30. Plaintiff avers that all of these persons filed either Chapter 7 or Chapter 13 Bankruptcy and either previously received a discharge in Bankruptcy under 11 U.S.C. §727 or are currently in an open Chapter 13.

31. An inquiry must be made with respect to each set of persons as Plaintiff's allegations with regard to these potential Defendants are multifaceted:

   a. Several are in active Chapter 13s potentially under circumstances where Plaintiff alleges that both their prepetition and post-petition conduct supports a finding of civil liability, due to the standing concerns referenced above and the timing of injury discovery, Plaintiff has not intervened or sought to file a Proof of Claim or Motion for Relief from the Automatic Stay in any of the cases so implicated, and whether any of these persons are possessed of any source of recovery not an asset of their Bankruptcy estate is unknown.

   b. Several of these persons may have filed Chapter 7 Bankruptcy under pretenses where, though Plaintiff may have difficulty in a vacuum establishing malfeasance, when viewed through a backward looking lens as part of a pattern of complicit conduct, these persons have created liability for Plaintiff as a result of the mere existence of these docket numbers[10] or, at a minimum, the facts precipitating the petitions in question are probative of the existence of concerted action.

   c. Several persons having filed Chapter 7 Bankruptcy committed both prepetition and post-petition improper acts, with arguably only the prepetition acts implicating the discharge injunction granted by 11 U.S.C. §727.

32. In light of the foregoing, Plaintiff avers that to the extent Plaintiff makes reference to the conduct of these persons in this Complaint, he does so for continuity of the structure of his allegations.

---

[10] One might suggest that Plaintiff is contributing to this liability himself by raising this issue. Unfortunately, Plaintiff respectfully avers that the research required to bring this Complaint in a cogent manner leaves Plaintiff exploring areas of law, conflicts of law and arcane ethical obligations on topics which Plaintiff previously had only limited familiarity given his short time in practice and under the fraudulently manufactured circumstances described herein which suggest conflicts to which there exist no clear answers. In light of Plaintiff's allegations with regard to recent enterprise efforts to interfere with Plaintiff's ability to secure property or maintain an independent law practice on terms which would foster professionally responsible procedures, Plaintiff errs on the side of fulfilling federal statutory obligations in mitigation of his own damages in light of the damage already achieved.

33. Plaintiff asserts that, until Plaintiff and Defendants or prospective Defendants have had the opportunity to address issues of standing, privilege, and confidentiality, Plaintiff avers that any allegation regarding any person or entity made in this Complaint should not be construed as institution of an action in violation of any automatic stay or discharge injunction and that Plaintiff or a party with appropriate standing shall take appropriate steps to ensure compliance with the bankruptcy code in advance of service of summons upon any such Defendant and, irrespective of how framed, any assertion, averment, or allegation in this Complaint which appears to be the institution of action against any entity lawfully possessed of duly obtained protection from the bankruptcy code is, until further notice, merely informational based upon the averments in the foregoing paragraphs.

<u>PARTIES</u>

34. Plaintiff, Evan P. Lowney, is an individual residing at 234 Tripp St. # 2E, Fall River, MA 02724 who received a Massachusetts bar card on or about June 13, 2011.

35. Harmon Law Offices, P.C. is a Massachusetts professional corporation masquerading as a law firm purporting to specialize in real estate and foreclosure law whose "business" appears more akin to a federal reserve guard dog (or attack dog) and gangster protection money collections operation with a principal place of "business" at 150 California Street, Newton, MA

36. Adam D. Mazonson is an individual residing at 39 Ponkapoag Way, Canton, MA 02021.

37. Mazonson Law Offices, P.C. is a "Professional Corporation" specializing in a mix of legitimate real estate conveyancing, the practices described more fully herein, and what appears to be serial refinance closings on behalf of Defendant Patriot Mortgage Company, Inc. for overleveraged or complicit borrowers who participate in these transactions in exchange for "protection" from other "affinity groups" or, depending on the form of leverage, simply to prevent attack from the Mazonson Defendants and their associates whose last known principal place of business was 905 Turnpike Street, Canton, MA. The Mazonson Defendants accept the "Hyatt Legal Plans" as a form of payment.

38. Larry S. Mazonson is a principal of Patriot Mortgage Company, Inc. residing at 13769 Eastpointe Way, West Palm Beach, FL 33418.

39. Patriot Mortgage Company, Inc. is a storefront "mortgage company" that underwrites loans using warehouse lines of credit for immediate sale with a regular place of business at 4 Lowell Road #11, N. Reading, MA 01864.

40. Brian A. Joyce is an attorney and former state senator who, like several others of whom Plaintiff is aware, found himself the subject of media scrutiny or other misfortune in the years following his acquaintance with the Mazonson Defendants and an individual with a regular place of business at 776R Washington St. Canton, MA 02021.

41. Brian A. Joyce, Attorney-At-Law, P.C., is an entity of which Defendant Joyce is a principal with a regular place of business at 776R Washington St. Canton, MA 02021.

42. Joyce Law Group, LLC is an entity of which Defendant Joyce is a principal with a regular place of business at 776R Washington St. Canton, MA 02021.

43. Mark V. Cirignano is an individual with a regular place of business at 733 Turnpike St. Ste 304, North Andover, MA 01845.

44. Resilient Investments, LLC is an entity of which Mark V. Cirignano is a principal with a regular place of business at 733 Turnpike St. Ste. 304, North Andover, MA 01845.

45. Jared T. Zicher is an individual residing as 39 Mirimichi St., Plainville, MA 02762 who knowingly operates, associates and cooperates in permissive symbiosis with the "affinity groups" described herein.

46. David S. Flashenburg is an individual purporting to run a d/b/a "Law Offices of David S. Flashenburg" that is primarily a "processing facility" for "members" of the "Hyatt Legal Plans" to use the courts, court procedures and document drafting services to process "fake work" to generate bills and invoices and keep a fraudulent machine running and an individual residing at 2 Thoreau Drive in S. Easton, MA 02375.

47. Legal Edge Real Estate, Inc. is an entity purporting to be a real estate brokerage of which Defendant Flashenburg is a principal with a regular place of business at 905 Turnpike St., Canton, MA 02021.

48. Kevin B. Walters is an attorney with a regular place of business at 7 Cabot Place, Top Floor, Stoughton, MA 02072 who accepts "Hyatt Legal Plans" as a form of payment.

49. Walters Law Offices, P.C. is an entity of which Defendant Walters is a principal with a regular place of business at 7 Cabot Place, Top Floor, Stoughton, MA 02072.

50. Molly B. Miller is an individual purporting to be a real estate agent with a regular place of business at 273 Chauncy Street, Mansfield, MA 02048 who is a management level person in a parallel or competing arm of a similar leverage brokerage or "affinity group" as to that of the Mazonson Defendants, operating and managing persons on behalf of the same lenders and financial institutions as the Mazonson Defendants and existing in permissive symbiosis with the other "affinity groups" described herein.

51. Michael J. Garrity is an individual purporting to be a real estate agent who has or had a variety of different entities and business relationships, including those with Defendant Philbin and Defendant Zicher, some of which are included in Plaintiff's Exhibit A as, at least facially, presenting as "clients" of Plaintiff, with a regular place of business at 29 Farragut Rd.., South Boston, MA 02127.

52. Michael Philbin is an individual purporting to be a real estate agent who has an ongoing business relationship with Defendant Garrity, including entities referenced in Plaintiff's Exhibit A with a regular place of business at 29 Farragut Rd. South Boston, MA 02127.

53. MetLife Group, Inc. d/b/a "Hyatt Legal Plans" is a provider of "group insurance" to participating or "member" employees of various institutional employers that acts as a "feeder" of "cases" on behalf of "plan beneficiaries" or "members" who often present with disputes whose purpose and necessity are subject to question with a regular place of business at 200 Park Ave., New York, NY 10166 and doing substantial business in Massachusetts with a registered agent at CT Corporation System, 155 Federal St. Ste. 700, Boston, MA 02110.

54. Julius L. Sokol is an individual purporting to be a real estate agent with a regular place of business at 1 Curtis St., East Boston, MA who knowingly operates, associates and cooperates in permissive symbiosis with the "affinity groups" described herein.

55. Douglas K. Sheff is an individual with a regular place of business at 10 Tremont St., 7th Floor, Boston, MA 02108 who knowingly operates, associates and cooperates in permissive symbiosis with the "affinity groups" described herein.

56. Sheff Law Offices, P.C. d/b/a Sheff Law is an entity of which Douglas K. Sheff is a principal with a regular place of business at 10 Tremont St., 7th Floor, Boston, MA 02108.

57. Dragan M. Cetkovic is an individual residing at 8 Fieldstone Lane, Milton, MA 02186 who knowingly operates, associates and cooperates in permissive symbiosis with the "affinity groups" described herein.

58. Dragan M. Cetkovic, P.C. d/b/a Dragan & Associates is an entity of which Dragan M. Cetkovic is a principal with a regular place of business at 500 Granite Ave., Milton, MA 02186.

59. David F. Scimone is an individual with a regular place of business at 5 Commonwealth Road, Natick, MA 01760 who is a management level person in a parallel or competing arm of a similar leverage brokerage or "affinity group" as to that of the Mazonson Defendants, operating and managing persons on behalf of the same lenders and financial institutions as the Mazonson Defendants and existing in permissive symbiosis with the other "affinity groups" described herein.

60. Hornung & Scimone, P.C. is an entity in which David F. Scimone is a principal with a regular place of business at 5 Commonwealth Road, Natick, MA 01760.

61. Shavar K. Douglas is an individual residing at 43 Juliette St., Boston, MA 02124 who knowingly operates, associates and cooperates in permissive symbiosis with the "affinity groups" described herein.

62. Elizabeth Teves-Michael is an individual residing at 22 Karen Avenue, Tiverton, RI 02848 who knowingly operates, associates and cooperates in permissive symbiosis with the "affinity groups" described herein.

63. Smith & Brink, P.C. is a company which purports to be a law firm specializing in insurance defense litigation. Whether this entity is involved in any unmanufactured litigation, Plaintiff is unaware; in Plaintiff's experience and based upon factors discovered after his contract assignment with this entity ended "organically," this entity appears to be some form of corporate law holding tank—handing out paychecks and training half-lawyers on the nuts and bolts of corporate litigation in processing the same sort of fraudulent fact patterns of which Plaintiff complains at length herein, just on a larger scale, which, unbeknownst to him, Plaintiff avers made up large swathes of his practice. Plaintiff takes no position on the permissibility of the foregoing averment generally, to the extent that there was an actual controversy to be litigated, Plaintiff names this entity as a Defendant because he avers that his treatment by this entity, when viewed through the lens of the pattern, constituted harassment and involved efforts that, absent Plaintiff's diligence, included efforts to discredit Plaintiff by engendering working conditions designed to make Plaintiff either feel crazy or appear incompetent.

64. Plaintiff's requests with regard to treatment of identity and service as regards JOHN AND JANE DOE CLIENTS AND ENTITIES RELATED TO OTHERWISE CONFIDENTIAL INFORMATION are set forth more fully in the supplementary materials filed simultaneously with this Complaint.

## FACTS

65. Enclosed herewith as Exhibit A and accompanied by Plaintiff's Ex Parte Motion to File Impounded Supplemental Case Opening Materials is, in effect, a description of facts pertaining to a set of persons and entities to whom Plaintiff is comfortable he could withstand an assault sounding in a breach of privilege and or confidentiality which Plaintiff suggests he can use to demonstrate the allegation that on the facts herein alleged, traditional concepts of evidentiary privilege or duties of confidentiality arising out of professional responsibility canons do not apply.

66. Plaintiff contends that this is the case not because Plaintiff has some unsavory "client" secrets that he would prefer not to keep, but instead because the very existence of the matters in question and the factual underpinnings giving rise to these "representations" appear to be wholly fraudulent, thus calling into question whether these persons are "clients" at all.

67. Plaintiff directs the Court's attention to the factual allegations contained in Plaintiff's Motion and Exhibit A and incorporates by reference the materials sought for consideration under seal as though fully set forth herein.

## COUNT I
### 18 U.S.C. §1964(c)

68. For a Plaintiff to state a claim under 18 U.S.C. §1962(c), a Plaintiff must allege (1) conduct, (2) of an enterprise, (3) through a pattern, (4) of racketeering activity. *Sedima, S.P.R.L. v. Imrex Co., Inc., et. al.*, 473 U.S. 479 (1985). A private right of action under 18 U.S.C. 1964(c) is available to "[a]ny person injured in his business or property by reason of a violation" of RICO's substantive restrictions provided that the alleged violation was the proximate cause of the injury. *Anza v. Ideal Steel Supply Corp.* 547 U.S. 451, 457 (2006)(*quoting* 18 U.S.C. 1964(c)(as amended)(*other internal citations omitted*.).

69. An enterprise for purposes of liability under §1962(c) is "'a group of persons associated together for a common purpose of engaging in a course of conduct,' the existence of which is proven 'by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit.'" *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d. 159, 173 (2nd Cir.2004)(quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)).

70. It is established that RICO liability alleging an association in fact enterprise between large corporations and local networks of persons and entities engaged in organized crime can lie. *RJR Nabisco, Inc. v. The European Community*, 579 U.S. ____, (15-138, June 20, 2016).

71. Racketeering activity is defined by statute as, *inter alia*, "any act or threat involving . . . murder . . . robbery, bribery, extortion, . . ., which is chargeable under State law and punishable by imprisonment for more than one year" as well as a variety of statutorily defined federal criminal offenses as set forth at length in 18 U.S.C. §1961(1). There is no express requirement for either a prior criminal conviction or that a 1964(c) Plaintiff establish a Defendant's culpability for a RICO predicate offense beyond a reasonable doubt for a civil action reliant upon such predicate acts to succeed. *Sedima,* 273 U.S. at 485, *supra*.

72. 18 U.S.C. §1956 defines the laundering of monetary instruments as, among other things, conducting or attempting to conduct a financial transaction knowing that the property involved in such transaction represents the proceeds of some form of unlawful activity which in fact involves the proceeds of specified unlawful activity with the intent to promote the carrying on of specified unlawful activity or knowing that the transaction is designed in whole or in part to either conceal or disguise the nature, the location, the source, the ownership, the control of the proceeds of the specified unlawful activity, or to avoid a transaction reporting requirement under State or Federal law.

73. 18 U.S.C. §1960 defines criminal liability for an unlicensed money transmitting business as knowingly conducting, managing, supervising, or owning all or part of an entity which affects interstate commerce in any manner or degree that (A) is operated without the appropriate license, (B) fails to comply with the requirements of 31 U.S.C. §5330, and

(C) transmits funds known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity.

74. Enterprise crime under Massachusetts state law, though requiring three (3) instead of merely two (2) instances of criminal enterprise activity and only allowing for five (5) years between predicate acts to establish a pattern, articulates potential criminal liability for a list of offenses not expressly contemplated by 18 U.S.C. §1961 *et. seq.* including, *inter alia*, any felony offense under G.L. c. 271; . . . assault, stalking, criminal harassment, commission of a felony for hire, violation of constitutional rights under G.L. c. 265 §37, breaking and entering and larceny by false pretenses and attaches a penalty for violations of up to fifteen (15) years' incarceration. See Mass. Gen. Laws c. 271A §§1 *et. seq*. The definition specifically articulates which crimes require felony status and with regard to the balance, mere commission or attempt at commission is sufficient, irrespective of the punishment attendant thereto. To wit, some of the offenses just listed would not, on their own, be punishable by more than one year of incarceration or necessarily involve an act or threat involving the articulated categories of State law violations contemplated by 18 U.S.C. §1961.

75. When read in conjunction with 18 U.S.C. § 1961, however, Plaintiff avers that should a Plaintiff be able to establish by a preponderance of the evidence that any of the Defendants named herein have engaged in a pattern of at least three instances of conduct *chargeable* as criminal enterprise activity under M.G.L. c. 271A *and* that such pattern involved at least one act or threat involving murder, robbery, bribery or extortion, even if such conduct may not otherwise rise to the level of federally indictable under 18 U.S.C. §201 or 18 U.S.C. §1951 (e.g., a Plaintiff demonstrates acts and/or threats *chargeable* under G.L. c. 271 § 39(a-b) relating to bribes, gifts and coercive threats, but issues of fact might remain as whether a "public official" is implicated as to 18 U.S.C. §201 or a Plaintiff demonstrates acts *chargeable* under G.L. c. 265 § 25 as attempted extortion under State law but arguably could be deemed merely "coercive" under the Hobbs Act, *see generally Scheidler v. National Organization for Women*, 537 U.S. 393 (2003)), and that such pattern of three instances of conduct is found to have occurred within ten (10) years of at least one other instance of racketeering activity under 18 U.S.C. 1961, whether that be a free standing federally indictable predicate act, a contemplated free standing chargeable State law offense, or another G.L. c. 271A chargeable pattern, such a Plaintiff would be empowered to recover treble damages and attorneys' fees for damages arising from acts which, taken alone, may not rise to a level of seriousness to even be contemplated as "racketeering activity" under 18 U.S.C. §1961, but as part of a pattern of enterprise crime chargeable as a violation of G.L. c. 271A, such chargeable pattern including at least one instance of conduct which would be considered an instance of "racketeering activity" under the first clause of 18 U.S.C. §1961(1), and such chargeable State law pattern were viewed as a single instance of "racketeering activity" in a larger pattern under the federal statute, liability for the damages naturally flowing from all of the chargeable acts of enterprise crime under G.L. c. 271A would be recoverable under §1964(c) provided the other list of prerequisites for liability articulated in *Sedima* were established to exist.

76. A conspiracy to violate constitutional rights under G.L. c. 265 § 37 is an enumerated offense under G.L. c. 271A.

77. G.L. c. 265 § 37 proscribes the use of "force or threat of force [to] willfully injure intimidate or interfere with, or attempt to interfere with, or attempt to injure, intimidate or interfere with, or oppress or threaten any other person in the free exercise or enjoyment of any right or privilege secured to him by the constitution or laws of the commonwealth or by the constitution or laws of the United States".

78. And to be clear, Plaintiff's Complaint is, by and large, one of statistical significance employing a civil standard.  With regard to many of the allegations of "racketeering" that involve financial crimes in furtherance of unlawful goals, Plaintiff alleges both that Defendants in this action have gone to great lengths to create a record of correspondence and documentary support which would seek to impute knowledge to Plaintiff as a complicit co-conspirator which he never had and, with regard to many of these allegations, still does not have, but for factual circumstances having ventured so far beyond the limits of rational behavior that many seemingly innocuous or unfortunate events must now be viewed through a backward looking lens implicating concerted action.

THE ENTERPRISE[11]

79. Plaintiff alleges an association in fact enterprise consisting of small local networks which operate in a manner akin to a manner in which organized crime operates symbiotically existing and appearing to the outside world to be legitimate real estate professionals, lawyers and those involved in real estate investment and rehabilitation, behaving in a largely cooperative manner and all working with the same large corporate interests, in this case the Hyatt Legal Plans and several large financial services firms and mortgage servicers identified by reference in Plaintiff's Exhibit A essentially making up one large association-in-fact enterprise for the common purposes of the employment of "covered persons" in the manufacture of closed system fact patterns that are akin to "prize money cases" and used for the purpose of transmitting what would otherwise be bank fraud or insurance fraud as "payoffs" in exchange for "handling problems," i.e. either, if not outright pretending, representing a borrower, a tenant or a debtor on behalf of a Hyatt

---

[11] With regard to any alternative formulation of civil liability under 18 U.S.C. §1964(c), a majority of operation and management level enterprise participants, if not travel, certainly use the mail and interstate facilities to affect interstate commerce and, in light of the nature of all formulations of enterprise liability contemplated, a majority of named Defendants conspired to do so.  As this Complaint is already extraordinarily lengthy in simply setting forth the predicate acts constituting unlawful activity, Plaintiff declines to make this Complaint longer by bundling subsets of predicate acts or duplicative identification of conspiratorial conduct and simply makes the blanket allegation that to the extent the facts described, if established, also constitute an ongoing and repetitive pattern of violations of 18 U.S.C. §§1952(a) and 1962(d), Plaintiff so alleges.  Further, as a review of certain case law suggests that the sort of property interest obtained or sought to be obtained is somewhat narrowly defined to make out a showing of an indictable violation of 18 U.S.C. §1951, Plaintiff sets forth those state law predicate acts and federal statutory provisions involving threats or coercion Plaintiff believes are more soundly implicated.  Similarly to Plaintiff's averments with regard to 18 U.S.C. §§1952 and 1962, to the extent the Court finds that reformation of the pleadings to the facts established would make out allegations of violations of 18 U.S.C. § 1951, Plaintiff likewise so alleges.

insured or a person who has been given a loan or an apartment they probably should not have been given (due to affiliation with the "group") while really working to "drop the hammer" on adult children who have decided they're just not going to pay any bills, child support, etc. and/or who someone, either these persons had previously been "made" by one of these "affinity groups" and some higher up has now identified them as attracting attention or a lender or corporate interest has become too displeased by their default, to assist in long work for short money in remedying the situation, all while treading an extremely fine ethical line.

80. To the extent that one would suggest, well, couldn't it be said that this is simply how the system works as opposed to an illicit enterprise—after all the common purpose alleged could lend itself to a finding that the maintenance of order and preservation of income streams is such common purpose?  And to the extent that these scenarios were arising organically or ethical lines not being crossed[12] perhaps such a finding might be well supported.

81. That is not what is happening.  As set forth elsewhere herein, irrespective of the sideways methods of communication being employed, or the use of "grapevining" of information with the goal of associates all having limited knowledge of the larger picture, as evidenced by Plaintiff's experiences in either attempting to extricate himself from these matters or simply generate new work from sources ostensibly unaffiliated with former associates, this enterprise undoubtedly functions as a continuing unit, especially in furtherance of maintaining compliant cooperation from anyone who "knows too much."

82. While Plaintiff acknowledges that, in a vacuum, it may appear that Plaintiff is alleging people have gone to preposterous lengths in an assault on someone who, in the grand scheme of things, is really a nobody—a bankrupt street lawyer from one of this state's lowest income areas and, under a less unique set of circumstances, one might find such an argument compelling.

---

[12] Perhaps more aptly, presented with a fact pattern and "client" where one is already going to be standing with their toes flush against any ethical line as a matter of course, having this person's lies and omissions, the referral source, aggrieved parties and the client's own insurer and network all working behind the scenes to yank one across the line for purposes of leverage, the purpose and implementation of which has numerous indicia of certain individuals taking the position that such leverage or ownership rights have been bought and paid for, well that would raise serious questions under 18 U.S.C. §§1581-1592 and, to the extent that the individual attempting to stay on the correct side of the line is being paid for services believed to be undertaken in good faith towards a good faith result, where due to the closed nature of a fact pattern making the desired result simply a foregone conclusion just as long as everyone puts on a passably palatable show of going through the motions, Plaintiff avers that were the professionals involved in such a transaction completely cognizant of such a state of affairs, to continue participation in such a scenario would be violative of 18 U.S.C. §1956, to the extent these transactions serve a purpose of getting illicit funds or funds which someone prefers to be hidden from one party to another, could be violative of 18 U.S.C. 1960, and to the extent continued participation by a particular individual or entity would helpful to the architects of such a fraudulent artifice, as set forth more fully herein, to the extent the coercive techniques described in the balance of this Complaint are employed to garner continued participation, if that isn't racketeering activity, then the statute would be completely gutted—the RICO statute was drafted at a time before certain technological advancements involving the speed, availability, price, volume and chosen medium for the almost instantaneous wireless transmission of vast quantities of information.  At some point, the methods available for employment by robbers evolve to keep pace with the cops, and vice versa.

83. However, Plaintiff has stumbled on some facts upon which he was not meant to stumble, facts which pose a threat to narratives constructed and monetary expectations flowing therefrom that Plaintiff suspects certain enterprise associates and managers have made great personal sacrifice in pursuit of, thus raising stakes on a microeconomic scale for certain named Defendants and, of certain other states of affairs Plaintiff seeks to establish very publicly by this Complaint, well simply because others become sick of the harassment, find ways to work within a corrupt master-slave system once these "affinity groups" arbitrarily decide you "owe them," or otherwise, what Plaintiff is alleging on the macroeconomic scale threatens more than individual livelihoods, it has the tendency to publicly shed light on certain aspects of the mortgage banking and lending industry that allow a public look behind the curtain of some of the methods which were employed and the sorts of deals that necessarily had to have been struck in pursuit of disposal or purported rehabilitation and default servicing of what would traditionally be bad debt, mainly in the residential mortgage lending and servicing industry, but also with regard to debt generally in the wake of the 2008 crash.

84. Pursuant to Fed. R. Civ. Proc. 8(d)(3), Plaintiff also avers an alternative enterprise formulation as follows, without limitation to expand upon this list: CE 11, CE 12, CE 13, CE 10, Defendant Garrity[13] and the Mazonson Defendants[14] improperly incentivizing certain customers, Defendant Flashenburg, JOHN OR JANE DOE CLIENTS 17 and 23, Undisclosed Supervisor 1, Undisclosed Supervisor 2, Undisclosed Supervisor 3[15],

---

[13] Plaintiff avers that, upon information and belief, Defendant Garrity has an arrangement with CE 12 for an option to purchase or invest in commercial paper at a fraction of the outstanding liability on defaulted residential notes. Plaintiff came upon this information in the context of Defendant Garrity offering Plaintiff an investment opportunity of his own, not in any capacity as counsel to Defendant Garrity.

[14] Plaintiff avers that the Mazonson Defendants use their Massachusetts contacts and network as a de facto default servicing arm of CE 11 and CE 13 in Massachusetts, posing as impartial borrower representatives while going far beyond the professional courtesies and collegial attitude with lender representatives that would fall within reasonable bounds for mere maintenance of business relations and professionalism, effectively cleaning up problems and servicing "special loans" on these lenders' behalf. As such, whether Defendant Adam Mazonson specifically should fall on the side of the inducer or the induced respecting CE 11 and CE 13, as with regard to certain of the specific predicate acts, he committed several himself, is somewhat irrelevant to this alternative formulation as he is certainly culpable as an operation and management level individual either way.

[15] To the extent all of the conduct complained of with regard to what Plaintiff avers are individuals acting as agents of their mortgage servicer or other enterprise elements while ostensibly purporting to act simply in the course of their employ, while there are theories of culpability to which liability would attach, the purpose of this Complaint is not to unnecessarily get people fired from jobs or thrown out of houses, but to protect Plaintiff while holding responsible the most powerful and well-funded management level operatives and entities. As such, Plaintiff names three supervisory employees as agents in this action under the pseudonyms "Undisclosed Supervisor 1," "Undisclosed Supervisor 2," and "Undisclosed Supervisor 3," to do what Plaintiff can in this regard without prejudicing the viability of this necessary action. To the extent that the conduct of Undisclosed Supervisor 3 occurred wholly in Rhode Island by a Rhode Island resident and, therefore, Plaintiff's formulation of RICO liability based upon a pattern of chargeable offenses of G.L. c. 271A's more expansive definition of enterprise crime would not apply to Undisclosed Supervisor 3 based upon this alternative formulation of the enterprise, the common purpose alleged is to unlawfully coerce Plaintiff's continued and silent "play acting" and "servicing" of the "special loans" and thereby inducing his complicity in matters from which he had or soon would attempt to extricate himself and thwarting his efforts to simply make a clean break from individuals and entities to whom, as set forth more fully herein, he owes or owed nothing beyond, to the extent any one of these individuals or entities could convince the Court their matter is not a complete and utter fraud, the smooth transition to successor counsel, or in the more likely event that they cannot, the opportunity to retrieve any property from Plaintiff. Therefore, with reference to JOHN

Defendant Teves-Michael, and JOHN AND JANE DOE CLIENTS 12 & 13, to engage in
gross fraud or cheat at common law, criminal harassment, conduct indictable under 18
U.S. C. § 1503, conduct chargeable under G.L. c. 265 §25, conduct chargeable under
G.L. c. 265 §37, conduct chargeable under G.L. c. 271 §39, assault, malicious destruction
of property, conduct indictable under 18 U.S.C. § 1512, generally, and §1512(b)(2)(B),
specifically, and that these actions were undertaken for the common purpose of harassing
and intimidating Plaintiff into behaving in ways which would destroy his credibility,
manufacturing falsified evidence of Plaintiff's discredit, and to constructively force[16]

---

OR JANE DOE CLIENT 10, Plaintiff avers that Undisclosed Supervisor 3's actions in agency for CE 11 or
incentivized by CE 11, CE 11 being the Trustee of the Securitized Trust purportedly holding under JOHN OR JANE
DOE CLIENT 10's purported mortgage, the actions of Undisclosed Supervisor 3 to influence Plaintiff's behavior in
any such manner would constitute an effort to influence the discharge of Plaintiff's official duties as an officer of the
United States Bankruptcy Court for the District of Massachusetts and thereby constitute a violation of 18 U.S.C. §
1503. Additionally, R.I. Gen. L. § 7-15-1 defines racketeering activity to include any threat involving larceny. It is
an issue of law for the Court to determine whether Undisclosed Supervisor 3's alleged coercive attempts to frame
Plaintiff for larceny fall within this definition. Plaintiff also declines to name these individuals as Defendants
subject to enterprise liability as they will simply argue they were just acting at the suggestion of an operation and
management level individual on behalf of CE 11 or CE 12 and this is likely true. Plaintiff can produce documentary
evidence of his experience being supervised by each of these individuals sufficient to avoid the necessity of
lengthening an already lengthy service list.

[16] It is here where the truly duplicitous, criminal and fraudulently self-serving representations and "assistance"
provided by the Mazonson Defendants becomes extremely pronounced. With reference to the facts set forth in the
opening section regarding statutes of limitations and the footnotes thereto, Plaintiff entered the spring of 2015
believing 1) Defendant Mazonson had some grounds to take the position that Plaintiff had caused injury to his
professional reputation and earning capacity due to untimely or sloppy work product *in legitimate legal work*; 2) a
contributing factor in the sense of urgency with regard to the foregoing was Plaintiff's behavior in his dealings with
"the jews"; 3) That, though there was a mystical element (whether one describes this as some form of divine
universal mathematics, the occult, something extraterrestrial, or mere karma—as far as Plaintiff can tell, all of these
explanations are fairy tales and what is or was actually transpiring, e.g. every case in which Plaintiff ever left a loose
end, whether big or small, irrespective of necessity, made a mistake, known or unknown, real or manufactured ex
post facto, or fell behind, being brought to Plaintiff's attention all at once is tied to how Americans have unwittingly
permitted our monetary system to work, i.e. by securitizing human capital, debt and the promise of future labor, and
those tiny percentage of individuals who actually control the money puppeteering crises to ensure some resolution
and enforcement of debt contracts,) "the jews" (this is Defendant Mazonson's preferred explanation, not Plaintiff's)
had the connections, the network and the power to grant reprieve from this sort of thing happening (as opposed to
there being numerous such networks of "made" individuals or "affinity groups" who, though at times in conflict, all
would symbiotically work towards the ruin of outsiders and grant "protection" to those deemed useful, friendly, or
worthy of admittance); 4) if Plaintiff simply brought his practice up to certain standards while being respectful to
"the jews," he would eventually be able to move on with his life provided he dispensed with a certain brand of
mortgage litigation on behalf of a certain type of individual (Plaintiff alleges that the Mazonson Defendants were
fully aware of certain individuals within their network posing as real "clients" of Plaintiff who Plaintiff would
necessarily categorize as the sort of "problem" to which Defendants were referring who were actually "made"
individuals with "special loans" who, should Plaintiff decline additional assistance, would be permitted to attempt to
destroy Plaintiff's reputation with impunity and nevertheless encouraged a sizing down of Plaintiff's operations and
the employment of non-objective criteria in so proceeding); and, most destructively, that Plaintiff and the Mazonson
Defendants' interests were aligned in favor of Plaintiff succeeding in this endeavor, that though Defendant Adam
Mazonson was angry, willing to make threats, and placed in what he was communicating was a difficult position for
him due to Plaintiff's conduct (and while this is facially true, i.e. had Plaintiff, with the benefit of hindsight, made a
few different choices with regard to how he handled a few specific individuals, who knows what would have
happened—perhaps he'd be blindly going about his business operating a law practice that various criminal elements
were using as a money laundering processing facility and providing signatures and notary stamps on shadow
contracts for the purchase and sale of human capital—it is not true that Plaintiff's choices had affected Defendant
Mazonson due to his conduct in transacting legitimate legal work that can lawfully be performed,) to the extent the

Plaintiff's participation in and maintenance in the narratives of the fraudulent "special loan" cases of, *inter alia*, JOHN AND JANE DOE CLIENTS 1 & 2, JOHN AND JANE DOE CLIENTS 3 & 4, JOHN AND JANE DOE CLIENTS 5 & 6, JOHN OR JANE DOE CLIENT 7, JOHN OR JANE DOE CLIENT 10, JOHN AND JANE DOE CLIENTS 18 & 19, and JOHN AND JANE DOE CLIENTS 24 & 25 in closed system transactions on behalf of complicit actors wherein, though he was not aware of it until he actually attempted to do so, and with regard to certain of the better actors in the foregoing class, realized certain indicia of fraud much later than with others, in a manner where the ultimate common purpose was specifically to manufacture either a reality or at least the appearance that, as a complicit co-conspirator, Plaintiff would be barred from recovery in an action such as this.

85. Plaintiff makes lengthy and what may, at first blush, appear to be somewhat incredible allegations in the footnote in the foregoing paragraph as regards Plaintiff being "forced" to act. In *Headley v. Church of Scientology, Int'l*, the Headleys asserted claims under the Trafficking Victims Protection Act, portions of which are codified at 18 U.S.C. § 1589 and included allegations that the Church had committed acts indictable for "knowingly provid[ing] or obtain[ing] the labor or services" of another by "means of force, threats of force, physical restraint, or threats of physical restraint"; "means . . . or threats of serious harm"; or "means of any scheme, plan, or pattern intended to cause the person to believe that . . . that person or another person would suffer serious harm or physical restraint." The TVPA defines "serious harm" broadly to include psychological harm. The Headleys essentially alleged that the Church engaged in a pattern of behavior that convinced them that they could not leave and that, if they did, they would be subject to

---

Mazonson Defendants had brought into Plaintiff's practice excessive unpaid or underpaid work or matters which were not appropriate to Plaintiff's level of experience, Defendant Mazonson wished to provide support in "cleaning up the mess," make restitution in the form of business generation upon which he would seek no compensation, and generally assist Plaintiff in responsibly winding up affairs between the two men. What the Mazonson Defendants did with Plaintiff's reaction to these averments is, quite simply, filthy—Defendant Mazonson used this initial period of Plaintiff confusion to attempt to create a paper trail of representations regarding his lack of knowledge of the law of Bankruptcy and foreclosure (Defendant Mazonson is, in point of fact, a brilliant man with a deep well of knowledge in both areas,) attempt to effect another shadow "sale" of Plaintiff's practice to the Scimone "affinity group," the success of which would have resulted in a success in ensuring Plaintiff's silence in light of the nature of the "work" which would flow therefrom, and, as far as "restitution," see the section entitled "Post-Separation Mazonson 'Referrals'" for what these cases turned out to be, and, finally, though Plaintiff cannot pinpoint when this occurred, Defendant Adam Mazonson (or someone acting on his behalf regarding digital maintenance services) destroyed evidence in the form of email correspondence housed on his cloud-based email server—and when Plaintiff says destroyed evidence, he does not mean merely deleted email, Plaintiff herein avers that email in Plaintiff's mazonsonlaw.com account has been manipulated at the level of the metadata—emails continuing to exist with attachments destroyed, emails continuing to exist with emails in the chain of correspondence missing from within the bodies of the emails, things which Plaintiff is wholly without the technical knowledge to have done on his own. This is a clear violation of 18 U.S.C. §1512 and implicates certain state law concepts as regards larceny—to the extent Defendant Mazonson would refute the second characterization as the destruction or theft of his own property, whether this would be well-supported is an issue of fact. In sum, the Mazonson Defendants grossly misled Plaintiff in order to protect their criminal enterprise, attempted to manufacture Plaintiff complicity in matters which he did not understand and then use new "clients" to attempt to either hammer the final nail into the coffin of Plaintiff's career or create circumstances where Plaintiff's only option to maintain a career in the future would be to engage in fraudulent slave labor for Defendant Flashenburg until the "heat was off" and Defendant Mazonson could find an "affinity group" where Plaintiff "fit in" to sell him to.

physical and emotional abuse and injury. *Headley v. Church of Scientology, Intl.*, 687 F.3d. 1173 (9th Cir. 2012).

86. The Headleys were denied relief on grounds of ministerial exception and, in light of the ostensibly religious nature of the organization and the vows taken by them, because they had entered Scientology's Sea Org with open eyes, having given informed consent to the treatment of which they later complained. And while the Headleys' allegations of their working conditions were far more restrictive than that of which Plaintiff complains, the threats, being ongoing, pervasive, and extending far beyond the reach of that which should have been achievable, has created circumstances of psychological abuse that are extremely similar.

87. And as regards the statutes of limitations questions and §1589, clearly Plaintiff only discovered his injury specifically because he thought he could get way from these people, an effort which has been thwarted time and time again. The only way out, it appears, is to engage in criminal conduct on the theory that, as these "affinity groups" appear to be operating above the law and with the blessing of the federal reserve system, Plaintiff will be fine on some sort of dystopian "if everybody else is doing it, it must be alright" theory of conducting one's affairs. And by "engage in criminal conduct," Plaintiff means to backpedal and keep "working on" the fraudulent "special loan" cases of JOHN AND JANE DOE CLIENTS 1 & 2, JOHN AND JANE DOE CLIENTS 5 & 6, JOHN OR JANE DOE CLIENT 7, JOHN OR JANE DOE CLIENT 10, JOHN AND JANE DOE CLIENTS 18 & 19, and JOHN AND JANE DOE CLIENTS 24 & 25 while taking on some "new softball" fraudulent matters that these groups can use to "pay off" Plaintiff in exchange for his silence and skill set for simply a little while longer (the rest of his life?) so that he does not file a lawsuit such as this.

88. As set forth more fully below, and again while this list is not exhaustive, Plaintiff avers that one of the motivations underpinning the foregoing goal as simple as: these cases were manufactured by others, essentially for processing, essentially with the understanding that they would be seen through as "win-win" propositions wherein theoretically the lender realizes at least clarity with regard to a particular asset, the "client" obtains some form of closure, presumably with some measure of remediation, opposing counsel or foreclosure counsel makes a few dollars and perhaps gains some experience, Plaintiff makes a few dollars and gains some experience, law gets made, Courts keep functioning, etc. Plaintiff trusts the Court understands both the ethical and statutory concerns raised on facts where, due to the totality of the circumstances described herein, when Plaintiff simply stopped playing his role, so did everyone else, including the lender and lender's representatives, or, alternatively, after purportedly seeking foreclosure for the better part of a decade, lender or lender's representatives continue to make incredible errors. Returning to such fact patterns under circumstance wherein Plaintiff will attempt to demonstrate that his "clients" will not be able to provide compelling explanations for their own behavior raises serious statutory and ethical challenges.

THE PATTERNS

89. Plaintiff hereby avers four (4) distinct patterns of criminal racketeering activity undertaken by the enterprises alleged, though there is some overlap in categorizing these patterns:

90. Pattern A: Fraud in initial cases pattern[17] – the illicit Mazonson Brokerage/Title Insurance Company and the "Patients Zero"

91. Plaintiff asserts that, unbeknownst to him, Defendant Adam D. Mazonson acting as agent for or in concert with Larry S. Mazonson, by and through Patriot Mortgage Company, Inc., one defunct entity, Joyce & Mazonson, LLC, a dba entity called MazonsonLaw and his current entity Mazonson Law Offices, P.C. (hereinafter the "Mazonson Defendants") have, since as early as May 2009, been acting as what Plaintiff can best describe as some sort of hybrid between "talent agent," "owner," "insurer," and "warden" for Plaintiff and has been "selling" or "renting out" Plaintiff's labor to persons or entities with whom he could strike a mutually beneficial deal (including persons with whom it was well known to the Mazonson Defendants Plaintiff viewed as a professional liability concern and for whom Plaintiff had to take pains to veil Plaintiff's well-earned contempt) and that since 2009 each time one of these "transfers" occurred, one of the very first cases or assignments he receives from a new group or contact is what can best be described as an "insurance policy case" and that while the Mazonson Defendants[18] are purportedly helping to assist Plaintiff's professional development and build their legitimate business (whilst in point of fact, they are using "made" persons having loans mainly serviced or

_____

[17] Plaintiff acknowledges that stand alone fraud is not a predicate act giving rise to liability under §1964(c), Plaintiff avers that in the sections which follow that this first pattern implicates violations of 18 U.S.C. §§1956 and 1960 as well as implicating 18 U.S.C.§ 1589 and G.L. c. 271A. And irrespective of the patterns, Plaintiff avers that the conditions and forms of subtle yet terrifying coercion described by the totality of this Complaint are extremely similar to the forced labor and human trafficking concerns described in *Headley v. Church of Scientology, Intl.*, 687 F.3d. 1173 (9th Cir. 2012) without any of the religious exemptions or informed consent upon which that Court relied in denying relief.  What Plaintiff alleges here is that he has been placed in an "invisible box" by individuals who, without repercussion or remorse, follow Plaintiff around, interfere with employment opportunities outside of these illicit networks, are communicating otherwise privileged information amongst themselves while declining to admit such communication is transpiring and garnering Plaintiff's silence under the auspices of a fake attorney-client relationship in cases that are nonsensical manufactured constructs for the purposes of transmitting illicit funds, telling anecdotal stories about "accidents" and "tragedies" which have befallen acquaintances that are pointedly directed at Plaintiff, tampering with Plaintiff's automobile in very dangerous manners, attempting to "bait" Plaintiff into acts of physical aggression, and, in certain instances where Plaintiff has succeeded in getting one of these fraudsters to "jump" and "break character," Plaintiff has been overtly threatened on several isolated occasions.
[18] Though it is, like many of Plaintiff's allegations, a matter of circumstantial evidence and statistical unlikelihood, it is worth noting that one necessary element to the efficient operation of these enterprises is the "grapevining" of information in a fashion where the goal is that no individual operative/agent/employee is possessed of enough information to allow liability to climb the chain of command any higher than that individual's level of knowledge predicated upon the theory that if no order is ever expressly given, it was the particular operative/agent/employee's own "personal choice" to have behaved in a fraudulent, oddly negligent, or anomalous manner that just so happened to benefit enterprise goals.  Nevertheless, Plaintiff avers that the information does get communicated and orders followed and, while this is simply one more piece in the puzzle, the mad scramble to get record title to service addresses and attachable assets out of the names of management level principals that has been transpiring in 2017 is particularly notable.  It is truly astonishing how asset poor some individuals manage to keep themselves in the face of the sheer volume of transactions containing their fingerprints.

affiliated with several institutions disclosed in Plaintiff's Exhibit A to keep Plaintiff on an invisible leash, with these "made" persons engaging in behavior that, with the benefit of hindsight, made little sense and were the actions of persons acting under operation and management of a racketeering enterprise,) and also unbeknownst to Plaintiff, Harmon Law Offices, P.C. has all the while been trying to "foreclose" upon Plaintiff's career through similar unlawful means, i.e., the use of Plaintiff's "clients" against him.

92. These persons and entities who Plaintiff describes as "clients," Plaintiff avers are not, in any traditional sense of the word, "clients," insofar as Plaintiff would analogize their conduct to that of the permissible separation of mortgage and note under Massachusetts title theory, the behavior of the persons in question, through the backward looking lens referred to above, tends to illustrate a separation of their natural person and their legal person, with a particular entity having surrendered their legal person to management by one of the "affinity groups" in question.

93. With regard to several of the articulated patterns set forth in what follows, irrespective of whether there is any body of law under which one can contract in this manner, i.e. to grant a constructive power of attorney to an association-in-fact enterprise while pretending to be acting of one's own volition, a case-by-case assessment of this practice and the problems it causes when one involves regulated institutions and regulated professions has resulted in the commission of crime and massive civil damages flowing therefrom.

94. By way of example, Plaintiff alleges that the manner in which the default servicing of certain loans by borrowers JOHN AND JANE DOE CLIENTS 26 & 27, JOHN AND JANE DOE CLIENTS 28 & 29, JOHN AND JANE DOE CLIENTS 1&2, JOHN AND JANE DOE CLIENTS 24 & 25, JOHN AND JANE DOE CLIENTS 12 & 13, and JOHN AND JANE DOE CLIENTS 30 & 31, after any time at which Plaintiff was actively involved in the "assistance[19]" of any of these persons, is suggestive that something akin to these persons having given a constructive "shadow mortgage" to a particular "affinity group" involved in the processing of such default servicing in exchange for this use of their legal person, i.e. the words coming out of their natural person's mouth and certain actions their natural person appears to "choose" to take.

95. To wit, Plaintiff alleges that with regard to the persons referenced in the foregoing paragraph, the only "consideration" anyone seems to have received in exchange for these persons either continuing to occupy, or occupying long past any point where there was any rational explanation therefor, a home encumbered by a mortgage or mortgages with respect to which, upon information and belief and with limited and nominal exceptions, they have not made a payment any entity claiming a right to a beneficial interest in such payments in four, five, six, sometimes seven years, and in at least one instance, over a decade, is any monies which were paid to Plaintiff, monies which run the gamut from

---

[19] It is Plaintiff's contention that, necessarily, this state of affairs must have existed at some point, indeed likely the entirety of Plaintiff's acquaintance with these individuals, but where Plaintiff worked the hours and believed he was engaged in legitimate assistance, Plaintiff cannot reasonably be found liable for a fraudulent state of affairs of which he had no awareness.

under a thousand dollars to, in a few instances, tens of thousands of dollars (throughout the course of several years and where the amounts which would have been owed to any lender during this time would have been on the order of hundreds of thousands of dollars, and in at least one instance, the better part of a million dollars). Plaintiff avers that this is because the actual "consideration" was to tell Plaintiff a manufactured story, engage in behavior designed to interfere with Plaintiff's employability and reputation, and, for as long as Plaintiff attempted to make a living in the area of borrowers' rights in any fashion more adversarial or litigious than simply carrying out the will of the federal reserve, constructively making himself a bank employee instead of borrower's advocate—irrespective of servicer conduct, generally ruin Plaintiff's entire life.

96. As evidenced by this Complaint, and in the absence of meaningful relief, mission accomplished.

97. And with regard to the allegations in the foregoing paragraphs, Plaintiff seeks not to interfere with the contracts of others or their ability to so contract in any manner which is lawful. Plaintiff's allegation is far more disturbing, i.e. that because persons and entities so contracting have involved themselves in both the traditional credit markets and employment of the judiciary, circumstances are being created where enforcement and performance of these "shadow" contractual obligations or "side understandings" require unlawful behavior or an irresponsibly blind paucity of diligence. And while Plaintiff appreciates the simplicity of a solution wherein one suggests, "just walk away," Plaintiff urges the Court to examine Plaintiff's current circumstances, his efforts in this regard, and what sort of liability and failure to mitigate one's own damages of which Plaintiff could be accused were he to employ such a course on these facts. Plaintiff is the victim of crime, crime which he has no means to stop and sufficient evidence of which, with the benefit of the empowerment of some additional discovery, he hopes to persuade the Court will rise to a sufficient showing using a civil standard.

### JOYCE & MAZONSON, LLC / JOYCE LAW GROUP

98. Plaintiff avers that the first such "insurance policy/tethering" case was the person identified in Plaintiff's Exhibit A as JOHN OR JANE DOE CLIENT 10. With regard to this first "policy," it is unclear whether this initial fraud was the joint venture of the Mazonson Defendants acting alone or a joint venture between the Mazonson Defendants and the Cetkovic Defendants or the Joyce Defendants, or all three, suffice it to say, as set forth in Exhibit A and certain tort counts sounding in fraud and tortious interference, the matter continues, unresolved, without reasonable factual predicate, with the "client" in question seemingly both beyond question for acting against such "client's" own interests, but suffering no tangible consequences either, simply forever in limbo, available to be used to launder funds, transmit messages under the ostensible cover of an "attorney-client" relationship, harass those in need of harassing, or really anything at all, just a conduit of the will of others without credible explanation for his or her circumstances[20].

---

[20] Plaintiff avers that he can demonstrate no mere coincidence in this regard and that no less than thirteen of the other specifically identified JOHN/JANE DOE CLIENTS or sets of "clients" are in a similar position, receiving similar treatment without credible explanation and this list is not exhaustive. See fn. 58.

99. The pattern as regards these "policies" goes like this, Plaintiff receives an "opportunity," sometimes directly from Defendant Mazonson, sometimes from a source one degree of separation from Defendant Mazonson, that appears predicated in pursuit of legitimate legal work.  The person in question presents with a set of facts that, while perhaps more complicated than the simplest of a "case" of that type, a sympathetic story, enough documentary support to maintain the narrative they're telling, and an ability to pay for legal services.  Legal fees get paid, representation begins, and then some fact upon which the original course was based it turns out was "mistakenly" communicated which, given Plaintiff's current experience level, but wholly unbeknownst to Plaintiff at the time, would require both backpedaling as to the expectation setting which had been done at the outset of the matter and fresh informed consent as to what was and what was not possible—often this small change will also require drastically more work and add a level of uncertainty to outcomes which did not appear to exist at the initial consultation.

100.      The assessment in the foregoing paragraph is the "party line" or "affinity group line" narrative as regards these cases, people make mistakes, clients do not always understand their own circumstances and communicate poorly, it is the lawyer's job to tell clients what is and is not possible, it is part of the job, etc., etc., etc.  Certainly all of the foregoing statements are true with regard to organically arising fact patterns within any practice that generates revenue by representing individuals and families.

101.      Plaintiff alleges this is simply not what these "cases" were.  There is no longer any reasonable alternative conclusion—certainly clients may lie or shade the truth to make themselves appear more sympathetic and prime the pump of their chosen advocate—neither is this what we're dealing with.

102.      Plaintiff alleges the existence of and interference from persons who simply will not let their matter be brought to resolution and seem to want it that way, persons who insist upon the more difficult course of action citing reasons why something is not an option which reason later appears to have been false and such falsehood having accomplished nothing more than the use of Plaintiff's time to no tangible benefit (see Plaintiff's averments above re: constructive shadow mortgages), and persons who, on a long enough timeline and with enough instances that Plaintiff cannot ignore, would not be able to support that their words and actions comported with their articulated goals.

103.      And in those instances where Plaintiff does the appropriate backpedaling, resets expectations, engages in additional work, or finds what should be a reasonably suitable work around to the "curveball" being thrown, nevertheless, some new issue crops up out of nowhere, often predicated upon a mysterious action by the "client," an extremely late disclosure of change in circumstances, fresh documentary support for a state of affairs from the past that was close to, but not quite as Plaintiff had remembered it, and certainly not how it had been presented—in sum, no matter how diligently Plaintiff works in pursuit of a long term resolution for this person, the matter persists, and in certain of these instances where Plaintiff brought these matters right up to the finish line, somehow the matters are left with "outs" that no one involved should reasonably want to exist, but

there they are, a document unrecorded here, a tiny payment deficiency there, a vague word choice perhaps, issues that seem trivial, but somehow they never are, every trap door is used, the matter never ends, just on and on we go into perpetuity with the "client" forever vocally "grateful" for the continuing assistance, while often torpedoing their own success behind the scenes and passive aggressively insinuating some long past mistake or unexperienced choice by Plaintiff as though there is some reward for them by ensuring Plaintiff fails to succeed in obtaining for them what they actually asked for.

104.    For the CEs involved in JOHN OR JANE DOE CLIENT 10's circumstances see Exhibit A.

105.    The Joyce Law Group, LLC operates as a title insurance agent issuing lender's policies of title insurance and is beholden to all CEs whose business affects record title to real property in Massachusetts.

CIRIGNANO

106.    Whether the next "sale"/"rental" is anything more than simply the straight fraudulent dirtying of Plaintiff's resume to keep Plaintiff beholden to the Joyce and Mazonson Defendants cannot be ascertained without additional discovery.

107.    While employed at Joyce & Mazonson, LLC, Plaintiff was introduced to Defendant Cirignano with whom he worked on the next "patient zero case" as "insurance" Plaintiff's unlawful "sale" or "rental" to Defendant Cirignano.

108.    Defendant Cirignano was purportedly only acquainted with Defendant Mazonson as Defendant Mazonson's Short Sale Broker in effecting the disposition of his marital home the equity of redemption for which the Harmon Defendants were purportedly attempting to foreclose.

109.    The "clients" in question are identified in Exhibit A as JOHN AND JANE DOE CLIENTS 14 & 15.  This introduction occurred in the spring of 2009 and technically predated the matter referenced under JLG, however, Plaintiff avers that the matter involving JOHN AND JANE DOE CLIENTS 14 & 15, was a "test run" to gauge the unlawful "buyer's," interest in Plaintiff's "career" as a potential purchase.  This particular "transaction" is particularly distressing as the Mazonson and Joyce Defendants took a paralegal who was still in law school with no real estate experience to speak of whatsoever and gave him, as one of his very first assignments, the negotiation of a short sale before he even was aware of the phrase "arm-s length transaction" where the proposed buyer was a corporate entity in the control of an insider, complete with such "assignment" having been afforded the veneer of legitimacy of having been handed off to Plaintiff after initial work on the matter having been commenced by Defendant Mazonson himself.

110.    Though Plaintiff eventually assisted Defendant Mazonson in effecting a "solution" to this matter involving home retention for these borrowers, in light of the

balance of this Complaint, Plaintiff avers that it appears empirically that there was, by and large, little danger of these persons losing their home.

111.     Plaintiff avers that the Massachusetts Board of Bar Overseers issued a finding in the late spring/early summer of 2010 that Plaintiff's application for admission would be held in suspense for a period of one year, at which point Plaintiff would be reconsidered for admission, purportedly in part, based upon the "recommendation" of the Joyce Defendants.

112.     By the time this finding occurred, Defendant Mazonson and Defendant Joyce had, to the outside world, parted ways, and Plaintiff agreed to work remotely to finish open matters as a contract paralegal, but ultimately resigned his position to avoid either the appearance or the reality that staying effectively would amount to, or could be perceived as, the unauthorized practice of law in light of the fact that the Joyce Defendants apparently were going to be comfortable continuing to run a lender-initiated foreclosure practice, the other aspect of Plaintiff's duties at this time, with Plaintiff with no license and Defendant Joyce having little, if any, familiarity with this area of law.

113.     For some time thereafter, Plaintiff believed this was an amicable departure and that Plaintiff's agreement to ensure that no work was left undone was satisfactory to the Joyce Defendants.  It was not until years later that Plaintiff realized he has been under clandestine attack from members of the Mazonson Defendants' and Joyce Defendants' "affinity groups" for the entirety of his career, a state of affairs which Plaintiff avers also extends to the "job opportunity" from Defendant Cirignano that follows.

114.     Between the Board of Bar Overseers finding and Plaintiff's admission to the bar in June of 2011, in addition to doing contract paralegal work for the Joyce Defendants, the Flashenburg Defendants and the Mazonson Defendants, Plaintiff was offered the "opportunity" for regular employment with Defendant Cirignano.

115.     Plaintiff avers that what had actually transpired is that Defendant Cirignano had struck a deal with either the Joyce Defendants or the Mazonson Defendants to "occupy Plaintiff" in a manner where he could be molded into a tool to be used in their fraudulent schemes by showing him only a carefully selected sampling of the distressed real estate business and foreclosure practice for a time and then finding a reason to terminate his at will employment for alleged cause, thus creating a disclosure problem for Plaintiff were he to ever seek employment in a more traditional setting[21].

116.     As with the balance of the "patient zero" cases, JOHN AND JANE DOE CLIENT 14 & 15, reappeared on several occasions later, yet appear to continue to reside in the

---

[21] Plaintiff has declined to so disclose his "employment" with Resilient Investments, LLC during the summer of 2010 on numerous occasions as, by the time Plaintiff actually found himself pursuing such a course, it had become abundantly clear that vast swathes of his experience in the early stages of his career were farcically manufactured fairy tales engineered by very dangerous and self-serving individuals who use people like pawns in power games they are ill-equipped and under financed to be playing. Plaintiff, as a general rule, simply discloses the paper trail of his professional life as though this "job" with Defendant Cirignano never happened.

premises without any evidence of the necessity of further substantial intervention.  More disturbing is the timing of when Defendant Cirignano reappears later—a circumstance addressed in the sections regarding the more overt criminal acts.

117.       Resilient Investments, LLC purchases at auction from foreclosing lenders and, upon information and belief, is in the business of purchasing beneficial interests in commercial paper from institutional lenders and is therefore beholden to all CEs whose business affects record title to real property in Massachusetts.

ZICHER

118.       With regard to Defendants Zicher and Miller, the "patient zero" cases have all of the indicia of those cases indicative of the pattern, however, with regard to these two, the issue is both more disturbing and involves an additional manipulative twist – Plaintiff avers that of the "clients[22]" presented, unbeknownst to Plaintiff and despite express discussion on the point to the contrary, for a home retention alternative for review by Plaintiff, both Defendant Zicher and Defendant Miller were, in certain circumstances, relying on Plaintiff to "catch and release" these persons back to them for a short sale after "trying."  And in these instances, it appears that there was a pattern of a complicit spouse working with the enterprise contact and another spouse who was largely in the dark as to

---

[22] Plaintiff draws the Court's attention to the fact that understanding of both of these individuals, both express and implied, (with regard to Defendant Zicher, Plaintiff has always shut down any implication or request that this individual would ever receive any sort of illicit "cut" on actual legal work and apparently Defendant Mazonson believed he could work around this position behind Plaintiff's back by making Defendant Zicher an employee of Defendant Mazonson's firm, which was fine with Plaintiff, it isn't Plaintiff's decision who Defendant Mazonson chooses to employ.  However, Plaintiff was unaware of the true nature of that relationship—Defendant Mazonson will contend that facially, Defendant Zicher was employed in a marketing and support role where he was generating loan modification business in some lawful form or fashion, bringing that business to Defendant Mazonson to be processed by Zicher but under the supervision of one of the firm Attorneys and then, in those instances where Defendant Zicher was not receiving a favorable response from the bank, sending that person to Plaintiff to review more litigious courses.  Discovery in this action will bear out that the only substantive matters originated by Defendant Zicher which made their way to Plaintiff were all fraudulent constructs to keep Plaintiff tethered to the enterprise and eternally unable to take a step forward so that Plaintiff would be there to file Bankruptcies and obtain lien releases for Defendant Zicher and Garrity's distressed real estate business. No client that Defendant Zicher ever originated that did not result in a real estate commission to someone within the circle of these individuals ever resulted in a successful result through litigation (due to client noncooperation, factual manufacture and, in at least one pronounced example, interference by Defendant Zicher himself) or a mutually agreed upon home retention alternative—by and large, where a client from Defendant Zicher filtered through to Plaintiff via Defendant Mazonson wherein all that was purportedly needed was a litigious "nudge" to get the client back on track towards a modification, time and discovery had borne out that what these matters actually were involved instances where Defendant Zicher had taken these persons money to pursue a factually infeasible modification and, unbeknownst to Plaintiff, the understanding was that Plaintiff would provide these Defendants "cover" to the clients to make them feel as though no mistake had been made, blame the bank, and then, eventually, send these persons back to Defendant Zicher for a short sale.  In effect, it is Plaintiff's contention that with regard to a certain subset of transactions, Defendant Zicher acted more akin to a lender or servicer employee in providing "cover" to the lender that alternatives were explored with, in the absence of an extreme change in circumstances and modification of behavior by the borrowers (often with regard to issues having little to do with ability to pay,) the end goal being a transfer of title and removal of the persons in question from the home.  When it became clear Plaintiff planned to fight on these persons behalf instead, the descent into wonderland and the assault began, facts which Plaintiff is only able to see on a long enough timeline through a backward looking lens.

the nature of their circumstances and actively instructing Plaintiff to fight for the home while the complicit spouse gave lip service to this course while secretly undermining Plaintiff's efforts. Plaintiff can select any one of a number of "patient zero" "insurance policies" coming from Defendant Zicher, though JOHN AND JANE DOE CLIENTS 31 & 32 most clearly illustrates the pattern. And a "referral" Plaintiff received directly therefrom (JOHN AND JANE DOE CLIENTS 24 & 25) revealed collaboration with the Harmon Defendants, discovery of which only becoming apparent many years later and also exhibited all of the same markers and all of the other "clients" against whom Plaintiff asserts direct claims for tortious interference and common law deceit.

119.     During the relevant time period, Defendant Zicher was a principal in several fraudulent business ventures beholden to all CEs whose business affects record title to real property in Massachusetts due to the nature of the purported services provided and mortgagor on an investment property in which CE7 is mortgagee[23].

120.     For the CEs involved in JOHN AND JANE DOE CLIENT 31 & 32's circumstances see Exhibit A,

121.     Defendant Zicher, like Defendants Garrity and Philbin, later attempted to transform himself into a "client" of Plaintiff's as a shield using an agent of Defendant Mazonson's[24] network to initially undertake the representation.

<u>JOYCE (ROUND TWO—AFTER BAR ADMISSION)</u>

122.     Almost precisely the time Plaintiff was to receive admission to the bar, Plaintiff and Defendant Mazonson were provided with a purported home retention client who had

---

[23] Do not mistake Plaintiff, Plaintiff does not aver that every time someone gives a residential mortgage to a major lending institution and subsequently behaves in a manner where they align their interests with such an institution this somehow creates RICO liability. Plaintiff avers specifically that his own experiences with CE 11, CE 13, and CE 7, specifically after his suspicions had been aroused, tend to indicate that there is a method of communication being employed on behalf of these institutions which involves routing of calls to "messengers" when a "special loan" or "targeted" person is the subject of the communication wherein sometimes pointed suggestions are overtly made or, more often, the representative, employing a variety of duplicitous techniques involving the use of non-sequiturs framed as misunderstandings, odd slips of the tongue, or exaggerated accents, among others, communicates suggestions to a borrower or borrower's representative that are designed to induce some action by the borrower to protect lender's interests in a manner where they can deny anything "extra" is being communicated. Plaintiff avers that in those instances where action so taken required unlawful behavior in the absence of reasonable alternatives, or a failure by borrower to behave as suggested yielded coercive manipulation by lender to induce more drastic action, the lenders are "operating and managing" enterprise associates.

[24] There is another individual named Richard Wheeler whose level of knowledge, complicity or role Plaintiff cannot pin down. This is a person who has, by outward appearances, always seemed to simply "do the bidding of" Defendant Mazonson. Nevertheless, Plaintiff avers that Mr. Wheeler was heavily involved in several "cases" and "transactions," two of which had ties to both Defendant Mazonson and Defendant Zicher while another seemed to originate organically from within Mr. Wheeler's own family, wreaked fraudulent havoc, and is implicated by at least pattern three regarding coercive interference and Plaintiff's claims for civil conspiracy and fraud. Plaintiff has no reasonable grounds to assert operation or management level culpability of this individual but reserves the right to amend should discovery bear out that this person was behaving of his own agency.

both very close ties the Joyce Defendants' offices and who were purportedly seeking home retention alternatives[25].

123.      The persons in question are identified in Plaintiff's Exhibit A as JOHN AND JANE DOE CLIENTS 1 & 2.

124.      When it became clear Plaintiff was going to walk away from these persons for good, the lenders and lender representatives seemingly started mysteriously creating fresh causes of action for them to pursue.  It's almost as though no matter what they do, they will not lose this house, and seemingly without credible explanation.  And as set forth more fully herein, this is a pattern, not just with them, but with many others, a pattern which, by its very nature, would require Plaintiff to terminate representation and then sit and watch what the bank did in order to establish such pattern's existence.

125.      In those instances where the persons in question did not find successor counsel, some of the scenarios at this point are, quite frankly, incredible.

126.      For the CEs involved in JOHN OR JANE DOE CLIENT 1 &2's circumstances see Exhibit A.

127.      The Joyce Law Group, LLC operates as a title insurance agent issuing lender's policies of title insurance and is beholden to all CEs whose business affects record title to real property in Massachusetts.

## DEFENDANTS FLASHENBURG AND WALTERS

128.      With regard to the formal arrangement between Defendant Flashenburg, Defendant Mazonson and Defendant Walters, it is unclear what was agreed to between these three behind the scenes. From the standpoint of temporal and logistical relationships, what makes most sense is that Defendant Mazonson's filth brokerage sold or rented "a piece" of Plaintiff to Defendant Flashenburg who, in turn, "sublet" "a piece" of that "piece" to Defendant Walters as Defendant Walters claimed he was expanding his practice into Bankruptcy around the time Plaintiff was to receive his license.  How to interpret the first case originating out of Defendant Walters' practice may be a point of contention, though Plaintiff simply draws the Court's attention to 1) the beneficial leverage which was created by the choices which were made and the relative sophistication of the parties; and 2) the in excess of six years' worth of empirical data referenced in this Complaint with regard to the outlandish nature of much of the "business" originating out of Defendant Flashenburg's and Defendant Walters' practice. In sum, the first trial run Bankruptcy case arising from Defendant Walters' practice involved an effort by Defendant Flashenburg and Walters to construct circumstances the result of which, many years down the line, was that Plaintiff now appears from the documentary record to have been unlawfully paying referral fees on Bankruptcies to Defendant Walters though the true circumstances were something far different.

---

[25] See Exhibit A at "Additional Background Facts Relevant to JOHN AND JANE DOE CLIENTS Reasonably Necessary to Formulation of Plaintiff's Claims."

129.     In July of 2011, Defendant Mazonson was renting space in one suite at 1017 Turnpike Street, Canton, MA, Defendant Flashenburg was renting space in another suite at 1017 Turnpike Street, Canton, MA, this suite having previously also been occupied by Defendant Mazonson, and Defendant Flashenburg had a lease agreement for shared virtual office space in Faneuil Hall Marketplace that, at the time, Defendant Walters also leased from and which Defendant Walters was using as his primary office address while also using a spare office in the back of Defendant Flashenburg's Canton space.  In sum, Plaintiff avers that what from the standpoint of what these persons preferred their books to look like, these were three separate and distinct entities, however, at the time Plaintiff had no office space of his own and was treated as a "member" of each respective firm for purposes of servicing their Bankruptcy clients[26].  What transpired on this initial matter was a decision that, for reasons which, with the benefit of hindsight appear to have been a figment of Defendant Walters' imagination, was that Plaintiff would act as debtor's counsel but the case would run through Defendant Flashenburg's office because Defendant Walters was in the process of securing infrastructure to build out a Bankruptcy practice to complement or replace his divorce practice and he was not yet licensed to practice before the federal judiciary.

130.     In the ensuing months, Defendant Walters told fantastical tales of office space already procured that was just itching for a team of Bankruptcy paralegals who Plaintiff would supervise with Defendant Walters as managing attorney, he was just ensuring the volume was there first.  Plaintiff never expressed anything more than a curiosity in any sort of formal employment relationship or partnership arrangement with Defendant Walters (that looking back Defendant Walters now seems to have behaved as though this were a foregone conclusion, however, fits well with the characterization of Plaintiff's career being rented and sold without his consent or knowledge, especially in light of the fact that Defendant Walters was, in effect, a total stranger and someone who Plaintiff took seriously only to the extent the story Defendant Walters was telling on a particular day seemed grounded in a legitimate business opportunity).  Through the lens of the "work" Plaintiff actually did for Defendant Walters' firm through the years it has become clear that Defendant Walters, supposing the perspective of one who cares not how one makes their living, is not the fool Plaintiff perceived him to be at the time these fantastical discussions were transpiring.  Nevertheless, Plaintiff's point is that the circumstances surrounding Plaintiff doing cases as a member of Defendant Walters' firm were convoluted and Plaintiff's perception of what was going on was here was a lawyer who had a relationship with Defendant Flashenburg who was trying to break into the Bankruptcy business and build out his practice in a real way and who needed labor while he worked on infrastructure.

---

[26] It has since become clear that other Massachusetts Attorneys have illustrated a rules' compliant mechanism for representing such an arrangement involving filing each matter so implicated with both attorneys' listed on the petition in circumstances where there is no formal employment relationship.  As set forth in what follows, however, in light of Defendant Walters' representations and subsequent behavior, this would never have become a tenable choice with regard to the Walters Defendants.

131.    The ultimate result of this initial case was, however, that Plaintiff got lambasted by the trustee in that action for Defendant Flashenburg's name appearing on the petition while Plaintiff appeared at the §341 meeting of creditors with no corresponding disclosure of fee sharing.

132.    The arrangement which resulted therefrom was that going forward, Plaintiff simply listed himself as counsel of record and handled no bankruptcy retainers himself that were generated by any one of the firms of these three individuals and simply listed 1017 Turnpike St. and subsequently 905 Turnpike St., Canton, MA as counsel's address for any of these three individuals and then these individuals paid Plaintiff as a contract attorney while Plaintiff disclosed on these petitions the full amount of the retainer remitted to each person's firm as reported by the managing or assigning attorney with Plaintiff acting as a "member" of each separate firm.  Plaintiff acknowledges there was a better way to have done this, but this is what was done.  With regard to Defendant Walters, however, this arrangement was expressly predicated upon Defendant Walters' representation that he was going to become certified to practice before the Bankruptcy Court himself, something which Plaintiff learned years later he inexplicably never did.

133.    What was actually going on was here was simply that Defendant Walters proved to be either wildly delusional or extremely dangerous.  From Plaintiff's allegations with regard to both Hyatt cases and some of the lead generation sources Defendant Walters identified, Defendant Walters' "bankruptcy practice" appears wholly dependent on corporately funded (and questionably sourced) lead generation systems with Defendant Walters seeking to entice Plaintiff into a venture with him to build what would be, in effect, a Bankruptcy sweatshop akin to a plaintiff oriented smash and grab car accident and personal injury shop complete with professional debtors and compartmentalized processing systems so that it would be difficult to see that the nature of many of these persons' circumstances made little sense.  The bottom line is that Plaintiff and Defendant Walters' business relationship, to the apparent chagrin of Defendant Walters, never evolved beyond Defendant Walters telling Plaintiff to call new "clients" with whom he had already spoken and for whom Defendant Walters was collecting the funds, and then doing the cases and collecting a check.

134.    Plaintiff avers that the first case after the case referenced above was, consistent with the pattern, a case involving JOHN AND JANE DOE CLIENTS 35 & 36, involved persons who told fantastic tales and attempted repeatedly to induce mistakes from Plaintiff with shifting tales and insufficient documentary support for that for which they were asking who, once again, turned back up years later with a complaint or suggestion of a mistake which had not been made, such request having been precipitated either by their mortgage lender providing them with incorrect information, or because it was deemed time to engage in some fraudulent time thievery or tortious interference by elements within the enterprise.

135.    Plaintiff avers that, for reasons not entirely consistent with those contemplated when discussing Defendants Zicher and Miller, but unlawful nonetheless, not a single case in which Plaintiff was involved on behalf of Defendant Walters' firm was, with the

benefit of hindsight, supported by "client" explanations which actually matched the behavior or motivations of persons acting in good faith. Not one.

136.     The relationship with Defendant Walters was terminated completely in May of 2014 when Plaintiff learned of Defendant Walters' failure to obtain federal admission after a dispute arose regarding a number of topics[27].

137.     Defendant Flashenburg operates as a title insurance agent issuing lender's policies of title insurance and is beholden to all CEs whose business affects record title to real property in Massachusetts.

138.     Defendants Flashenburg and Walters are beholden to MetLife Group, Inc. d/b/a Hyatt Legal Plans for income streams upon which they rely.

139.     Defendant Flashenburg's residential mortgage is serviced by CE 12.

140.     The number of CE's and fraudulent "client" matters implicated in cases of suspect factual support originating out of these two sources is too numerous to list.

## MILLER

141.     Plaintiff avers that at the end of 2011, Defendant Mazonson's or Defendant Flashenburg's "rent to own" deal[28] to Defendant Walters having not worked out (because

---

[27] The correspondence from the dispute in question lends itself to a finding that not only did Plaintiff not have actual knowledge of any concerted enterprise action, but also that he had no idea that the matters arising out of Defendant Walters' practice were fraudulent, nor should he have—further, as one "client" in question who had initiated contact prior to the termination of the relationship thereafter reached out to Defendant Walters' after the termination of the relationship continued to seek relief from Plaintiff, using Defendant Mazonson's office as the Hyatt Legal Plans participating attorney, Plaintiff contends that all, or with very limited exception, almost all, Hyatt legal plans cases that received treatment by Plaintiff were, to a certain extent, manufactured and targeted at Plaintiff for a variety of purposes, and to the extent that any of the purposes suggested by this Complaint would be found permissible by this Court in theory, in practice, the vast majority involved facts which would support causes of action sounding in fraud, tortious interference with advantageous business relations and civil conspiracy.  A conspiracy to violate constitutional rights under G.L. c. 265 § 37 is an enumerated offense under G.L. c. 271A and Plaintiff avers that many of these manufactured Hyatt Legal Plans cases implicate Plaintiff's liberty interests and rights afforded him under the 1st, 4th, 5th 8th, 13th and 14th amendments.  In sum, Plaintiff alleges that a certain subset of Plaintiff's "cases" involve persons or entities who, as "protected" persons, are actively attempting to "tie Plaintiff up," or "trip Plaintiff up," unencumbered by any requirement that they follow the law, maintain a consistent narrative, or support the narrative they're telling and, though Plaintiff has cut ties with any and all persons he avers are implicated by the foregoing, as set forth in the section regarding crimes against person and property, he has had his personal space invaded, searched, and items taken, such items largely related to evidence of fraud by the persons in question.  And though it facially may appear all of Defendant Walters' conduct is some time distant, irrespective of whether one credits Plaintiff's arguments under 11 U.S.C. § 108 or Plaintiff's advocacy for equitable tolling, the "spookery" and fraud Defendant Walters' "clients" brought into Plaintiff's practice extends well into any traditional accrual period.
[28] Pursuant to *Rotella*, Plaintiff files suit as soon as is practicable after learning of the damage to his future career prospects that has occurred as a result of association with these networks and the collateral damage flowing therefrom without yet having evidence of all of the elemental pieces but with a reasonable belief as to the discoverability of such evidence—Plaintiff cannot speak to the specifics of any of these back room deals or arrangements with regard to Plaintiff's prison labor, however, Plaintiff can speak to a timeline of new people coming into his life at various times, all traceable back to the same networks and a clear pattern that with each new

Defendant Walters is a person who, analogous to the discussion of Defendant Teves-Michael set forth below, having allowed participation in this sort of fraud to become a part of how they lived and with knowledge that Plaintiff was very naïve in this regard, frequently found themselves in personality conflicts with Plaintiff marked with heavy friction, these persons becoming irritated and confused by Plaintiff's irritation and confusion at the speed and frequency of revisionist histories espoused from their mouths on a regular basis. In addition, the business Defendant Walters was purportedly generating constituted extremely long work for extremely short money all due to what seemed at the time to be extraordinarily needy client behavior[29],) analogous to the case

---

set of people one of the very first cases being someone who eventually turned up later asserting or causing problems stemming from having preyed on Plaintiff's inexperience or naivete to create the appearance of liability to Plaintiff on facts which, when viewed as a whole, it is impossible that these persons behaved the way they did uncoached (and when Plaintiff says "uncoached," he is not referring to the sort of advice Plaintiff might give his clients when faced with facts open to multiple interpretations—he means third parties are feeding persons narratives in advance to bring to Plaintiff for his review and processing without his knowledge,) in good faith or with their goals being those they actually articulated.

[29] What was actually happening appears to have been something akin to manufactured "law school exam" test fact patterns using complicit actors as "clients" to ensure that Defendant Walters overlord sponsors could allow Plaintiff to do work for their minions in a manner that comported with their operating procedures (Plaintiff obviously failed this exam he didn't know he was taking, partly due to the fact that some of the questions to which the clients sought answers, practically speaking, may have been helpful information for Plaintiff to have determined the correct answer to in a general sense, but were largely irrelevant and peripheral to this particular client's outcome, and partly because for what Defendant Walters' expectations seemed to be in the face of what Plaintiff viewed as profoundly absurd behavior (to be sure, his behavior becomes far less absurd when viewed as what it was, i.e. a test drive of a human being, unfortunately as irrespective of any enforceable contractual obligations or "affinity group" affiliations, one cannot lawfully purchase a human being in this country, Defendant Walters required certain ruses that in real time appeared to Plaintiff to be idiosyncratic at best) that Plaintiff viewed as a gross misuse of time, as awful as this may seem, Plaintiff had little interest in exhibiting an overly gracious demeanor to persons who seemed to Plaintiff to simply be acting like the worst sort of obnoxious jerks and, potentially and far more dangerously in the area of law in which Plaintiff primarily practiced, liars, and he simply did his best to not snap at them while focusing on obtaining the contemplated result—it appears what was actually going on was fraudulent persons were being charged with poking at Plaintiff attempting to get Plaintiff to either answer a specific question correctly, irrespective of its import, or make his life miserable until he did, and in so doing may even have been acting in concert with other local firms in the manufacture of court documents in disputes of questionable credibility for purposes of "grading" and "leverage." It is worth noting that at many points throughout his career Plaintiff has suggested to all of the Defendants who accept Hyatt Legal Plans as a form of payment that he believed that there was a serious problem with an attitude of entitlement as regards persons being provided group legal insurance. No Defendant ever disabused Plaintiff of this notion being misdirected and wholly misunderstood by Plaintiff; Plaintiff was forced to go back through years' worth of correspondence, paper files, subject himself to theft of property and directed attack that certain "client" behavior could no longer be explained away as mere entitlement was Plaintiff able to see the fraudulent nature of many of these matters. Again, this is not Plaintiff attempting to "have his cake and eat it too," arguing from a statutes of limitations perspective that it would be unreasonable to do this, then arguing that he was able to nonetheless (and when he says he was able to, such an endeavor still remains incomplete and, given Plaintiff's allegations as regards maintaining file security, to complete such a task under such circumstances while still mitigating his own damages would take Plaintiff years more)—Plaintiff simply draws the Court's attention to the fact that he would not have been able to have established the existence of concerted action, nor identified either fraud or coercion with any particularity until experiencing the behavior in real time, nor would he have been able to have identified appreciable harm on an individualized basis until lender or opposition complicity were evident, something which Plaintiff was prevented from doing by the enterprise itself, alleging harm to business reputation by Plaintiff's alleged "bad acts;" such "bad acts" being the failure to complete or having fallen behind on, or having made mistakes in THE VERY WORK THAT WAS FRAUDULENT, thus manufacturing the appearance of Plaintiff complicity in something which he was never complicit. See Plaintiff's section on Post-Separation Mazonson "Referrals" for more on this point. The limitations concerns raised in *Rotella* are founded in principles of a potential

giving rise to Plaintiff's introduction to Defendant Walters, Plaintiff was introduced to someone organically and ostensibly due to need, a "client" in need of assistance referred through members of Plaintiff's home group of Alcoholics Anonymous, who it turned out was, at the time, working with a realtor named Molly B. Miller.

142.     Plaintiff avers that this initial "case" was for purposes of making Plaintiff's introduction to Ms. Miller seem organic and unrelated to Defendant Mazonson and his network, and the very next case was a fresh "insurance policy" to keep Ms. Miller's new purchase tethered close by her side if anything went awry.

143.     Later discovery bore out a number of things about the story told by Ms. Miller at the outset of the acquaintance that seem to have been half-truths, quarter-truths, etc. simply so that Plaintiff would have no suspicion that this introduction somehow bore the fingerprints of anyone from his current network.

144.     Suffice it to say, as with most new people in Plaintiff's life during the last decade, Defendant Miller's "organic introduction" can be traced to few degrees of separation, if any, to enterprise contacts.  To wit, Plaintiff later discovered that the accountant the persons who brought Defendant Miller into Plaintiff's life was affiliated with the Canton network, Defendant Miller misrepresented certain facts about her own past in order to win Plaintiff's trust, and, generally, the Mazonson Defendants and Defendant Miller's network had large amounts of overlap which were purposefully obscured from Plaintiff until the relationship was well established.

145.     Plaintiff's introduction to Defendant Miller's "patient zero" case occurred in January of 2012 and, in certain respects, its principals continue to affect Plaintiff to this day.  The case of JOHN AND JANE DOE CLIENTS 26 & 27 and the behavior of these persons, the behavior of their lender and their lenders agents as well as the underlying factual predicates giving rise to their alleged circumstances are all open to investigation.

146.     In short, not only did these persons foreclose the most logical course of action out of hand without reasonable explanation beyond their own personal feelings, but they insisted upon changes to Plaintiff's standard loan modification fee agreement to exclude certain behaviors which would not permit Plaintiff's withdrawal for cause, subsequently engaged in every single one of the behaviors they insisted be removed from the agreement, seemingly in the absence of credible explanation, proceeded to direct a course

---

RICO plaintiff having an adequate alternative remedy at law.  Without the later discovered information as to both the nature and extent of the fraud and conspiracy, or that he could not walk away without potential damages in excess of any recovery (see crimes against property section), what was Plaintiff's adequate remedy at law with the facts as a reasonable person would have perceived them at the time? Several dozen individual separate mini suits for fraud on he said she said facts against persons and entities who remain impoverished on paper so as to enhance their own usability in pursuit of enterprise goals with damages difficult to ascertain in sums certain and, in the absence of the empirical evidence as to post-termination outcomes, both difficult to prove and with no discernible grounds to break privilege in the face of such issues of proof?  Such a holding would permit precisely that against which Plaintiff cautions—as long as these networks operate loosely enough and ensure the damages of individual instances remain small or amorphous, they will be permitted to operate in perpetuity, simply bringing in a new cast of characters every few years for a fresh round of harassment.

of action which later proved unnecessary as, when put to the test, these persons were able to produce funds sufficient to have remedied the deficiency precluding the substantive relief they sought as of inception and, upon reaching the point in their matter where the relief for which they had originally approached Plaintiff ready to be undertaken, ostensibly due to a fresh emergency with their lender, their conduct had become so outlandish and so many hours worked that Plaintiff terminated representation upon bringing the matter to a sensible point at which successor counsel could take over.

147.    Interestingly, though able to speak with potential successor counsel by arrangement with Plaintiff and despite the appearance that no further action was taken in this regard, after Plaintiff was no longer involved in their matter, their emergency mortgage problem seems to have vanished into thin air.  It is now in excess of two years since Plaintiff terminated representation and attempted to get them set up with counsel for litigation with a new party upon which they were now insisting though they were now in a position to simply apply for a modification (while nonetheless screaming—yes, screaming, the person in question screams and lies in the absence of any actual controversy beyond, what with the benefit of hindsight, was simply Plaintiff's reasonable action that just so happened to fall outside the confines of this person's fraudulent script—at Plaintiff without logical support that this was a "big case").

148.    It is Plaintiff's contention that at least one of these persons is an enterprise "spook," effectively paying their "constructive shadow mortgage" referenced above by engaging in destructive and nonsensical behavior, (often allegedly at the last possible second on an emergency basis despite there being no such emergency,) predicated on complaining and being in constant need of unnecessary legal services as a conduit for funneling funds to enterprise members in exchange for this person being permitted to call at any point in time and have their fabricated circumstances take precedence as a weapon to interfere with Plaintiff's pursuit of other opportunities. Certain cases originating from all of these networks or "affinity groups" have persons meeting this description, though few act as irredeemably outrageous or in a manner as factually incredible as JOHN AND JANE DOE CLIENTS 26 & 27.

149.    How Plaintiff's practice was used by Defendant Miller during the life of Plaintiff's acquaintance with Ms. Miller is unfortunate, Plaintiff now being experienced enough to see how Defendant Miller chose to make a living during this time period. Suffice it to say, it consisted solely of either use or abuse, with little room for anything else and several of these matters are addressed herein in Plaintiff's Exhibit A delineating Plaintiff's position and requests as regards what would otherwise traditionally be confidential or privileged information.

150.    In sum, Plaintiff avers that every matter arising out of Defendant Miller's network consisted of either 1) a transaction from which Defendant Miller received a real estate commission on behalf of persons who, seeing now what these "affinity groups" are capable of, had been subjected to the same sort of treatment of which Plaintiff complains in this Complaint in a "short sale" transaction where Defendant Miller was effectively operating more akin to a bank employee than a seller's agent; or 2) a "plant" in Plaintiff's

practice who was, at all relevant times, actively attempting to trip Plaintiff up and with an ostensible disregard for the consequences of their behavior as regards their own circumstances—Plaintiff will illustrate that this sort of behavior seems to have been at least partially motivated by an implicit understanding that no such consequences would ever be forthcoming—persons who time and circumstance tend to strongly suggest are mysteriously "above the law".

151.    Defendant Miller's business is or was dependent upon all CE's listed herein.

152.    Up until very recently, Defendant Miller was mortgagor on a property in which CE 7 was mortgagee.

<u>GARRITY/PHILBIN</u>

153.    The various business relationships and overlap between Defendant Garrity, Defendant Philbin, Defendant Zicher, certain associates in Defendant Sokol's network, the Mazonson Defendants and certain associates in the Mazonson Defendants' network, and JOHN OR JANE DOE CLIENT 37 are convoluted and many of the transactions and occurrences relating to Defendants Garrity and Philbin fall into several of the patterns and implicate more than simply the predicate acts involved in this first pattern.

154.    In sum, with regard to both of these individuals, Plaintiff avers that after a certain real estate closing in the spring of 2013 and after it became clear that Plaintiff was going to continue to pursue relief for the client referenced above in the section regarding Defendant Zicher (who, it is Plaintiff's contention, Defendant Zicher attempted to assist the lender and the Harmon Defendants in their efforts to foreclose,) in the second half of 2013 they turned themselves into their own "patients zero"—switching their role in Plaintiff's life from "referral sources" and "coworkers" to a role as "client" in an effort to insulate themselves from Plaintiff ever filing a lawsuit like this (because they knew well before this the machinations they had employed to damage Plaintiff's career, pollute Plaintiff's knowledge base, use Plaintiff in transactions that Plaintiff was unaware exhibited indicia of fraud, and generally create circumstances where Plaintiff would experience difficulties flowing naturally therefrom for a long time to come).

155.    With regard to the Garrity and Philbin Defendants, these individuals seemed to have believed that by making a "purchase" or "rental" from the Mazonson Defendants of Plaintiff's time they would be able to create win-win circumstances wherein they could create some leverage for themselves in the event Plaintiff ever realized what they had done, secretly pay restitution to Plaintiff in the form of legal fees for manufactured work, and hopefully manufacture both an attorney-client relationship and mutual dependency scenario wherein Plaintiff would not be able to flip on them.

156.    The circumstances under which these "representations" were undertaken was that Defendants Garrity and Philbin were having a "come to Jesus" moment, so to speak, wherein they were acknowledging that they had been too informal in many of their

dealings in the past, they needed to get certain operating procedures in place, and they wanted Plaintiff and the Mazonson Defendants to assist in this regard.

157.     Defendant Garrity may point to certain correspondence outside of any traditional limitations period that is suggestive that Plaintiff knew or should have known that these individuals were not acting in good faith[30] in the winter of 2012 into 2013 or perhaps earlier.

158.     Correspondence Plaintiff had with others much later and squarely within any traditional accrual period for RICO purposes is indicative that the foregoing representation is not well founded and that Plaintiff believed these individuals when they suggested they wanted to employ some more grown up business practices.

159.     Time and discovery of additional facts are suggestive that this was not, in fact the case, that these individuals tried to turn themselves into their own "patient zero" cases, having Plaintiff assist with matters for what appears to be the pollution of the documentary record with a large volume of supporting correspondence on "deals" in which Plaintiff was called in at the last second to assist with some tiny issue, to run correspondence through Plaintiff's office that could have been sent directly, and generally attempt to create a record of Plaintiff's involvement in matters with respect to which he had virtually no knowledge and played only a minor role.

160.     As set forth above, Plaintiff avers that Defendant Garrity has a special relationship with CE 12 and, as real estate investors and property managers, these persons and the entities in which they hold interests are beholden to a certain level of cooperation with all CEs named.

## SOKOL

161.     Plaintiff describes the "patient zero" case involving Defendant Sokol from the standpoint that Defendant Sokol was the proposed record buyer in the short sale transaction in question and the only individual besides the Mazonson Defendants affiliated with this transaction of whom Plaintiff had any advance knowledge prior to undertaking representation.  Certain correspondence arising during the course of the representation is suggestive that perhaps Defendant Sokol was a straw man, though to the extent this is true and he was to realize a profit for entertaining such a role, Plaintiff names Defendant Sokol as the enterprise associate.

---

[30] While Plaintiff acknowledges this would be an odd admission, indeed, in light of the balance of the allegations contained herein with regard to the nature of the enterprise, forms of payment and benefits, and Defendant Garrity's general willingness to say and do anything irrespective of basis in fact, Plaintiff avers that a factually frivolous but well-constructed statutes of limitations defense predicated upon a theory that Plaintiff viewed or should have viewed Defendant Garrity as an attacker as opposed to some guy with whom Plaintiff did some business who often found himself with a lot of clients or referrals who simply could not get out of their own way (the express story Defendant Garrity was telling,) Defendant Garrity is not above some ex post facto tweaking of his recollections to serve his ends and indeed makes a handsome living as a criminal in so operating.

162.     This case was allegedly referred to Defendant Mazonson's Office while Plaintiff was in the hospital having surgery on February 27, 2014 and much of the initial back and forth with regard to this matter was undertaken while Plaintiff was recovering from major surgery.

163.     Whether the transaction in question fits the pattern is an issue of fact as, unlike the balance of this first pattern, Plaintiff became aware of its problematic nature while it was occurring, had certain dealings with the regulatory compliance department of the multiple listing service during the pendency of the matter, and later self-disclosed that Plaintiff had made, from the standpoint of strict liability, what appeared to be errors in judgment in proceeding with the representation in question at all to the Massachusetts Board of Bar Overseers.

164.     This is because, put quite simply, this was the ultimate "patient zero" case, the one that was either supposed to end Plaintiff's career or create unimpeachable leverage to dangle over Plaintiff's head later in the event Plaintiff's handling of a certain matter involving JOHN OR JANE DOE CLIENT 7 was not conducted in a manner which comported with the Mazonson Defendants liking—manufactured from start to finish, complete with complicit clients, fraudulent conduct by real estate professionals extraneous to the transaction, and a broker who was operating outside any and all bounds of any ethical canons.  And unlike the balance of Plaintiff's allegations, he knew it was, in effect, a "closed deal".

165.     That he knew the deal was a short sale that was being nudged to a specific buyer in a friendly fashion looks bad, Plaintiff acknowledges.  However this is not what is truly unsavory. What is truly unsavory is that this entire farce was orchestrated, manufactured and executed upon for the sole purpose of damaging the Plaintiff and, when Plaintiff attempted to step in and move the deal closer to something that would pass ethical muster, his efforts were thwarted and new fact manufactured, throwing good time after bad.  When Plaintiff undertook this project, he was misled by everyone involved in this transaction as to what the market would bring for the premises in question and that these Sellers and their broker had a predisposition to a certain buyer appeared of damage to no party provided that buyer was to make the highest and best offer.

166.     That discovery and inquiry later bore out the ridiculousness of the entire situation, including that this buyer was not actually willing to make the highest offer, Plaintiff attempted to right the ship, what effectively transpired from there will essentially be a "he said-she said" between Plaintiff and Seller's broker, an individual who unfortunately passed on prior to this transaction being consummated.

167.     Plaintiff simply avers that this transaction constituted yet another attempted "sale" of Plaintiff into bondage with a new "affinity group" associated with Defendants Sheff and Sokol who, irrespective of this transaction no occurring, later realized a monetary interest in a matter involving JOHN OR JANE DOE CLIENT 7 and who, in the summer and fall of 2015, may have tortiously interfered in Plaintiff's affairs in certain dealings with the Massachusetts Attorney General, a matter which is addressed in the G.L. c. 258

§ 4 presentment letter referenced above and, to the extent any response to such letter yields additional information germane to this suit, Plaintiff shall seek amendment accordingly.

168.     As with the balance of the "patient zero cases" certain factual circumstances arising during the pendency of this matter, Plaintiff's actual choices, as well as choices it only appears Plaintiff made, have repeatedly come back to "haunt" Plaintiff in a manner which, like many of Plaintiff's allegations set forth herein with regard to odd and either coercive or nonsensical communication, do not comport with any organically arising facts which would occur in the ordinary course of business.

## SCIMONE

169.     The final "patient zero" sale[31] or rental arose from an introduction from the Mazonson Defendants having purportedly been approached with some "business" which they traditionally did not handle themselves.

170.     After discussing the prospective "client's" circumstances with both Attorney Scimone and the prospective "client," Plaintiff sent some initial document requests geared towards assessing these persons for Bankruptcy assistance on December 9, 2014[32].

---

[31] Who holds the purported "title" on Plaintiff's purported and manufactured debt to these "affinity groups" currently is unknown to Plaintiff, perhaps it continues to be someone affiliated with one of these networks. Plaintiff calls this the "final" proposed "transaction" because, as set forth in the section entitled "Post-Separation Mazonson Referrals," with the exception of communicating certain very limited information regarding matters which the Mazonson Defendants may use in this action to establish the opposite proposition, i.e. that all of these matters are entirely legitimate, or at the very least that they know nothing about anything, such information being communicated as a buffer against the sort of preemptive strike referenced above as regards BBO intervention (Plaintiff later simply made the required disclosures nonetheless, but would like to avoid the potential for further nonsensical and fraudulent attack,) Plaintiff has ceased communication with the Mazonson Defendants and the pattern herein described is limited to those transactions that appear to contain the Mazonson Defendants' fingerprints at inception. Plaintiff avers that the facts described with regard to CE 16 and JOHN AND JANE DOE CLIENTS 8 & 9 fits the pattern as well, and, in light of the manner in which the enterprise alleged is envisioned to operate, Plaintiff avers this constitutes evidence that the pattern continues beyond Plaintiff so disengaging.

[32] This is occurring right in the middle of the initial complained of communications between Plaintiff and Defendant Mazonson re: "living in a world with too many coincidences," "when grown men fight, people die," "you're a jew," "you will find me entirely consistent" (findings of fact in this action will find this last statement unsupported,) as well as his odd pontificating on the occult, the paranormal, and anecdotal and thinly veiled accusations of lapses in judgment by Plaintiff – Plaintiff is completely transparent as to those things he did well and those things which he did not do well; this Complaint merely seeks to demonstrate that the proximate causes of Plaintiff's damages were not his own behavior as, in those instances where his own behavior might have been an intervening cause of his own damages under other circumstances, the appropriate remedy for all involved for the purposes mitigating damages was to confront the Plaintiff and seek remediation in a lawful manner. However, as this would require persons to admit or disclose the information sharing which was occurring, and thus prejudicing their affirmative defenses were Plaintiff to seek recourse upon learning of such state of affairs, the chosen course was concerted clandestine attack requiring criminal conduct, fraud and civil liberties violations to establish Plaintiff's discredit. Though Plaintiff was still months away from fully recognizing the reach of the enterprise alleged, the number of complicit participants, or the nature and extent of his potential damages, Plaintiff avers that he provided the Mazonson Defendants (and anyone with whom he might wish to go in on such a deal with) with the opportunity to simply take all of Plaintiff's files, Plaintiff would notify all clients and complete a limited subset of open work, and Mazonson

171.     The client in question is identified in Plaintiff's Exhibit A as JOHN AND JANE DOE CLIENTS 38 & 39 and follows the pattern to the letter.  Not only does this person identify a potential bar to Bankruptcy relief in the initial consult, but after almost a year of effort seeking to establish that such bar was in the process of being remediated to the extent practicable, the "client" permitted Plaintiff to file a petition at least arguably under false pretenses with regard to the issue in question and then subsequently made further mistakes in their testimony as regards the same issue, only alerting Plaintiff to the issue after the toothpaste was out of the tube and after Plaintiff received independent notification from DOR (as alleged with regard to JOHN AND JANE DOE CLIENTS 1&2, these are not the wholly unsophisticated sorts of persons that often attend this area of law) – Plaintiff takes the position that as set forth elsewhere herein with regard to behavior tending to suggest some incentivization towards Plaintiff making mistakes or manufacturing the appearance of errors in judgment, these persons will prove unable to defend their conduct on rational grounds.

172.     Plaintiff offered these persons the choice between voluntary dismissal and facing a Motion to Withdraw as counsel based upon a variety of factors wherein Plaintiff was unsatisfied with the level of candor being provided, along with an explanation of the effect of a voluntary dismissal and an explanation to these clients that Plaintiff believed he had made clear to both these debtors and those generating "business" that Plaintiff would not file Chapter 13 petitions for individuals who did not intend to proceed to plan confirmation and discharge.  As it became clear these persons had no intention of proceeding in good faith, they obviously chose voluntary dismissal over a Motion to Withdraw that may have raised questions as to the quality of their candor (as the most egregious misstatement of fact in question involved a misstatement to one governmental agency with regard to facts about "client" dealings with other governmental agencies, and Plaintiff could not indisputably prove these persons' state of mind when the misstatement was made, Plaintiff did not see the necessity of making a record disclosure if these persons were inclined to dismiss).

---

would assume all assets, clients, and those liabilities not personal to Plaintiff (at this point in time Plaintiff was still completely unaware that JOHN OR JANE DOE CLIENT 7 had engaged knowingly in unlawful conduct or was, by and large, a victimizer as opposed to a victim) for $75,000.00 and Plaintiff would simply make a clean break from all prior entanglements.  In light of what was brought to bear in the ensuing year and a half, the exacerbation of Plaintiff's damages during that time, Plaintiff now being left in a position where this Complaint appears the only palatable option for self-protection, the quality of the contacts involved in the enterprise alleged, and the sorts of sums being realized or implicated in many of the sorts of transactions in question, Plaintiff avers that such a course would have been a much more level-headed approach to a resolution to these circumstances.  That Plaintiff accepted Defendant Mazonson's representations as to infeasibility of coming up with those sorts of funds (and by extension, potentially Defendant Flashenburg's, Sheff's, Cetkovic's, Sokol's Garrity's or Philbin's—Plaintiff is unaware to whom the Mazonson Defendants actually reached out, and of the communications in this regard of which he is aware, Plaintiff cannot speak to whether such communications were comprehensive or undertaken in good faith— either way, Plaintiff avers that discovery in this action will bear out that Defendant Larry Mazonson certainly could have arranged this resolution in some form or fashion, and that any failure to do so was a "power play" in an effort to maintain the continuity of a narrative over which they had lost all control) is probative as to a number of issues relating both to the nature of the business the Mazonsons are actually in and Plaintiff's perceptions at that time.

173.     Plaintiff continued to deal with Defendant Scimone thereafter and continued to field calls on behalf of these persons into February of 2016. Indeed, it was not until the late winter of 2016 did Plaintiff start to become concerned that something more nefarious was afoot than what he had been led to believe—though Plaintiff freely admits that he was aware of some degree of space invasion and data tampering in 2015, it seemed highly individualized and, where Plaintiff had been led to believe this was a matter stemming merely from poor decorum and spotty performance, a contained form of "pranksterism" and mild coercion to ensure Plaintiff was in the process of remedying past practices. He was certainly not alerted to circumstances tending to indicate that no matter where he went or what he did, he would find himself harassed and unemployable in any good faith setting or that almost all, not just the subset of cases alluded to above[33], of the work he had performed throughout his career was, to some degree, fraudulent, until recently.

174.     Of the four cases initiated from Defendant Scimone's "affinity group," the first two which Plaintiff undertook, the second two which Plaintiff's additional preliminary diligence shockingly resulted in these persons "choosing" another path, Plaintiff avers that all constituted an effort to launder funds to Plaintiff on matters which it mattered not whether any result was obtained in exchange for allowing these fraudulent spies into Plaintiff's practice to communicate veiled threats and "reminders," create "insurance"

---

[33] With regard to Defendants Garrity and Zicher, Plaintiff was clearly aware that Defendant Garrity was prone to questionable judgment as early as 2013 and Defendant Zicher much earlier, but awareness of concerted action on the level that was actually transpiring was absent until much later and, in light of Plaintiff's averments as to the sources of almost every case he ever saw being controlled, whether a reasonable person should have become aware of even the underlying fraud or tortious interference sooner is a question of fact. Plaintiff will simply testify in this action that, with the benefit of hindsight, he essentially had an artificial reality created around him wherein it was extremely common for people to be woefully ill-equipped to manage simple tasks, command the English language, or take personal responsibility for a failure to be proactive. And as Plaintiff was not alerted to the level and sophistication of certain methods of digital tampering that was even possible until February of 2015, never mind that Plaintiff would ever find himself involved in matters of sufficient import that any such methods would ever be employed against him, nor would he realize that such tampering likely began much earlier or was more far reaching and pervasive than he has even yet to catalog comprehensively until the late summer or early fall of 2015, some portions of Plaintiff's practice and experience involved doing what he could to operate within the bounds of ethical constraints and common courtesy while trying to assist people who were either psychologically unwell or prone to exaggerating the nature and extent of the harassment, failures of technology, and explanations for their circumstances, while others, given that he had, with the benefit of hindsight, what was likely a stable of persons who were truly under the sort of concerted and unlawful attack of which Plaintiff complains, were other persons actively attempting to sabotage Plaintiff's practice and credibility by mimicking the symptomology of the foregoing persons for nefarious use later. Plaintiff simply raises this point to alert the Court that Plaintiff avers not that he is some form of eggshell Plaintiff, nor merely that he did not bring suit sooner due to fraudulent concealment, what Plaintiff avers is far darker and more disturbing, i.e. that Plaintiff was living and working, from at least as early as 2009, among individuals both in his personal dealings and professional life who, due to the nature of their business or the business of their families, created for Plaintiff the illusion of whatever one might describe as analogous to a photographic negative of fraudulent concealment—perhaps fraudulent construction—a world wherein Plaintiff's talents could be used as an unwitting agent in furtherance of unlawful goals while Plaintiff believes he is helping people and engaged in assisting in some small way to remedy a systemic injustice in circumstances where the reality is that he was, for all intents and purposes, some sort of closed system science experiment who, as a blind dupe, could as an added bonus be used to launder money, act as witness or trustee on "shadow contracts" for the purchase and sale of capital he doesn't even know exists, and generally participate in transactions in ways that more experienced attorneys or persons with knowledge of enterprise operations lawfully could not.

which would only be acted upon in the absence of Plaintiff's complicity or silence, and generally engage in insupportable criminal enterprise activity.

175.     With regard to the first two cases where Plaintiff undertook some degree of representation, Plaintiff was still only dimly cognizant that that which was amiss in Plaintiff's dealings was anything other than what he had gleaned from the Mazonson Defendants' sideways explanations and insinuations, Plaintiff continued to remain unaware of many of the methods and motivations implicated by this Complaint and Plaintiff still believed a much larger percentage of his practice had been, by and large, legitimate work.

176.     In light of the averments in the foregoing paragraphs, clearly an "insurance policy" of sorts was created.

177.     Though it did not seem relevant at the time, and only discovery in this action would bear out its relevance to the extent that other chains of transactions and parallel fact patterns are illuminated by this Complaint, Hornung & Scimone, P.C. apparently employs an attorney that Defendant Cirignano uses for much of his legal work.

178.     Hornung & Scimone, P.C. operates as a title insurance agent issuing lender's policies of title insurance and is beholden to all CEs whose business affects record title to real property in Massachusetts.

PATTERN TWO:
CRIMES AND ATTEMPTS AGAINST PROPERTY AND PERSON

179.     In January or February of 2015, Adam Mazonson committed violations of G.L. c. 265 § 25 with reference to a malicious threat to call the Board of Bar Overseers on Plaintiff and committed a battery upon Plaintiff.

180.     On two occasions between the spring of 2015 and the spring of 2016, leaving Plaintiff's car unattended in the parking lot of 905 Turnpike St. Canton, MA resulted in an extremely dangerous form of tampering with Plaintiff's vehicle.

181.     During the month of December, 2015, Plaintiff worked a temporary position as a driver's helper for United Parcel Service.  The driver who Plaintiff was assigned to assist was Undisclosed Supervisor 2.

182.     During the relevant time period, Undisclosed Supervisor 2 had a mortgage serviced by CE 12.

183.     Plaintiff will produce evidence in this action consisting of one sealed piece of USPS Priority mail correspondence, still sealed within sealed USPS envelopes with a postmark of December 8, 2015 that Plaintiff believes suggests Undisclosed Supervisor 2 was creating a hostile work environment by insisting upon spending large swathes of the workday discussing the teachings of Alcoholics Anonymous over Plaintiff's objection.

184.    Plaintiff avers that for all intents and purposes, Alcoholics Anonymous is a religion for purposes of interpreting any form of employment statute or the Frist Amendment, despite any objection one might hear from its most well versed adherents.

185.    As UPS is a good company and Plaintiff sought to retain his positive rehire status and not burn bridges, Plaintiff simply retained this document for posterity.  Plaintiff makes no express averment as to any employment law violation.  Instead, Plaintiff avers that Undisclosed Supervisor 2's conduct, which was not limited to the foregoing, fits a pattern of harassment which did not become evident to Plaintiff until after this temporary position had ended.

186.    Plaintiff does, however, aver that Plaintiff's driver assignment was not coincidental.

187.    In what Plaintiff avers was an effort to alert Plaintiff to this fact, Plaintiff avers that Undisclosed Supervisor 2 drove the truck away while Plaintiff was delivering a package and pretended not to be returning in a specific location of significance to Plaintiff and Plaintiff's life (and having a specific correlation to private notes written recently which were ostensibly privately stored), but that would stretch credulity to characterize as random coincidence.  Undisclosed Supervisor 2 took long enough in returning to ensure Plaintiff would not interpret this action as simply an exercise in repositioning the truck, making a special delivery, etc.

188.    Though this conduct may seem mild in a vacuum, when viewed with reference to Plaintiff's current circumstances as described below and twenty months later similar complained of conduct having become more pronounced and more ominous, under the totality of the circumstances the foregoing conduct is both alarming and psychologically disturbing.

189.    On March 1, 2016, Plaintiff commenced providing service as a direct sales newspaper carrier.  Though Plaintiff had a direct supervisor for this position, Plaintiff complains of conduct seemingly occurring at the direction of the management of the entire circulation department of the branch of the entity in question, and identifies this person as Undisclosed Supervisor 2.

190.    From March 1, 2016 to April 15, 2017, Plaintiff performed this position diligently and, at all relevant times, Undisclosed Supervisor 2 had his residential mortgage serviced by a wholly owned subsidiary of one of CE11's largest shareholders.

191.    Plaintiff avers that this position was marked, from the very start, with efforts to get Plaintiff to quit, ensure the company had a documentary record of grounds to end the engagement at any time, and generally harass the Plaintiff.

192.    Although the position was logistically difficult being very early in the morning 365 days a year, it allowed Plaintiff his days to explore opportunities for employment and

attempt to continue running a law practice consisting of those matters he had not yet determined were potentially of suspect legitimacy.

193.     Plaintiff was able to tolerate the constant harassment because it was only several hours of his day, though the harassment was constant, consisting of the enlisting of "watchers"—customers along Plaintiff's route who would make unfounded complaints and time Plaintiff's performance, route changes and additions wherein the stated rationale for the change later turned out to be baseless and served only to make the route more difficult, and several instances of truly exceptional occurrences wholly beyond the bounds of normalcy.

194.     Additionally, the dock employees charged with preparing Plaintiff's bundles for delivery, individuals also under the management of Undisclosed Supervisor 2, made Plaintiff's service excessively difficult.  And Plaintiff acknowledges that people make mistakes, this is not what this was, this was targeted behavior that was virtually constant—papers removed from ostensibly bound bundles straight from production (not off by one, but three and four papers short—after this happened several times Plaintiff began checking supply within the building to determine whether this was consistent for bundles for a particular day to learn that it was not,) being short inserts for Sunday deliveries for the entirety of Plaintiff's time, whole categories of product not provided multiple weeks in a row, and Plaintiff avers that the dock workers assisted in manufacturing the cause of the automobile accident referenced below occurring on December 25, 2016.

195.     And, to be sure, Plaintiff makes no averment that all of the conduct occurring while engaged in this endeavor is traceable to Undisclosed Supervisor 2, indeed, Plaintiff avers that many of Plaintiff's customers were instead "affinity group" associates, Plaintiff simply avers that Undisclosed Supervisor 2's choices in responsiveness with regard to certain email correspondence, the content of certain direct communication and the inexplicable conduct of his employees towards Plaintiff was an exercise in message sending that he had been incentivized to target Plaintiff.

196.     Nor does Plaintiff aver that no accidental mistakes have ever been made— Plaintiff takes pains to parse out those items which really cannot be considered accidental.

197.     Of some of the truly exceptional occurrences referenced above, and making no averment as to whether Undisclosed Supervisor 2 was involved in this conduct or whether these individuals had been incentivized from elsewhere, Plaintiff avers that a man purporting to be a resident of 48 Blackbird Court in Tiverton, RI introduced himself to Plaintiff in the late summer or early fall of 2016 as "Jack"—title to these premises is held in the names of John Hodnett and Barbara Guay, though Plaintiff's delivery sheets suggest the customer's name was John Guay.  Plaintiff's father's name is John and, in Plaintiff's experience, "Jack" was a common nickname for John for a certain generation. This gentleman has a very distinct appearance.

198.     During the week of Christmas, 2016, Plaintiff was invited into the home of the
purported residents of 22 Short St. in Portsmouth, RI for purposes of a Christmas tip and
to make certain requests of Plaintiff with regard to delivery instructions.  Plaintiff
suggested he had no problem pulling into the driveway to deliver the paper to the porch
given the customer's stated mobility concerns.  Due to Plaintiff's extreme disorientation
by both the wife's odd manner of communicating, and not sure he wanted to make a bold
accusation of which he could not, and still cannot, discern the import, Plaintiff was
simply polite and wished the customers a Merry Christmas, though the gentleman sitting
at the kitchen island and *who introduced himself to me as "Charles" was the same man
who had introduced himself to me as "Jack" at a different home in another township only
several months earlier.*  Title documents to these premises suggest they are held in the
names of Charles and Phyllis Cloutier.  Plaintiff tried several times thereafter to ring the
doorbell at 48 Blackbird Court, but no one answered the door.

199.     Plaintiff's efforts to speak with the residents of 48 Blackbird Court correlated
with the residents of 22 Short St. suddenly changing the usual arrangement of vehicles in
their driveway where Plaintiff would not be able to fulfill the delivery request referenced
above without parking on the street, exiting the vehicle, and walking the paper up to the
porch, something Plaintiff declined to do.  It's somewhat astonishing given the number of
complaints of behavior along these routes that were of tenuous credibility those instances
when enterprise "spooks" declined to speak up.

200.     In the summer of 2016, a resident of Victory Road in Westport, MA attempted to
induce Plaintiff into a physical altercation arising seemingly out of nothing.  In sum,
Plaintiff had gotten into the practice of parking off to the side of the road at the very
entrance to Victory Road, a location at the very beginning of the Westport section of his
route, and organizing papers and reviewing change orders.  Plaintiff was unaware that
Victory Road is technically a private way, but the behavior of the person in question was
so outlandish that Plaintiff is forced to question his motivations. There is no clear
marking that this is private property and not simply a public road.

201.     Before proceeding further on this point, if it isn't clear, Plaintiff avers that
"protected" or "made" individuals, irrespective of to whom they pledge their allegiances,
are systematically and systemically attempting to harass Plaintiff into silence, create the
appearance of Plaintiff incompetence, irresponsibility, discredit, and generally ensure that
Plaintiff goes away quietly in fear and ruin.  The list of persons engaging in strange
behavior along Plaintiff's route is long, and Plaintiff simply raises the strangest instances,
but Plaintiff avers that he can easily provide additional offers of proof on this issue.

202.     The incident to which Plaintiff refers consists of an extremely gaunt gentleman in
a large pick up truck pulling up to Plaintiff's vehicle which was parked off to the side of
Victory Road one morning quite early, far too early for there to be any true objection to
his presence, though Plaintiff acknowledges this gentleman's private property rights.  The
gentleman indicated for Plaintiff to roll down his window.  Plaintiff rolled down his
window and the gentleman stated "I caught you." As Plaintiff didn't even know he was
on private property, (literally one car length off of a main public road) nor would a non-

insane person not ulteriorly motivated wish to harass the paper carrier of his immediate neighbors, Plaintiff inquired as to what this gentleman meant and indicated that Plaintiff had deliveries at 270 and 280 Old County Road (said neighbors,) to which this gentleman responded "you gotta find someplace else to go" or something to this effect.

203.    Plaintiff then inquired whether he was being told this was private property and whether this gentleman would care if Plaintiff advised his customers of this gentleman's request.  At this point the gentleman opened the door to his vehicle, purporting that he was going to exit, began screaming, and generally attempting to bait Plaintiff into an altercation.  Again, this escalated from 0 to 100 in a matter of seconds in response to Plaintiff making additional inquiries about communications that sounded like nonsense talk and inexplicable harassment.  Plaintiff moved to open his door, at which point the gentleman started holding his open door in a manner seeming to indicate he was hoping that the car doors made contact, so he could make some sort of complaint or report without appearing insane.  Plaintiff then closed the door in response to this lunacy which prompted the gentleman to start moving his vehicle in a manner suggestive that he was going to attempt to block Plaintiff's exit and file some form of police report for trespassing.  Plaintiff succeeding in reversing the car out of the location and driving away before this escalated further.

204.    The foregoing is to the best of Plaintiff's recollection.  Plaintiff simply avers that beginning a conversation with "I caught you" under these circumstances and then pointedly attempting to start a fight about it is not the behavior of someone acting in good faith.  Caught Plaintiff doing what, precisely, parked on what appears to be a public way? This is akin to a public park abutting unmarked private lands and the private landowner who first does nothing to identify themselves walking up to strangers who inadvertently wander across the property line and attempting to fraudulently instigate physical altercations in defense of their freehold to no discernible benefit.

205.    See below regarding the events of December 2016 for additional instances of "spookery," and, again, Plaintiff simply makes some illustrative averments, however, Plaintiff alleges he was followed, tracked, monitored, and harassed frequently while attempting to perform this position.

206.    Between at least as early as December 1, 2014 and April 15, 2017, Plaintiff has had both his home and office entered without his consent and in his absence, with such instances being marked by alerts to missing items communicated by either the very persons who would be prejudiced by their absence or other "affinity group" associates and such entries occurring with no sign of forced entry.

207.    Prior to terminating his office lease effective April 1, 2016, Plaintiff had changed the locks to this office and provided no keys to the building owners.  This action was taken in response to returning to his office to find a cart of files he had alphabetized within the last several weeks having been completely rearranged, ostensibly with no other person having access to that area beyond the landlord.

208.     Plaintiff has changed the locks to his home no less than three times since being alerted to the original issue.  The first change of locks Plaintiff employed was simply a precautionary measure as, being in possession of years' worth of closed files, though Plaintiff was periodically alerted to missing, but ostensibly recoverable or largely unnecessary items, Plaintiff presumed there had been a single invasion of both locations and that Plaintiff would be well served to change his locks.  In early 2016, Plaintiff began to suspect this was not the case, in the late summer of 2016, Plaintiff became certain this was not the case, and, after having again changed locks, this time obtaining higher quality product from a professional locksmith, on April 15, 2017, Plaintiff became certain he was without the resources to employ appropriate security to maintain a law practice until he took measures aimed at litigating the damages arising from this criminal conduct.

209.     See below with regard to Plaintiff's dealings with Defendant Douglas and the circumstances surrounding the sale of Plaintiff's automobile for more on the events of April 13, 2017 through April 17, 2017.

210.     As set forth above, Plaintiff had initially been led to believe any targeted acts of sabotage which were occurring were a contained form of "pranksterism" and mild coercion to ensure Plaintiff was in the process of remedying past practices, in late 2016 and early 2017, this presumption proved poorly supported and Plaintiff began treating his circumstances as one who was under unlawful attack and would now have to employ drastic measures to defend against massive and unquantifiable future liability.

211.     There are various state law provisions detailing with burglary, breaking and entering, unauthorized entry in the daytime, criminal trespass and to the extent Plaintiff avers that the conduct related to the unauthorized access to his personal quarters is suggestive of a pattern for purposes of G.L. c. 271A, Plaintiff simply avers that no one other than Plaintiff was provided this most recent set of keys and Plaintiff can identify missing items which have not been returned.

212.     As a result, Plaintiff has been forced to make public record disclosures of issues relating to securing client property to his reputational damage.

213.      In addition to the averments above regarding tampering with Plaintiff's automobile specifically at 905 Turnpike St., Plaintiff avers that in addition to the damages flowing therefrom, enterprise associates began a campaign of unscrewing a certain bolt and loosening one of Plaintiff's calipers from the frame of the vehicle on a semi regular basis, sanding down interior portions of tires, and it eventually became necessary for Plaintiff to regularly reset the keyless entry system as Plaintiff came to have items go missing from the interior of the vehicle and trunk as well as being advised by his mechanic that the manner in which the connection governing his reverse lights failed involved access and damage to an area of the vehicle "that doesn't get a lot of action."

214.     Between May 9, 2016 and May 24, 2016, Plaintiff was "employed" through a temporary staffing agency[34] at Defendant Smith & Brink, P.C.  As set forth in Plaintiff's statement identifying the parties in this action, Plaintiff avers, essentially, that the "job" was a fabricated exercise in training Plaintiff on document review on terms and in a setting where he would prove unable to complete tasks with regard to those portions of his practice which he continued to believe constituted legitimate exercises, monitor Plaintiff, "grade" Plaintiff on his ability to make a transition to a corporate setting on terms wherein the work itself effectively constituted harassment, and, to the extent Plaintiff was in any sense not in this position to make such a transition and instead was simply attempting to feed himself, discredit Plaintiff[35].

215.     On May 17, 2016, Plaintiff took steps with regard to some of those items he still believed to be legitimate exercises referenced in the foregoing paragraph.

216.     On May 18, 2016, Plaintiff had his front passenger tire fail mid-route, inspection of the tire, to Plaintiff's eye, appeared to be the result of having been sanded down as there existed a highly anomalous wear pattern, and, despite Plaintiff's last service having occurred on March 2, 2016 and Plaintiff having hand tightened these wheel lugs himself since then, Plaintiff found that the lugs appeared to have been mechanically tightened at some point very recently as it took Plaintiff almost an hour to change this tire simply due to an inability to remove the lugs.

217.     Plaintiff called his supervisor at Smith and Brink, advised of the issue, and told him he would call in after finishing the route and estimating how long it would take to get to Braintree.  Plaintiff later called in expressing a willingness to appear for a half day but it did not seem to Plaintiff from the supervisor's response that it mattered all that much from the perspective of project continuity and Plaintiff suggested that he would prefer not to appear if it made no difference.

218.     When Plaintiff appeared at Smith & Brink on the 19th, all contract employees were in business dress due to alleged "clients" in the building.  Supervisor did not apprise Plaintiff of this during either call on the 18th, nor did he send an email.

219.     Plaintiff walked out and drove to Target and purchased a shirt and tie and then returned to work.  Plaintiff witnessed no evidence of any "clients" in the building.  Indeed, Plaintiff wonders what people did there every day.  It certainly seemed like there

---

[34] Plaintiff suggests that perhaps, like Defendant Sokol, Smith and Brink, P.C. is a mere straw man for the staffing agency as Plaintiff is unaware of the source of some of his "co-workers" for this "assignment."  However, as Plaintiff cannot establish this absent discovery and the anomalous occurrences in question occurred at Smith & Brink, Plaintiff so names that entity as the Defendant.  It is notable that the staffing agency in question has a Boston Office in the same building as CE1 is employed, that being the same building which houses the only firm which was willing to even discuss the possibility of filing a Complaint such as this with Plaintiff.

[35] Plaintiff makes many of these averments with regard to Smith and Brink after having had the opportunity to experience what occurred with reference to Plaintiff's Exhibit A at paragraphs 6 and 8, not in real time.  Though Plaintiff was skeptical of certain anomalous occurrences while there, and recorded those notes he could, he could not be certain of the suspect nature of the project without further experience with this nuanced form of harassment and fraud.

were a whole lot of people sitting in sparsely appointed offices looking at computer screens not doing a whole lot of anything.

220.     See Plaintiff's Exhibit A for Plaintiff's description of the matter involving CE1 for the sort of manufacture of which Plaintiff complains at P. 63 above with regard to this Defendant.  While this was transpiring in real time, Plaintiff attempted to chalk it up to coincidence, though this is not well supported given the balance of this Complaint.

221.     On May 23, 2016, there was no indication that this project was close to conclusion.

222.     On May 23, 2016, Plaintiff contacted the staffing agency to reiterate a previously voiced concern as to Plaintiff's suitability for this project due to a "miscommunication" (or strategic omission) as to certain conditions of "employment" when the assignment was accepted.

223.     On May 24, 2016, Plaintiff had a conversation with said staffing agency in response to his email of the previous day wherein Plaintiff discussed topics related to the project both positive and negative (Plaintiff continued to attempt to afford these circumstances the benefit of the doubt) wherein he suggested that he felt as though the project was not near completion.  Almost immediately thereafter, the project ended abruptly—that same afternoon[36].

224.     Upon being notified that the project was drawing to a close and being provided instructions as to how to close out the "work," prior to completing the required steps, Plaintiff's workstation was "blue screened" – it is Plaintiff's averment with the benefit of hindsight[37] that the entirety of this project was monitored in a prison-esque manner and

---

[36] Whether this was in direct response to Plaintiff's correspondence of the prior day or certain other communication referenced in Plaintiff's Exhibit A occurring on the 24th of May, (i.e. thus creating circumstances wherein he had a new babysitter so the necessity of the fake Smith & Brink "job" was now unnecessary is unclear, and somewhat irrelevant to the larger pattern,) Plaintiff merely avers that it was fraudulent, involved directed harassment, and when viewed with reference to Plaintiff's allegations as a whole, raises issues of concern under a variety of the statutory provisions constituting predicate acts for RICO liability.  And when Plaintiff asserts it was fraudulent, Plaintiff not only means he has reason to believe the persons participating in this project were simply redacting manufactured materials that were generated specifically for the project or, if not generated specifically for the project, at a minimum constituted the same sort of "case" as that of CE1, but Plaintiff spent the entire project with the individual sitting directly behind him, an individual with purported document review experience where Plaintiff had none, asking questions of Plaintiff suggestive of ulterior motivation.  Such individual introduced himself to Plaintiff phonetically as "Ivan Lang."  Upon seeing one of this individual's timesheets however, Plaintiff noticed an odd spelling, the import of which did not become evident until some time later.  He was spelling his name "Eivind Lange."  Perhaps a set of clever hippy parents giving their child a name which anagrams to Divine Angel is cute and simply a one off oddity.  Plaintiff avers, however, that should the Court find compelling Plaintiff's arguments as to the inapplicability of privilege and confidentiality sufficient to open this issue up to whether this truly is a one off oddity, Plaintiff can establish a pattern of a whole lot of clever parents and a whole lot of people placed in Plaintiff's life by management level enterprise participants with suspect back stories who have found themselves in some inexplicable predicaments to the benefit of little more than fraudulently occupying Plaintiff and wasting his life.

[37] To clarify, Plaintiff acknowledges that alarm being caused in the present is a required element of a violation of G.L. c. 265 §43A, and to the extent that throughout Plaintiff's Complaint he alleges conduct with regard to various actors that falls into two categories, i.e. conduct that was immediately distressing and conduct that, though not

that likely there was supervisory IT personnel with manual override capabilities on Plaintiff's workstation at all times (Plaintiff does not take issue with the legal permissibility of such a practice for individuals willing to accept working under such conditions, Plaintiff raises this as it again placed him in the position where he was having artificial obstacles to simple professionalism being placed in front of him). Plaintiff ultimately thanked his supervisor for his time and the opportunity, had a pleasant discussion of the potential for future opportunities on less restrictive terms, and finished those tasks he could complete before leaving.

225.    Upon exiting the premises where Defendant Smith & Brink, P.C. conducts its experiments or exercises, Plaintiff was met immediately with an elderly gentleman in an old sedan leaning on his horn and ostensibly attempting to run Plaintiff into another lane of traffic and, essentially, driving "at" Plaintiff while pointedly declining to acknowledge Plaintiff's efforts to get the driver's attention. Plaintiff avers this gentleman had to have been waiting for Plaintiff as Plaintiff took a right turn onto a northbound section of a divided roadway and almost by definition couldn't have made any sort of offending traffic decision, this gentleman was simply attempting, if not cause an accident, certainly to scare the Plaintiff.

226.    On August 8, 2016, Plaintiff was in an automobile accident on Route 24 North.

227.    The circumstances surrounding this accident were suspicious, though Plaintiff attempted to discount the anomalous behavior of the driver involved as a mere oddity at the time. Subsequent events and occurrences no longer permit treating this accident as anything other than manufactured.

228.    The other driver was a woman named Diane Weatherbee. Her mortgage is serviced by CE 11.

229.    The "accident" in question involved Ms. Weatherbee and her daughter purportedly out for a test drive in the hopes of purchasing her daughter a starter car – a 2003 Jeep Liberty being test driven from F&F Auto, also of W. Bridgewater.

230.    While traveling northbound on Route 24, slightly to the passenger's side of Plaintiff's windshield was struck by an airborne object, cracking the windshield substantially. When Plaintiff returned his attention to the roadway, he saw a blue Jeep Liberty with additional debris falling from its undercarriage.

231.    Plaintiff sought to pursue the vehicle in question. Though Plaintiff was not going to level accusations at seemingly respectable mother and daughter out for a test drive, Mrs. Weatherbee clearly attempted to accelerate from the scene and get lost in traffic or otherwise prior to Plaintiff realizing what had transpired. When it became clear to the

_____

immediately distressing as Plaintiff failed to ascertain its import in real time, such conduct nevertheless serves to establish both the pattern element with regard to directed conduct of G.L. c. 265 §43A and exacerbates how distressing and alarming all subsequent conduct happened to be in real time when viewed through the lens of how long this has been transpiring and how far reaching the conduct extends.

two ladies that Plaintiff was following the offending vehicle, they pulled off the highway at the next exit and into a local gas station.

232.      Plaintiff called the state police to have an officer come out to the scene and an officer from the Middleboro Barracks produced an incident report # 2016-0D4-003688 citing debris from vehicle and no action taken for insurance purposes.  These ladies called their husband and father to come wait with them and gave Plaintiff the information for the dealership who had provided them with the vehicle for test drive.  What ostensibly transpired was that the front passenger guard to the wheel well had flown off while they were driving.  Plaintiff took the Journal Extract from the Officer and made arrangements with the dealership F&F Auto of West Bridgewater.

233.      The dealership eventually had their insurance provider get me a new windshield, though the principal of this company attempted to get Plaintiff to permit his shop to do the work themselves.  As Plaintiff was in dire financial straits and concerned that an institution which would permit a car in that condition out on the road (Plaintiff had not yet had the opportunity to review some of Mrs. Weatherbee's strange statements or the totality of the circumstances not under the duress of yet a new problem with which to contend or through the lens of events yet to transpire,) Plaintiff insisted on insurance information.

234.      Upon later review and recollection, Mrs. Weatherbee had made the following either nonsensical, or statements inconsistent with what transpired, to Plaintiff: 1) that she hadn't wanted to meet the Plaintiff; 2) that they had been on the test drive since that morning – the accident occurred after 3PM (who takes or permits an all day test drive?; and 3) during that period she had had it looked at by her mechanic, Jimmy's Equipment Services, which appears to be a repair shop specializing in automotive electrical components about two blocks from F&F prior to completing the test drive.

235.      Plaintiff avers with the benefit of hindsight that this was some form of rigged up accident, Plaintiff is unaware of how it was accomplished, some form of homing to Plaintiff's cell or GPS signal, Plaintiff presumes—though this may seem like conspiracy theorizing, Plaintiff avers that this is the third time in four years he has been in an engineered auto accident that later review reveals raises unanswerable questions and this is only because Plaintiff is a talented, conscientious and prepared driver able to effectively operate a manual transmission and change flats—Plaintiff has also had several dangerous near misses after having his brakes or tires tampered with, as well as close calls with kamikaze lunatics[38] as set forth above.

236.      Between October 14, 2016 and November 2, 2016, Plaintiff worked a part-time job at Cumberland Farms under the supervision of Undisclosed Supervisor 3.

---

[38] As to this averment Plaintiff draws the Court's attention to the specific incident on May 24, 2016, but further avers that daytime driving for Plaintiff in the last two years has developed into an exercise requiring unparalleled diligence—Plaintiff is tailed, boxed into short stop engineered attempts to cause accidents, and efforts are made to run him right off the road, in at least one instance after having experienced tampering with Plaintiff's brakes.

237.     Plaintiff will produce evidence in this action consisting of sealed USPS Priority mail correspondence, still sealed within sealed USPS envelopes with postmarks of October 14, 2016 and October 19, 2016 which contain Plaintiff's contemporaneous impressions of his first several days of "employment" with this gentleman and his "team."

238.     Plaintiff does not recall specifically what these envelopes contain and seeks to preserve their posterity in light of the ostensibly incredible nature of the extent of the harassment contained herein.

239.     In sum, Plaintiff avers that within the first two conversations Plaintiff had with this gentleman, a complete stranger, this gentleman was discussing with Plaintiff certain circumstances from his personal life tending to indicate that he was presently "under the thumb" of CE 11, his mortgage holder or servicer.

240.     This gentleman's behavior, the behavior of individuals upon whom he relied, and the behavior of individuals that other employees identified as being within Undisclosed Supervisor 3's network in the ensuing weeks constituted harassment and was designed to alert Plaintiff to circumstances wherein, if properly incentivized, Plaintiff would be terminated for manufactured cause.

241.     In this regard, Undisclosed Supervisor 3 had Plaintiff complete his orientation materials after telling Plaintiff a story about the fastest person ever to complete the materials having taken just under an hour with them and prior to actually training Plaintiff on many items that were contained therein.

242.     Plaintiff neither claims to be the smartest, nor dumbest man in the world, but had he been trained on all items and actually studied for the orientation, given the format of some of the computerized materials and simple logistics regarding quantity of questions, Plaintiff would estimate that it would not be humanly possible to complete all of the materials presented in under three hours even were one to know every answer immediately.

243.     While Plaintiff cannot speak to Undisclosed Supervisor 3's motivation, this is certainly a strange way to treat a new hire and, as the orientation materials contained legal documents and acknowledgments of regulatory training with regard to items like safety at a government regulated refueling station, it seems like an odd spot to randomly engage in mere rookie hazing.

244.     In sum, Plaintiff avers that Undisclosed Supervisor 3 was not dealing with Plaintiff in good faith from inception.

245.     Additionally, Plaintiff was placed on register almost immediately and prior to having his own log in credentials, thus creating circumstances where there were several shifts over which he had no control over what was reported as regards the contents of those drawers and, during one such shift, a coworker and friend of Undisclosed

Supervisor 3 asked that Plaintiff put $20.00 on a particular pump so an acquaintance could fill her car and then would not provide clear affirmative confirmation the funds were remitted to the drawer.

246.     Finally, an individual who was a career Cumberland Farms employee identified an alleged "associate" of Undisclosed Supervisor 3 after Plaintiff described a sort of "bait and switch" this gentleman had performed with regard to swiping his card and separate payment methods for what should have been a single transaction and then quickly left the store prior to Plaintiff realizing the error.  Though Plaintiff accounted for the error in writing, Plaintiff got the distinct impression that he was not long for this job should he attempt to be somewhere he was clearly not wanted.

247.     In addition to the foregoing, with reference to Plaintiff's allegations of "on call" enterprise associates as described below when discussing the events of December 2016, Plaintiff avers that throughout all shifts where Plaintiff was assigned to the register at the front of the store, he would regularly have random "customers" ensure they went to his register, speak in pointed non-sequiturs that seemed ominous or out of place, stare menacingly and regularly shake their head in a "no" gesture at Plaintiff.

248.     Plaintiff avers that Undisclosed Supervisor 3 was acting under the operation and management, or at the very minimum, illicit coercive influence of CE 11.  However, as set forth in Exhibit A, other events regarding other CEs were transpiring during this period and Plaintiff makes no averment that this conduct by individuals Plaintiff cannot directly link to Undisclosed Supervisor 3 was limited to influence by CE 11.

249.     In October 2016, Plaintiff had also begun sending unsolicited inquiries to major law firms seeking counsel for a suit such as this, though at the time, Plaintiff misperceived the nature and extent of the enterprise and the culpability of certain actors. Prior to making such inquiries, Plaintiff had also sent correspondence to certain JOHN AND JANE DOE CLIENTS to whom he attributed behavior too anomalous to discount seeking informed consent to disclose confidential information in a lawsuit like this.  The correspondence in question was sent to a much shorter list of persons than that which is contemplated by this Complaint as, even as late as October of 2016 Plaintiff continued to operate from the perspective that more of his practice had constituted the good faith provision of legal services than it ultimately did.

250.     The "client correspondence prompted precisely four (4) responses, those four (4) responses coming in the following forms:

   a.   Correspondence with a Hyatt Legal Plans participating attorney who, with the caveat that Plaintiff did not seek to interfere with the "client's" choice of counsel, was apprised that Hyatt Legal Plans was contemplated as a Defendant in the prospective suit.  Such communications quickly deteriorated when what was ostensibly to be a serious discussion degenerated into the sort of communication alluded to in Plaintiff's Exhibit A with regard to CE1.  The "CLIENT" in question is identified therein as JOHN OR JANE DOE CLIENT 40 and is implicated by

Plaintiff's allegations regarding the Hyatt Legal Plans, CE13 and "special loans," tortious interference as a person who needs assistance of a type (at oddly inopportune moments for Plaintiff,) where the potential avenues for relief have been constrictively narrowed by the actions of others, despite mysteriously being connected to all the lawyers in the world, and generally suffers from alleged memory issues, a fluidity of narrative, and communication problems which Plaintiff finds not only dangerous, but somewhat frightening for someone in this person's circumstances.  Suffice it to say, this did not result in an offer to waive any privilege which might exist for purposes of Plaintiff filing offensive litigation.

b.  An extremely strange conversation with JOHN OR JANE DOE CLIENTS 41 on or about October 19, 2016, wherein this person offered to sign the privilege waiver Plaintiff had sent along, but also made reference to all the cases brought to Plaintiff by this person.  This goes to Plaintiff's allegation above with regard to the employment of "surrogates" and his allegations as to learning ex post facto that perhaps his practice had not been funded legitimately as Plaintiff has no knowledge of the person in question having ever referred Plaintiff anything. When Plaintiff pressed this person on this point, the person cut off communication and did not send the waiver never to be heard from again. Plaintiff respectfully avers that to have accepted for use any waiver under such circumstances would effectively amount to complicity in whatever sort of tomfoolery in which this person was involved anyway.  JOHN OR JANE DOE CLIENT 41 was also a Hyatt Legal Plains "covered" person.

c.  A call from JOHN OR JANE DOE CLIENT 10's replacement counsel on or about December 2, 2016, ostensibly for the purpose of transitioning this person's matter.  This did not result in assent to disclose and Exhibit A contains additional information as regards the matter of JOHN OR JANE DOE CLIENT 10.

d.  A text message exchange with one of JOHN OR JANE DOE CLIENT 5 & 6, also a Hyatt Legal Plans affiliate whose circumstances implicate so many of the potential predicate acts, allegations of fraud and touch upon almost every aspect of every pattern that Plaintiff need not go into great detail about this person's response which was similar in content to that of JOHN OR JANE DOE CLIENTS 41, but included some added flourishes of fraudulent indignation.

e.  To summarize, Plaintiff avers the only responses he received came from people whose circumstances sound most loudly in fraud while seemingly being least harmed thereby.  Astonishingly fortunate, these four.

251.    Between October 13, 2016 when he was offered the job up through his voluntary resignation, Plaintiff continued to be engaged in communication from JOHN OR JANE DOE CLIENT 10 as regards this person's inexplicable circumstances despite having formally withdrawn as counsel.

252.     Ultimately, on October 28, 2016, Plaintiff had a rather heated exchange with an attorney on a particular matter who he mistakenly believed was counsel for CE11 as regards the matter of JOHN AND JANE DOE CLIENTS 18 & 19.  Upon receiving a response from this individual the following week it was confirmed that this individual had communicated Plaintiff's concerns to CE 11 as regards the issue being discussed.

253.     Certain other events occurring between October 24, 2016 and October 28, 2016 as regards JOHN AND JANE DOE CLIENTS AND CONFIDENTIAL ENTITIES are described in Plaintiff's Exhibit A.

254.     Prior to reporting for work on October 29, 2016, Plaintiff went to the Bristol Community College Library as that library has full sets of a variety of legal reference texts.  While inside cross-referencing several items, Plaintiff had the balance of the gasoline in his vehicle siphoned from his tank.  Plaintiff had put the last several dollars he had in the tank on the way to the library.  Plaintiff ran out of fuel approximately three miles from where the vehicle had been parked, meaning the tank had been siphoned to essentially bone dry.

255.     The first time Plaintiff encountered Undisclosed Supervisor 3 besides just minutes after the call referenced at P.251 was November 2, 2017.  Plaintiff began his shift with one of these odd customer encounters and then Undisclosed Supervisor 3 attempted to show Plaintiff a technique with regard to the security system at the premises in, what Plaintiff alleges, was a manner designed as an excuse to deliver an emphatic use of the phrase "Done."

256.     Plaintiff takes no position as to what all of this head shaking and "done" talk was about, presumably it had something to do with a perception that Plaintiff sought admission to their criminal "affinity groups," alas, all Plaintiff has ever been trying to do is live his life in a manner which didn't require he compromise his future. Nevertheless, it is psychologically taxing and extraordinarily alarming to be constantly monitored and made to feel crazy by complete strangers engaging in menacing forms of communication.

257.     Suffice it to say, after the quantity of anomalous conduct which had transpired in just a handful of shifts at this job, Undisclosed Supervisor 3's directed conduct, and Plaintiff's reasonable concern as to the injury to his job prospects disclosure of an involuntary termination would cause, especially for some form of trumped up financial malfeasance, Plaintiff simply quit when faced with the present round of nonsense talk verbal assault.

258.     G.L. c. 265 §43A defines criminal harassment as  engaging in a willful and malicious pattern of conduct over a period of time directed at a specific person that alarms that person and would cause a reasonable person to suffer substantial emotional distress and extends to essentially any form of communication.

259.     Criminal harassment is an act contemplated by G.L. c. 271A.

260.     Between November 29, 2016 and December 4, 2016, Plaintiff engaged in various correspondence relating to JOHN AND JANE DOE CLIENTS 1& 2, 7, 10, and was actively preparing for a civil action in the name of Plaintiff's professional corporation[39] against JOHN AND JANE DOE CLIENTS 42 & 43.

261.     All of the foregoing actions were directed at extricating himself from any entanglements with persons he believed were not acting in good faith or potentially involved in enterprise associations in any capacity as counsel of record and preparing to attempt to litigate certain issues as regards the manner in which Plaintiff believed he had been harmed to date.

262.     Discovery in this action will bear out why subsequent conduct by enterprise affiliates contributed to the evolution of Plaintiff's damages and affected the answers to professional responsibility concerns and ethical questions in a manner wherein Plaintiff avers his Complaint is both timely with regard to the vast majority of substantive conduct and equitable tolling is appropriate with regard to the balance despite Plaintiff having comprehended the possibility of racketeering liability in October of 2016.

263.     Analagous to the contents of Plaintiff's Exhibit A, there is a one to one correlative component to Plaintiff's treatment of certain "affinity group" associates and what Defendant Mazonson originally described as "living in a world with too many coincidences" that, as Plaintiff had come to realize by December of 2016 in light of the averments contained herein, has nothing to do with "coincidence" or anything "mystical," but is simply old fashioned gangster intimidation tactics and criminal conduct.

264.     As such, on Monday December 5, 2016, the onslaught of property crimes and harassment were in full force.

265.     On December 5, 2016, Plaintiff was late in completing his route.  As such, at 8:54 AM, close to the end of his route, he witnessed a green Chevy SUV marked Z1, possibly a Suburban, sitting at the corner of Cherokee Dr. in Portsmouth, RI, ostensibly purposeless[40].  Plaintiff noticed the vehicle from some distance; Plaintiff avers that the vehicle's occupant appeared to be watching for Plaintiff, and drove off almost immediately after Plaintiff turned onto Cherokee.  Plaintiff followed this vehicle to record the plate and recorded a Rhode Island license either [IN 181] or [IN-181].

---

[39] Plaintiff voluntarily withdrew this action unnecessarily seeking to preserve certain rights as information ascertained in the days leading up to the hearing suggested that Plaintiff may find himself in a position where the attorney witness rule might come into play on both the side of the Plaintiff and Defendant to the extent Defendant appeared through counsel.  Given that Plaintiff's action sought legal fees for hours performed on work that Plaintiff avers constituted a fraudulent exercise in pursuit of enterprise goals, this turned out to be a preferred result.  At the time Plaintiff had filed that action on behalf of his corporate entity he had yet to grasp many aspects of civil RICO damages and that, though Plaintiff certainly had his time wasted by this "client" well in excess of any funds remitted, attempting to be paid for such hours was not well supported to the extent that this "client's" business is reliant upon proceeds of a racketeering enterprise in order to function.

[40] Though Plaintiff avers the tailing tracking and monitoring came in waves, Plaintiff had recently noticed a sedan Rhode Island plate either [MACKEY 1] or [MACKY 1] or [MACKEY1] or [MACKY1] at various points around his route quite frequently and was on heightened alert for being monitored or followed.

Whether the driver, a middle-aged white adult female noticed Plaintiff following is unclear, but this individual turned abruptly into a local beach club in the early morning on a weekday in the pouring rain. Plaintiff turned his vehicle around to complete the last several stops on his route and in so doing watched the beach club entrance to see if the SUV was simply turning around as well; Plaintiff did not see the vehicle reemerge and drove on.

266.     Plaintiff did not make any notes of his activities for the middle part of the day on the 5th, however, when Plaintiff returned to his vehicle in the evening to get dinner from the local McDonalds, the front driver side tire had apparently been deflated so much that it could be removed from the rim. It was dark and as it erroneously appeared to Plaintiff that the tire was simply a little low and McDonalds is less than a quarter mile from Plaintiff's home, Plaintiff attempted to get dinner and deal with the tire in daylight. Not only was the tire completely flat, but the tire came completely off the rim while in the drive thru line after just several blocks of slow driving on side streets, tending to indicate to Plaintiff not only that the tire had been deflated, but levered off the rim[41].

267.     Indeed, reinflating this particular tire revealed the tire was wholly undamaged even after several rotations of rim on cement with the tire tangled up off its axis clearly indicating that the tire had mysteriously become completely deflated in less than eight hours' time (plaintiff pulled directly out of the drive thru line into a spot at McDonalds and put on a spare in the McDonalds parking lot).

268.     On December 7, 2016, at 4:27 PM Plaintiff finished putting the rim with the better tire back on the vehicle. Plaintiff specifically checked the tightness of the bolt on the front passenger caliper (Plaintiff had been recently been experiencing tampering with this item again. Though Plaintiff later obtained some better parts that made tampering with this part of Plaintiff's vehicle more difficult, at this point in time Plaintiff was employing a certain bolt and aftermarket composite resin to secure this connection). The caliper was fastened securely to the frame at 4:27PM on December 27, 2016. Plaintiff then drove to the post office approximately a quarter mile from his residence and the most readily available parking space is one that opens up as soon as Plaintiff approaches the post office when a vehicle pulls away at Plaintiff's approach and so Plaintiff pulls in behind an orange Jeep (Wrangler or similar) with non stock wheels – a "flashy" vehicle, as set forth in the preceding paragraphs, Plaintiff is in high alert mode and records Massachusetts plate [1ND 857] for this vehicle parked on the northbound side of S. Main just south of the post office close to first metered spot in or just outside the 15 minute free parking zone immediately in front of the post office at this location. The vehicle has at least two occupants.

269.     Inside the post office there are at least three individuals in line in front of Plaintiff – when the speed of the line begins to concern Plaintiff in light of recent events (and because one of the women in line who appears healthy starts coughing like she has

---

[41] Plaintiff makes no averment that he is an automotive expert, but Plaintiff does have a degree in Mechanical Engineering is able to perform those procedures for which he owns the proper tools like changing brake pads and oil and can tell the difference between normal wear and tear and malicious tampering with respect to common parts.

tuberculosis,) Plaintiff moves towards the door to check on his vehicle and when Plaintiff gets partially into foyer with the vehicle in view a gentleman pops out from around the rear of Plaintiff's vehicle, this happens quickly and Plaintiff cannot tell for certain exactly how this individual arrived in the location from whence he came.  The individual in question has a short cropped hair cut, a dark top, black rimmed heavy duty military style eyeglass frames, ostensibly prescription; he is a white male with a light Mediterranean complexion, approximately 5'5" - 5'9".  He enters the post office.  He will not make eye contact with the Plaintiff, upon Plaintiff attempting to ascertain whether this gentleman believes Plaintiff suspects him of something, he behaves suspiciously "nonchalant" – reading Post Office literature on the wall and turning his back to look out the window.

270.     Plaintiff completed this transaction at approximately 4:35 PM, approximately eight minutes after leaving the house with a secure caliper and no brake issues.  Upon returning to Plaintiff's vehicle, the vehicle Plaintiff perceived to be acting as a lookout vehicle[42] immediately drove off – it did not appear as though anyone entered or exited the vehicle during this time and the lookout vehicle seemed to have been sitting in that location with no ascertainable purpose.

271.     Plaintiff immediately inspected the bolt that had been the prior subject of tampering (Plaintiff avers that this has occurred outside this very same post office previously, on the previous occasion the culprit having been so bold as to leave the piece of cardboard he knelt on directly in front of the tire).  The bolt in question had, indeed, been loosened.

272.     Plaintiff then waited to see to which vehicle the other gentleman returned. Upon exiting the post office, the gentleman in question crossed the street and started window shopping at Fall River Pawn Brokers without pausing at any of the vehicles parked on southbound side (Plaintiff suspects this gentleman might be attempting to surreptitiously determine whether Plaintiff is watching him).  He eventually actually enters the pawn shop.  After a period of time of watching this gentleman have a little impromptu shopping trip at the local questionably sourced goods emporium, there is only one vehicle remaining on that stretch of southbound side so Plaintiff crossed the street to get the plate number of that vehicle before he exits the store.  The vehicle is a Dark Blue Chevy Tahoe with what appear to be aftermarket rims and a heavily tinted license plate holder. So darkly tinted in fact that Plaintiff can only read with any degree of certainty the large digits of the registration number but only because Plaintiff is standing directly behind the vehicle: [Z305] with some sort of logo, perhaps a circle with a star after the five. Plaintiff does not wish to appear he is hanging around recording license plate numbers, especially if this does not turn out to be his vehicle, so Plaintiff recrosses the street without being able to detect whether this was a standard MA registration or potentially some form of special or government plate.  There is no possible way this tag was clearly

---

[42] Or decoy vehicle, or, less likely, the persons who actually did the damage.  Given the behavior of the other gentleman to be described in what follows, Plaintiff suggests decoy (the persons in the bright orange vehicle were minorities blasting loud music, ostensibly simply loitering and drawing attention—more like "thugs" out of central casting than anyone actually committing any crime) or lookout, but perhaps these gentlemen had some other legitimate purpose there.

readable in traffic, even in broad daylight with the level of tint on the plate holder. The gentleman then exits pawn shop, opens passenger door to the vehicle in question, then closes the passenger door and reenters the pawn shop.

273.       Plaintiff waits to ensure the gentleman actually leaves in the vehicle in question. The gentleman does leave with some form of parcel, but then window shops again for a period, then gets in the vehicle and drives away. It is approximately 4:57PM when he leaves.

274.       At approximately 5:10 PM Plaintiff calls the Fall River Police Department who advise Plaintiff to use the online Complaint reporting form. Plaintiff inquires as to whether the Officer has any knowledge with regard to four digit plates, special issue plate holders or Plaintiff's best description of the circular logo as to whether this could be some form of official vehicle, the Officer is somewhat dismissive, but helpful and suggests that if Plaintiff files a report they may be able to find some security footage from the block, but he reiterates to use the online reporting form.  Plaintiff is clear at several points in this call that he has plate numbers and gives a fair amount of detail about locations, etc.

275.       Plaintiff's review of the Fall River Police Department's online complaint reporting system makes clear not to use the online reporting system when plate numbers or identifiable suspects are involved.

276.       On December 9, 2016, Plaintiff calls back the Police Department and asks about the instructions not to use the online reporting system and describes the content of the call from two nights previous.  The woman with whom Plaintiff spoke on December 9, 2016 confirms that online reporting would be inappropriate based upon the facts described and advises that there would be two methods, either she could send officers to my residence (it sounded like perhaps there was some confusion about the location of the incident) or to come to the Pleasant Street station and file a report, but that both would probably take a fair amount of time.

277.       In September of 2016, Plaintiff experienced having the Fall River Police Department out to his residence for a "wellness check" initiated by members of his family (no call first, no legitimate reason for alarm, indeed Plaintiff and members of his family had not spoken in over 24 hours).  Plaintiff remains to this day unsatisfied with the quality of his family's stated rationale in this regard, and to the extent any Defendant in this action deems this relevant discovery, they can ask the same questions Plaintiff has asked numerous times.  In short, Fall River has a lot of serious crime.  The police do not seem terribly encouraging about pursuing the facts Plaintiff is describing, and Plaintiff is not interested in wasting the time of law enforcement on something that, as evidenced by the scope of this Complaint, Plaintiff would really only be filing the report for the sake of posterity, not because he believed it would be a good use of the Fall River Police Department's resources investigating this single isolated incident, especially after having them out previously at the behest of another for no apparent reason (Plaintiff was sitting on the couch watching videos with his phone turned on and functioning).

278.  Unfortunately no report was ultimately filed.

279.  Between December 9, 2016 and December 22, 2016, Plaintiff made a follow up inquiry of potential litigation counsel to discuss this case and began preparing to file for Bankruptcy protection[43].

280.  On December 25, 2016, Plaintiff was in a minor automobile accident that was entirely manufactured and the events which followed were highly disturbing.

281.  The accident in question occurred directly in front of the loading dock to the location Plaintiff picked up the product for his daily route. On Christmas Day 2016, the dock employees had arranged several trucks in front of the dock in a manner where a driver approaching the building from in the eastbound lane would perceive an opening to pull in where there was no opening due to obstacles blocked from an approaching vehicle's line of sight. It was early on Christmas morning, though Plaintiff did not record the time, it was likely between 5:30AM and 6:30AM. When Plaintiff found his approach blocked, barely getting the vehicle in reverse met with a driver traveling behind Plaintiff, apparently quite close behind for the location and complete absence of traffic who alleges he attempted to pass Plaintiff still partially within the eastbound lane and Plaintiff not having even pulled all the way off the road (Plaintiff was seeking to enter perpendicular to eastbound traffic, or lack thereof). Plaintiff's driver's side (yes, driver's side, the car in question made it all the way around Plaintiff's half parked vehicle before being struck,) taillight assembly clipped the rear quarter panel of the vehicle making the ridiculous "pass." Plaintiff knew immediately that the whole thing stunk to high heavens.

282.  Upon exiting his vehicle, Plaintiff was repeatedly met with "you backed into me," which, while technically true, Plaintiff was not going to make admissions under such circumstances, and Plaintiff made an inquiry as to how closely he was following and commented on an effort to go around under these circumstances. The gentleman in question for some reason seemed intent on obtaining a verbal acknowledgment that Plaintiff backed into him. Plaintiff simply asked the gentleman what he wanted to do. Plaintiff did not know what he was going to do if this gentleman wanted to pursue the matter, perhaps wait and have a police report taken as Plaintiff was not going to permit insurance claims to be made this time on an accident he knew to be fraudulent[44]. The gentleman made what Plaintiff can best describe as either a "forget about it" hand gesture or a "forget you" hand gesture, and made a move to get back in his car. Plaintiff said Merry Christmas and went back to his vehicle to inspect the damage as the other driver

---

[43] The circumstances of Plaintiff's prior Bankruptcy docketed in the Eastern Division of the District of Massachusetts at 16-14811 are evident in that record and not relevant to this crimes against property and person by private actors section. Certain relevant points with regard to this case are touched upon elsewhere in this Complaint.
[44] By way of this action Plaintiff seeks to establish, among other things, that the concept of the staged auto accident is not limited to use in cases of insurance fraud, but is now being used by enterprise participants to "test" individuals on whether their reactions to real life situations is compatible with a particular group's business practices and to assess liability which might be created by "real world" situations. Putting aside all other concerns this sort of behavior raises as regards considerations of lawfulness, this is, quite simply, dangerous—no matter how skilled the players or the precautions taken.

departed.  Plaintiff thought this was the end of it, and, as regards this anonymous driver, it was.

283.      Mysteriously, however, upon reaching 16 Hillside Road in Portsmouth Rhode Island almost two hours later, Plaintiff positioned his car multiple car lengths back from some individuals parked in front of 21 Hillside Road in Portsmouth apparently preparing to assist an elderly passenger into that residence.  Plaintiff was nowhere near the vehicle in question.  The vehicle in question wasn't looking to move.  Plaintiff was completely stationary and wouldn't have needed that vehicle to move even had he wanted to pass the vehicle.  Hillside Road is a dead end street with perhaps five or six residences on it and Plaintiff was parked in the middle of the street, clearly delivering the newspaper.

284.      Upon Plaintiff's vehicle coming to a stop, one of the occupants of the vehicle up the street from Plaintiff's vehicle walked several car lengths back down the street to the passenger's side of Plaintiff's vehicle and indicated for Plaintiff to roll down the passenger's side window.  The gentleman in question then proceeded to make a pointing back over his shoulder motion, gesturing back towards his own vehicle with his thumb and closed fist stating "I didn't see you back there."  Indeed, Plaintiff only rolled down the window for this gentleman because his approach seemed purposeful as there was no necessity of any interaction between the two vehicles given their distance from one another.  Plaintiff was somewhat taken aback by the gentleman's statement as it seemed out of place.  Plaintiff made some form of polite response having to do with simply delivering the newspaper.  Then he said it again.  Plaintiff can't be sure whether he also said it a third time, but given that zero times is usually the appropriate amount of times to walk up to the vehicles of individuals with whom you have no acquaintance and talk nonsense, two would be sufficient to have delivered the message.

285.      It was now indisputable to Plaintiff that networked persons were participating in concerted action to actively drive Plaintiff insane or snap on somebody and make an accusation of conspiracy that they would deny and claim Plaintiff was some sort of paranoid lunatic (See Exhibit A with regard to Plaintiff's averments as regards CE3).  Essentially Plaintiff remained calm in the face of this gentleman making reference to an accident two townships away of which he should have no knowledge, said Merry Christmas, and rolled up the window.  The maniacal expression on this gentleman's face when Plaintiff was disengaging was disturbing, but one he now recognized, Plaintiff had seen it before on, among others, Defendant Mazonson and Defendant Miller, as well as an untold number of persons listed on the enclosures to Plaintiff's Exhibit A.

286.      In light of the foregoing, Plaintiff has only recently attempted to go back through his recollections and reconstruct the events of September 18, 2013, largely to no avail since foul play of the sort contemplated by this section dealing with manufacturing automobile accidents and tampering with property was something that Plaintiff believed only occurred in movies or to people who knew they were involved with organized crime.  The events of September 18, 2013, when viewed through the lens of the foregoing, however, are suggestive to Plaintiff that an attempt on his life may have been made on that date.

287.     As Plaintiff can produce no evidence of this nor testify with any clarity of recollection as to the events of that morning, Plaintiff simply brings to the Court's attention the following facts to which he can testify with certainty.

288.     On the morning of September 18, 2013, traveling northbound on Route 24 just several miles south of the accident occurring on August 8, 2016, Plaintiff lost control of his vehicle.  Whether this was the result of a catastrophic tire failure or simply occurred out of the blue, Plaintiff does not recall specifically, however, the accident in question occurred at highway driving speeds and involved Plaintiff's vehicle spinning in morning traffic at speeds and under circumstances where Plaintiff is lucky to have walked away from the accident with only bruises.

289.     Plaintiff makes no further averment in this regard in light of Plaintiff's inability to testify with adequate specificity[45].

290.     On March 6, 2017, Plaintiff notified counsel[46] for JOHN OR JANE DOE CLIENT 10 that Plaintiff planned to dispense with litigation and try once again to move on with his life unmolested.

291.     Immediately thereafter, Plaintiff's home was broken into, a set of random client documents removed which would be of no value to anyone besides Plaintiff and the "client," and then the "client" reached out with a multi-stage set of document requests the likes of which Plaintiff has never experienced[47].  Almost immediately after engaging in nonsensical hoop-jumping to satisfy professional responsibility obligations on behalf of a

---

[45] Whether this constitutes simply another exercise in "message sending" or if the following is another effort by enterprise associates to obscure those actors with most culpability is unknown, Plaintiff simply draws the Court's attention to the fact that after several years of having had no contact whatsoever with Defendant Cirignano, within an hour of the accident in question Defendant Cirignano sent Plaintiff the following email: "Are you still reachable at this email address?" Again, as Plaintiff was unaware of the nature of the businesses of some of his business contacts at this time, Plaintiff imagines he simply thought this was a coincidentally ill-timed networking request of some sort, though it appears particularly ominous with the benefit of hindsight—or given Plaintiff's averments as regards the tampering with the account in question, perhaps it now looks more ominous than it should, though this is doubtful.  Plaintiff does recollect the exchange which followed and avers that the exchange is not a fabrication and believes the initial contact did occur only shortly after the accident.  Of further note, Plaintiff's responses to Defendant Cirignano are clearly indicative that as of September 2013 Plaintiff had no suspicion that Defendants Garrity or Philbin were not acting in good faith.

[46] Coincidentally, such counsel just so happens to have ties to elements within Defendants Mazonson, Garrity and Philbin's network.  Given the service this person was seeking and their locale, Plaintiff wonders at how small a world it is.

[47] The person in question had their "case" arise from a source that has created untold issues within Plaintiff's practice that, upon information and belief, is no longer managed by the same entities from the time this service was being used.  However, Plaintiff avers that this matter was also directly linked to Defendant Mazonson's network and, as set forth in this paragraph, required Plaintiff to attempt to undertake additional security measures which also proved inadequate.  In sum, this person called Plaintiff asserting that their mortgage servicer had advised that a refinance was possible if this person produced "every document that was filed in their bankruptcy," a bankruptcy which had been closed for four and a half years.  Shockingly, Plaintiff found that large portions of this person's file were missing.  Plaintiff then reconstructed the court records at his own expense, including certified copies of this person's discharge, and hand delivered them to this person's home (to the extent this becomes relevant to a recovery in this action, the circumstances surrounding the entirety of this encounter are so gross it shocks the conscience).

person clearly not acting in good faith, Plaintiff discovered that documents had been returned to Plaintiff's locked home to a location Plaintiff had inspected several times in assessing the request being made.

292.      Thereafter, Plaintiff used the fire escape as a means of egress for several weeks, a procedure neither fool proof nor able to be sustained long term, and subsequently employed a locksmith to install higher quality hardware on both the exterior door to the building and Plaintiff's unit on March 21, 2017.

293.      Attached hereto as Exhibit B is an Application for Criminal Complaint sworn out against Shavar K. Douglas on April 25, 2017 for a certain set of events occurring between April 13, 2017 and April 17, 2017.

294.      In sum, Plaintiff listed his vehicle for sale in late March 2017 with the intent of purchasing something old and less expensive to insure so he could simply continue his route while he figured out his next move. On April 4, 2017 upon learning of the facts related to CE1, his next move became clear, this lawsuit.

295.      A review of Exhibit B evidences the nature of the bizarre transaction with Defendant Douglas which ensued[48].

296.      With regard to these events, Plaintiff acknowledges 1) a portion of the criminal conduct to which Plaintiff seeks to attach liability would not, on their own, constitute predicate acts sufficient for RICO liability in the absence of the Massachusetts statute governing enterprise crime; and 2) the Application enclosed herewith alleges only misdemeanor liability due to the proof beyond a reasonable doubt standard required in criminal proceedings but that Plaintiff avers that he can establish that the amounts in question were greater than $250.00 using a preponderance standard. *Sedima,* 273 U.S. at 485, *supra.* (holding that there is no express prerequisite for either a criminal conviction or that a 1964(c) Plaintiff be able to establish beyond a reasonable doubt the commission of RICO predicate offenses in establishing a pattern of conduct chargeable or indictable under the corresponding provision of §1961).

297.      In addition to the contents of Exhibit B, Plaintiff hereby avers that with reference to the events described as occurring on April 13, 2017 after Defendant Douglas' departure from the premises, the triggering events giving rise to the ensuing email exchanges which occurred between Plaintiff and Defendant Douglas was Plaintiff's review of his security footage, recollection that, in Plaintiff's presence Defendant Douglas had only taken a picture of a single area of damage of the vehicle in question and, finding this to be pointedly suspicious due to advance disclosure of several areas of

---

[48] By the time this transaction with Defendant Douglas occurred, Plaintiff was on high alert. As evidenced by what actually transpired during the course of arranging this transaction, Plaintiff respectfully avers that any suggestion that Plaintiff's emails regarding pursuit of this gentleman by way of an Application for Criminal Complaint in the face of what Plaintiff reasonably perceived was a person who was neither acting in good faith nor beyond attempting to make assertions of contractual entitlement should not be construed as anything more than statements of Plaintiff's intention to enforce his legal rights by way of his chosen action. While such statements were made with a preference for not consummating the transaction, such preference was not corruptly motivated.

noteworthy damage and Mr. Douglas' decision to photograph that area while Plaintiff was watching, but take additional photographs only after Plaintiff was inside the house, and Plaintiff making a review of his personal file regarding an allegation of Driving Under the Influence from September of 2015[49].

298.    Due to the manufacture of evidence in the September 2015 incident, the factors set forth in the preceding paragraph, and several other considerations raised in Exhibit B, Plaintiff immediately became concerned that Mr. Douglas' motivations might be more complicated than simply a man looking to buy a car, suspicions which were confirmed when the file review referenced above yielded that Plaintiff's copy of the affidavit in question was not in his file.

299.    The balance of the contents of Exhibit B speak for themselves.  Plaintiff's vehicle was tampered with again almost resulting in a very serious accident on April 14—travel which was only necessitated by the missing affidavit in the first place (Plaintiff drove the vehicle to Post Office Square to line the damage in question up with the standard supporting columns in that garage so as to have some form of evidence to support his claims in the event a new version of the affidavit in question cropped up somewhere later).

300.    At some point on April 14, 2017 or April 15, 2017, the affidavit was returned to Plaintiff's locked home.

301.    In effect, despite the new locks, Plaintiff's home was again being invaded in his absence.

302.    In response, Plaintiff quit the paper route effective that day, April 15, 2017.

303.    Between April 15, 2017 and May 23, 2017, Plaintiff did not leave the premises at all, a practice which eventually became logistically unworkable.

304.    The initial hearing in the action referenced above was scheduled for May 24, 2017 and Plaintiff withdrew his Application as, at that time, those who later assisted him as set forth in the paragraph which follows were not willing to assist Plaintiff at all.  The first foray outside Plaintiff's home on May 23, occurred in the middle of the night and lasted less than thirty minutes.

---

[49] Plaintiff raises this point because he pled no contest in that action in a plea agreement geared towards the expeditious return of his drivers' license despite the affidavit upon which such indictment was based having contained several anomalies or omissions and at least one outright fabrication—i.e. that Plaintiff's vehicle had "struck a Jersey Barrier." Plaintiff has vocally discussed and disputed this injustice with numerous individuals due to Plaintiff's vehicle having preexisting unreported damage to the rear passenger door (Plaintiff had parked the vehicle in a compact spot in the Garage at Post Office Square in the months leading up to the September 2015 incident and the vehicle had rubbed up against a supporting column and this was the actual cause of the "Jersey Barrier-esque" damage). Plaintiff acknowledges review of findings of fact in other cases are not to be litigated here and should he seek further review of the disposition of that case, Plaintiff will take that up in the appropriate forum—Plaintiff is simply making averments which informed his motivations.

305.     Between May 23, 2017, and the date of this Complaint, with the exception of one Court appearance on June 7, 2017, wherein he made arrangements to have someone watch the premises in his absence and one other on June 19, 2017 wherein he was unable to secure similar arrangements and so packed up as much relevant evidence and as much sensitive information as he could carry on his person, Plaintiff leaves his home for no more than half an hour at a time, does so without notice and uses additional barricading mechanisms for necessary trips out of the house.

306.     Plaintiff had erroneously believed he would have this Complaint prepared sooner, potentially facilitating his ability to obtain additional assistance with this serious liability concern.

307.     An intervening Bankruptcy docketed as 17-11609 and a number of other events largely beyond Plaintiff's control have slowed his progress in this regard, including, as set forth below, efforts at information gathering from state and federal authorities peripherally related to the facts contained herein.

308.     In sum, however, Plaintiff is now, for all intents and purposes, a destitute prisoner in his own home, faced with the following choices as Plaintiff sees them: 1) attempt to secure employment and leave unattended materials relevant to this action and materials constituting court and client property until he can raise enough funds to secure third party storage and hope he is able to do so prior to facing unknown and potentially unlimited liability and, as set forth above and in Exhibit A, do so at the risk that such employment will, like every other "opportunity" Plaintiff has received in the last two years, come with a fraudulently incentivized babysitter to harass and intimidate Plaintiff in contravention of G.L. c. 265 §43A or manufacture circumstances wherein, in addition to the at will nature of the employment, an additional layer of fraudulently manufactured "insurance" will be generated; 2) call the FBI and tell this story hoping they'll take custody of Plaintiff's files with the professional responsibility concerns attendant thereto and knowing full well that the likelihood of criminal prosecutions based upon statistical probability, review of years' worth of potentially altered electronic evidence combing for needles in haystacks, Plaintiff's testimony, and what documentary support Plaintiff still has based on a criminal standard is highly unlikely given the sums involved and crime of greater danger and more far reaching implications with which law enforcement could be occupied is highly unlikely; 3) take the next CE1-esque "case" that calls on the lemming theory that if everybody else is doing it, it must be alright—obviously with the understanding that, as set forth in Exhibit A, any such "case" would come with exactly the same strings as is set forth at 1), i.e. whoever this person is will be illicitly incentivized and charged with ensuring Plaintiff simply says his lines and collects his check, thus making Plaintiff truly owned by these monsters, now and forever, with the added bonus of never quite being sure if or when the "powers that be" are going to put a stop to the "fake case" party (Plaintiff's reading of the law suggests this is not really an option from the standpoint of that which is actually lawful, he simply raises it as there seems to exist a rather large subset of persons who are operating from the position that as long as one is skilled enough at playing dumb, no criminal liability ever attaches even to the tallest of tales); or 4) file this Complaint in self-protection in the hopes that something

good can come of it, though with the very real downside that, as Plaintiff is, at least on paper, suing "clients" and former "colleagues," he will have an insurability problem.

309.     It is, in sum, a terrible situation and one which exists due to actionable criminal conduct by others.

310.     And with regard to considerations arising out of the intangible effects of having seven to ten of his best career building years essentially having a case against him built with fraud, this simple fact gives rise to categories of damages for which Plaintiff has no adequate remedy at law.  Plaintiff worked hard for many years and, while perhaps he made some large blunders and bit off more than he could chew, Plaintiff was for many years both always available to deal with an emergency situation and compassionate with those who treated his efforts with a modicum of respect and that Plaintiff was unaware of the element with which he was involved, through no knowledge of his own, he has had a lifelong employability concern created for him and had more than a few of what are usually one's career building years taken from him in the pursuit of learning a trade which, as far as Plaintiff can tell, cannot actually be practiced legitimately in this area of the country outside of a law firm setting without aligning oneself with an untoward element or being in a constant and irresponsible state of defensive posture.

311.     Unfortunately the conduct described herein remains of imminent concern – on June 15, 2017, Plaintiff had his U.S. Passport stolen; on August 5, 2017, Plaintiff was followed and photographed during a very brief grocery trip.

312.     Defendants in this action will likely make much of Plaintiff's "choice" to take this action or that action, or seek to raise affirmative defenses or counterclaims sounding in Plaintiff being an intervening or superseding cause of his own damages—as set forth in the following section regarding the pattern of coercion and coercive threats, however, Plaintiff asks how a reasonable person would find most "choices" with which Plaintiff has been faced.

313.     In addition to the federal statutory provisions and articulated grounds for establishing the existence of racketeering activity, those state statutory definitions included in Plaintiff's Exhibit B, and not defined elsewhere in this Complaint, the following state statutory provisions are relevant to the foregoing averments and certain other averments found elsewhere in other sections defining the patterns:

   a.  G.L. c. 266 §30(2) provides:

The term "property", as used in the section, shall include money, personal chattels, a bank note, bond, promissory note, bill of exchange or other bill, order or certificate, a book of accounts for or concerning money or goods due or to become due or to be delivered, a deed or writing containing a conveyance of land, any valuable contract in force, a receipt, release or defeasance, a writ, process, certificate of title or duplicate certificate issued under chapter one hundred and eighty-five, a public record, anything which is of the realty or is annexed thereto, a security deposit received pursuant to section fifteen B of

chapter one hundred and eighty-six, *electronically processed or stored data, either tangible or intangible, data while in transit, telecommunications services*, and any domesticated animal, including dogs, or a beast or bird which is ordinarily kept in confinement.

    b.  Mass. Gen. Laws ch. 266 § 34 provides:

Whoever, with intent to defraud and by a false pretense, induces another to part with property of any kind or with any of the benefits described in sections 33 and 33A shall be guilty of larceny.

    c.  Mass. Gen. Laws ch. 266 §33 provides:

Whoever, with intent to defraud, obtains by a false pretense the making, acceptance or endorsement of a bill of exchange or promissory note, the release or substitution of collateral or other security, an extension of time for the payment of an obligation, or the release or alteration of the obligation of a written contract . . . shall be guilty of larceny.

    d.  Mass. Gen. Laws ch. 265 §37 provides:

No person, whether or not acting under color of law, shall by force or threat of force, willfully injure, intimidate or interfere with, or attempt to injure, intimidate or interfere with, or oppress or threaten any other person in the free exercise or enjoyment of any right or privilege secured to him by the constitution or laws of the commonwealth or by the constitution or laws of the United States. Any person convicted of violating this provision shall be fined not more than one thousand dollars or imprisoned not more than one year or both; and if bodily injury results, shall be punished by a fine of not more than ten thousand dollars or by imprisonment for not more than ten years, or both.

    e.  Mass. Gen. Laws ch. 265 §25 provides:

Whoever, verbally or by a written or printed communication, maliciously threatens to accuse another of a crime or offence, or by a verbal or written or printed communication maliciously threatens an injury to the person or property of another, or any police officer or person having the powers of a police officer, or any officer, or employee of any licensing authority who verbally or by written or printed communication maliciously and unlawfully uses or threatens to use against another the power or authority vested in him, with intent thereby to extort money or any pecuniary advantage, or with intent to compel any person to do any act against his will, shall be punished by imprisonment in the state prison for not more than fifteen years, or in the house of correction for not more than two and one half years, or by a fine of not more than five thousand dollars, or both.

    f.  Mass. Gen. Laws ch. 271 § 39 provides:

(a)  Whoever, in relation to any transaction or matter concerning the business affairs of an employer, principal or beneficiary (1) offers, gives or agrees to give an agent or fiduciary

of another person any benefit or anything of value with intent to influence the recipient's conduct, or (2) as an agent or fiduciary, solicits, accepts or agrees to accept any benefit or anything of value from another person who is not an employee, principal, or beneficiary upon an agreement or understanding that such benefit or thing of value will influence his conduct, shall be punished by imprisonment in the state prison for not more than five years, or by a fine of not more than ten thousand dollars, or both.

(b)   Whoever, verbally or by a written or printed communication, threatens an economic injury to another, or threatens to deprive another of an economic opportunity, with intent to compel that person to do any act, involving the use or disposition of anything of value against his will, shall be punished by imprisonment in the state prison for not more than five years, or in the house of correction for not more than two years, or by a fine of not more than five thousand dollars, or both. The provisions of this paragraph shall not apply to any labor disputes as defined in section two of chapter one hundred and fifty A.

PATTERN THREE:
THREATS, COERCION AND COERCIVE INTERFERENCE

314.      18 U.S.C. §1512 (a)(2)(A-C) proscribes: the use or attempted use of physical force or the use or attempted use of threat of physical force against any person with intent to—

(A) influence, delay, or prevent the testimony of any person in an official proceeding;

(B) cause or induce any person to—

    (i)      withhold testimony, or withhold a record, document, or other object, from an official proceeding;

    (ii)     alter, destroy, mutilate, or conceal an object with intent to impair the integrity or availability of the object for use in an official proceeding;

    (iii)    evade legal process summoning that person to appear as a witness, or to produce a record, document, or other object, in an official proceeding; or

    (iv)    be absent from an official proceeding to which that person has been summoned by legal process; or

(C) hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, supervised release, parole, or release pending judicial proceedings;

315.      18 U.S.C. §1512 (b) proscribes: the knowing use or attempted use of intimidation, threats, or corrupt persuasion of another person or engaging in misleading conduct toward another person, with intent to—

(1) influence, delay, or prevent the testimony of any person in an official proceeding;

(2) cause or induce any person to—

    (A) withhold testimony, or withhold a record, document, or other object, from an official proceeding;

    (B) alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding;

    (C) evade legal process summoning that person to appear as a witness, or to produce a record, document, or other object, in an official proceeding; or

    (D) be absent from an official proceeding to which such person has been summoned by legal process; or

(3) hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, supervised release, parole, or release pending judicial proceedings;

316.    18 U.S.C. §1512 (c) proscribes: corruptly

(1) altering, destroying, mutilating, or concealing a record, document, or other object, or attempting to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or

(2) otherwise obstructing, influencing, or impeding any official proceeding, or attempting to do so,

317.    18 U.S.C. §1512 (d) proscribes: intentionally harassing another person and thereby hindering, delaying, preventing, or dissuading any person from—

(1) attending or testifying in an official proceeding;

(2) reporting to a law enforcement officer or judge of the United States the commission or possible commission of a Federal offense or a violation of conditions of probation, supervised release, parole, or release pending judicial proceedings;

(3) arresting or seeking the arrest of another person in connection with a Federal offense; or

(4) causing a criminal prosecution, or a parole or probation revocation
proceeding, to be sought or instituted, or assisting in such prosecution or
proceeding;

or attempting to do so.

318.     Admissibility of evidence and whether an official proceeding is pending or about
to be instituted are no bar to the applicability of 18 U.S.C. §1512 and pursuant to 18
U.S.C. §1512(k), conspiracy to violate the provisions of the section are similarly
punishable.

319.     With regard to several JOHN AND JANE DOE CLIENTS and potential
arguments which may arise in this action regarding whether certain persons waived
privilege through third party disclosure, Plaintiff anticipates the potential necessity of
producing evidence that certain persons did not approach Plaintiff for purposes of
obtaining legal advice, representation or counsel, but instead to instruct, school or grade
Plaintiff's performance in the carrying out of closed system transactions.  Specific
conversations with representatives of CE 11 tend to support this idea.  Irrespective of this
possible issue, Plaintiff avers that from June of 2011 through the date of this Complaint,
Plaintiff has held a Massachusetts bar card and been admitted to practice before various
federal courts and in those instances wherein he was performing functions in that
capacity, Plaintiff is contemplated by G.L. c. 265 § 25.

320.     As set forth in Plaintiff's Exhibit A, Plaintiff further avers that the facts
precipitating the prospective "case" of CE 1 for Plaintiff's attention are simply one
example of circumstances implicating G.L. c. 271 § 39 and that Plaintiff's entire career is
replete with "cases" of suspect factual predicate that constituted either constructive
bribes, or more aptly, (and only with the benefit of hindsight) some dystopian form of
bribe/threat combination wherein Plaintiff's cooperation is met with simple work and
long money whereas Plaintiff's non-cooperation or simply having accidentally gone "off
script" in someone else's scripted fraud that Plaintiff simply thought was his life and
career is met with disappearing documents, shifting narratives, insane behavior, and often
involves "client" conduct that is against the "client's" own interests and involves willful
omissions and nondisclosures that stretch the bounds of credulity as the matter in
question slowly devolves into the realm of the absurd[50].

---

[50] Plaintiff's Complaint and Exhibit A to Plaintiff's Complaint are formulated in a manner designed articulate
sufficient facts to make out cognizable claims for enterprise liability and conspiracy liability in what Plaintiff admits
is an extremely diffuse network of persons skilled in both the art of deception and adhering to codes of silence while
nevertheless taking great pains to provide safeguards against premature or excessive disclosure of what would
traditionally be viewed as confidential or privileged information.  And with the exception of the necessary disclosure
of a single matter meeting the technical definition of a related case on local category form 4 filed with Plaintiff's
case opening materials, in the body of the Complaint itself, Plaintiff attempts to take measures to ensure that even
with the use of pseudonyms he does not disclose information which would permit circumstantial identification of
affected parties, though with regard to certain entities, this will be difficult to avoid.  Given that Plaintiff's case
opening materials are hundreds of pages, as difficult as this may be to wrap one's head around, while Plaintiff's
Complaint may not be the shortest, plainest statement of facts possible to state his claims (he is under some time
constraints without assistance and absent a sufficient number of examples, the nature of Plaintiff's Complaint has
the tendency to sound more like a conspiracy theory than an actual conspiracy,) especially with regard to Hyatt

321.     To the extent the foregoing has, in certain specific instances, involved what Plaintiff believes he can establish are "cases" that are never won or lost with any measure of finality, "clients" who, even in the face of withdrawal and accusation, are unable to move on without action by Plaintiff specifically, and the reasons for the foregoing appear attributable to "client" and "lender" conduct that appears related not to an impartial review of circumstances, but tethered to Plaintiff, specifically, Plaintiff avers that such circumstances raise concerns under both G.L. c. 265 § 37 and 18 U.S.C. § 1589.

322.     Plaintiff avers that when read as a whole, the factual recitations contained in this Complaint implicate repeated and ongoing violations of 18 U.S.C. § 1512 both in Plaintiff's capacity as an officer of the U.S. Bankruptcy Court, an officer of this Court, an officer of the Courts of the Commonwealth, and, most importantly, that large swathes of the conduct described herein is specifically targeted at Plaintiff not filing a lawsuit like this and choices related to whether and how he might seek protection under Title 11 of the United States Code on his own behalf.

323.     In addition to the myriad ways this Complaint when read as a whole implicates violations of the foregoing provisions and establishes a pattern of racketeering activity, Plaintiff sets forth the following additional specific instances of conduct constituting, at a minimum, attempts at corrupt interference with the administration of justice.

324.     As set forth above, during a meeting with Defendant Flashenburg during the period referenced above wherein the Defendant Mazonson was weaving his narrative about the paranormal, the occult, "the jews," his general lack of familiarity with matters that ran through his office[51], and that "when grown men fight, people die," Defendant Flashenburg similarly engaged in a conversation with Plaintiff wherein he was repeatedly using the word "dead," though ostensibly in context in discussing a third party, the usage was emphasized in a manner which didn't flow with the cadence of the balance of what was being said and was, in point of fact, quite ominous.

---

Legal Plans "cases" and "cases" originating from and the specific conduct of certain named Defendants, or the sort of thing Plaintiff alludes to with regard to Mr. Lange, Plaintiff hereby avers that this Complaint only begins to address the scope of fraudulent, unlawful, actionable, or otherwise bizarre conduct.

[51] On this point Plaintiff draws the Court's attention to the second fact pattern described in Plaintiff's Exhibit A illustrating representative conduct as regards the Mazonson Defendants and CE 13.  And while Plaintiff acknowledges that his awareness of these facts arose in the context of a "business" relationship with the Mazonson Defendants, the nature of which he was largely in the dark on, in light of the balance of the averments contained herein and the context in which Plaintiff learned of these facts—i.e. that Defendants Mazonson and Zicher must have done an intake of a matter upon which neither of them did any work and planted a file in Plaintiff's materials on behalf of a person who the public record suggests is some form of professional straw man or professional client, Plaintiff avers that no attorney-client relationship or duty of confidentiality extends to Plaintiff irrespective of any traditional formulations of ethical canons—Plaintiff has never spoken with this person, has no knowledge of this person's circumstances other than what the public record bears out and what had been fraudulently placed in Plaintiff's custody –see Exhibit A for Plaintiff's averments in this regard, and generally avers that the entire existence of this "case" appears to be a blatant exercise in "fake work" that Defendants Mazonson and Zicher never got around to dumping in Plaintiff's lap prior to the deterioration of the relationship between Defnedant Zicher and Plaintiff and then later ensured that the entire file made it into Plaintiff's custody without his consent (it is Plaintiff's contention that he has been getting set up as a scapegoat for all manner of indiscretions by these Defendants for some years now so why not throw all the trash into Plaintiff's realm?).

325.      Between May 27, 2016[52] and August 25, 2016, Elizabeth Teves-Michael, analogous to the same sorts of fairy tales Defendant Mazonson was spinning in the winter of 2014 into 2015, struck up a several month long text message exchange replete with similar sets of fantastical explanations of what, in essence, amounts to "how the world works." Defendant Teves-Michaels' explanation leaned more heavily on theories about extra-terrestrials and illuminati or elite blood lines, but again, it was a targeted campaign that, much like the facts described in Exhibit A with highly suspicious temporal correlations, appear timed to interfere in Plaintiff's affairs.

326.      The point is not merely that a crazy woman is texting Plaintiff or that mere unwanted, accusatory or hurtful communication standing alone would be actionable. The point is that the flavor of the communication is part of a targeted campaign of subtle coercion and interference. Not only if one reads the exchange as a whole, does one find it replete with unfounded accusations not only against which can Plaintiff defend, but that are inconsistent in context—Defendant Teves-Michael is recommending Plaintiff obtain a firearm for self-protection while making assertions that she fears for her safety as regards Plaintiff, she fraudulently attempts to create a paper trail of a belief that Plaintiff is a "paranoid schizophrenic" on the heels of a conversation from just a month earlier wherein she advised Plaintiff he was "blocked" then proceeded to continue the conversation. As Plaintiff has no social media accounts and clearly wasn't blocked from continuing the text exchange they were then conducting, from what was Plaintiff "blocked" precisely? What we have is someone talking either nonsense at Plaintiff or attempting to create the appearance Plaintiff is privy to some set of facts to which he was

---

[52] Defendant Teves-Michael is a woman with whom Plaintiff had a serious long term relationship between 2006 and 2011 and thereafter with whom relations can best be described as "on again, off again" whether as mere platonic friendship or something more and with regard to whom Plaintiff's averments are similar to those levied against Defendant Mazonson i.e. 1) there seems some participation in a system involving the purchase and sale of "social debt" or "rights" in the "choices" of others, though with regard to Defendant Teves-Michael there seems to be some blurring of lines into Plaintiff's business affairs ; 2) that Defendant Teves-Michael is an "affinity group" associate whose family has strong ties to Commonwealth enforcement agencies and who Plaintiff used to joke had mafia ties but, in light of the contents of this Complaint, apparently the greatest truths are said in jest; 3) that, with the benefit of hindsight and the ability to review from a distance the timing of Defendant Teves-Michael's most recent "appearances," like the contents of Plaintiff's Exhibit A, there seem to be some highly coincidental temporal correlations as to the timing of these appearances; and 4) Defendant Teves-Michael seems to most recently behave in a manner tending to suggest that she has an interest in misleading Plaintiff, discrediting Plaintiff, and interfering with Plaintiff's ability to function professionally. With regard to point 3), Plaintiff draws the Court's attention to her reappearing after months of no communication while Plaintiff was walking in to a court appearance for which he was already late on behalf of another "affinity group" participant and a mere three days after once again becoming underemployed, (subsequent discovery bore out that this matter was of suspect legitimacy and Plaintiff makes no claim of injury from the timing of this particular correspondence, Plaintiff merely draws the Court's attention to the fact that, with the benefit of hindsight, Plaintiff can establish a distinct pattern of interference from Defendant Teves-Michael that cannot be explained as mere coincidence and that given the content of some of the text messages referenced in this paragraph, Defendant Teves-Michael was, at the time, employed in the same sort of pollution of Plaintiff's understanding of the nature of his circumstances as Defendant Mazonson, the content of the messages in question is both harassing and attempts to pollute the quality of the correspondence with blatant inconsistencies and accusatory fabrications so as to dissuade Plaintiff from using them in an action such as this and culminates in a wholly fraudulent and coercive threat of an intent to fabricate an accusation against Plaintiff.

not privy and then being faced with fraudulent accusations of mental illness when it is the accuser and not the accused who is talking gibberish.

327. Plaintiff questions why a person without ultiorior motivations would keep initiating contact with an allegedly dangerous and paranoid schizophrenic (who should also get a firearm for self-protection and is a reasonable resource for political opinion and legal advice, mind you).  The answer is the same as it is with all named Defendants herein—absent Plaintiff's discredit, what this Defendant has to hide about the manner in which she conducted herself as regards Plaintiff throughout the entirety of their acquaintance is dark.

328. On August 24, 2016, this most recent foray into Defendant Teves-Michael's shadowy world of illicit communication, psychological torture and interference in Plaintiff's life culminates in a set of messages which begin after 11PM, mere hours before Plaintiff would be scheduled to be up and preparing to do his route (facts to which Defendant Teves-Michael was privy) and at a point in time when Plaintiff wasn't even aware of where Defendant Teves-Michael resided wherein (for literally no reason whatsoever unless one acknowledges Defendant Teves-Michael is aware of Plaintiff's business activities) she advises Plaintiff who is at home asleep "the police are getting called" because someone, (and she suspects Plaintiff) is allegedly "casing her property.[53]" The parties had not spoken in over a month.

329. Though Plaintiff acknowledges that a three month period of odd communication and fraudulent accusations is probative of little standing alone, Plaintiff avers 1) it is part of a larger pattern of attempts to engage in threatening and coercive communication by a large group of persons under the cover of some ruse, whether that be a fraudulently manufactured privileged or confidential setting or by peppering the correspondence with information that Plaintiff would not wish to disclose publically—as to the latter, Defendant Teves-Michael miscalculated Plaintiff's willingness in this regard; 2) reviewing the entirety of Plaintiff's acquaintance with Defendant Teves-Michael would yield that this sort of directed interference was occurring for years, Plaintiff simply never related the two; and 3) it is, in point of fact, a direct threat of the type of false accusations to expect should Plaintiff's "business" decisions not meet with Defendant Teves-Michael's liking ("business" decisions about which she purportedly has no awareness and which have the tendency to affect official proceedings).

330. In addition to the foregoing more subtle forms of coercion and attempts to exercise illicit influence, Plaintiff has been physically threatened by:

 a. One of JOHN AND JANE DOE CLIENTS 3 & 4;

---

[53] Similar to other Defendants named herein who behaved in a targeted fashion towards Plaintiff who may also have been under clandestine attack from someone other than Plaintiff, to the extent Defendant Teves-Michael truly had someone outside her home on August 24, 2016 behaving in an unlawful manner, she is free to defend Plaintiff's allegations with evidence of same or bring cross-claims against those Defendants whom she believes are the true culprit or culprits.

      b.   One of JOHN AND JANE DOE CLIENTS 18 & 19;

      c.   Defendant Mazonson;

      d.   An allegedly adverse party in a matter involving Defendants Garrity and Philbin wherein it subsequently appeared the person in question was actually acting in cooperation with Defendants (or was similarly coerced in the interim);

331.     Plaintiff has been implicitly threatened either through non-sequitur allusion to possession of guns or firearms, allusions to ties to organized crime, or repeated allusion to dying, killing, or a willingness to engage in physical violence towards Plaintiff or others:

      a.   JOHN AND JANE DOE CLIENTS 12 & 13;

      b.   JOHN OR JANE DOE CLIENT 23;

      c.   One of JOHN AND JANE DOE CLIENTS 18 & 19;

      d.   One of JOHN AND JANE DOE CLIENTS 1 & 2;

      e.   Defendant Mazonson;

      f.   Defendant Sokol;

      g.   Defendant Zicher;

      h.   Defendant Flashenburg;

      i.   A coworker at Cumberland Farms other than Undisclosed Supervisor 3;

      j.   One of JOHN AND JANE DOE CLIENTS 3 & 4;

332.     Plaintiff has had implied threats of a show of actual physical force made by:

      a.   One of JOHN AND JANE DOE CLIENTS 24 & 25;

      b.   One of JOHN AND JANE DOE CLIENTS 42 & 43;

      c.   One of JOHN AND JANE DOE CLIENTS 3 & 4;

333.     Plaintiff avers that the foregoing activities were of varying credibility and several were not even perceived as threats in real time, however, Plaintiff avers they were, nonetheless, attempts to corruptly persuade.

334.    Before continuing into Plaintiff's allegations of coercive threats, implied bribes, the "flooding" of Plaintiff's practice with fraudulent interference in the ongoing appellate or post-judgment lower court pursuit of remedies in 12-11697, and other efforts to influence Plaintiff's lawful discharge of his obligations, Plaintiff draws the Court's attention to the following averment with regard to some of the threats referenced above as well as the other conduct Plaintiff references in the body of this paragraph: some of this conduct would serve no useful function or makes no sense in the context of the factual circumstances as they had been described to Plaintiff or the public record would support outside the context of a directed and concerted attack on Plaintiff.

335.    To wit: certainly with varying degrees of credibility or support, some of the coercive influencers listed above and those to follow, as well as other persons and entities described elsewhere herein can make out plausibly colorable rationales for behaving in the manner they did at a particular point in time—but merely "some" on a point such as this is not nearly enough—in all of these categories of persons and entities one will find evidence of a common phenomenon: conduct tailored to prompt action from *Plaintiff specifically*, not merely that the action occur somehow.

336.    Plaintiff has encountered threats to professional reputation either express or implied from the following persons, and in those instances where litigation of this action will reveal real mistakes, lapses in judgment, or professional error, Plaintiff has made extensive disclosures in this regard to certain enforcement, judicial and administrative bodies as to the majority of what Plaintiff's review has uncovered in this regard, Plaintiff has no issues addressing how this conduct or any other conduct of which he is actually culpable might defray his own damages, however the threats in question in this paragraph, by and large, have little to do with any malfeasance in which Plaintiff willfully or negligently engaged that was not the result of fraudulent circumstantial manufacture, outright false statements upon which Plaintiff reasonably relied, or coached or clearly material factual omissions, i.e. the communications constituting the truly coercive, threatening, attempts at extortion of contractual rights, equitable rights or labor by and large stem from dummied up circumstances where Plaintiff's behavior was not only industry standard, but went above and beyond, though due to the simple fact that the "client" was an attacker as opposed to a good faith purchaser of services, Plaintiff has been framed as having committed some error or punishable act in entirely fraudulent "no win" scenarios:

   a.  Defendant Miller (and other persons within her "affinity group");

   b.  JOHN OR JANE DOE CLIENT 17;

   c.  JOHN AND JANE DOE CLIENTS 3 & 4;

   d.  The Mazonson Defendants;

   e.  Defendant Flashenburg (and other persons within his "affinity group");

  f. Defendant Sheff and employees of Sheff Law;

  g. Enterprise associates communicating on behalf of parties purportedly affected by the processing of the Sokol "patient zero" matter;

  h. JOHN AND JANE DOE CLIENTS 26 & 27;

  i. JOHN AND JANE DOE CLIENTS 42 & 43;

  j. JOHN OR JANE DOE CLIENT 23;

  k. CE3 & CE6;

  l. JOHN OR JANE DOE CLIENT 10;

  m. JOHN OR JANE DOE CLIENT 7;

  n. "Prospects" "referred" by Defendant Garrity for no legitimate purpose besides Plaintiff's discredit or distraction.

337. Plaintiff avers his allegations with regard to the breaking and entering and document theft contained throughout his Complaint have an inherently coercive effect and clearly indicate corrupt intention to obstruct justice in a variety of official proceedings.

338. And with regard to one official proceeding, specifically, Plaintiff avers that intentional interference traceable to "affinity group" participants posing as "clients" or "forced action" by complicit lenders, collectors, or agents of lenders or collectors can be traced in one to one correlation to every single time a filing was due in 12-11697 or the ensuing Appeal to the First Circuit from the time Plaintiff identified Harmon Law Offices, P.C. as having manufactured evidence in that action right up through judgment being upheld on appeal.  With regard to this averment, Plaintiff names as Defendants those "clients," Hyatt Legal Plans[54] "clients" or "prospects" relevant to at least one other set of averments contained herein in an effort to avoid this litigation becoming more onerous and complicated than it already proves to be and until it is determined how issues of privilege and confidentiality are to be treated throughout.  In instances where persons from within a particular "affinity group" network unaffiliated with Hyatt and appearing to act in furtherance of the goals described in this paragraph but ostensibly or arguably unwittingly and ostensibly at mere prompting by either a nominally related lending institution or a named Defendant, Plaintiff similarly leaves these persons off any service lists at the outset.

---

[54] With regard to Plaintiff's averments as regards Hyatt, Plaintiff alleges that Hyatt was being used as a "feeder" for networked persons and that upon Plaintiff making it clear that he would perform no future Hyatt service beyond file maintenance, CE 16 attempted to move into Hyatt's place as a mechanism to "get at" Plaintiff with harassing nonsense.

339.     Filings or actions of some import were due in that matter on or about the following dates:

    a.  April 17, 2013;

    b.  July 1, 2013;

    c.  August 7, 2013;

    d.  September 5, 2013;

    e.  December 21, 2013;

    f.  January 6, 2014;

    g.  February 27, 2014;

    h.  April 2, 2014;

    i.  May 2, 2014;

    j.  May 15, 2014;

    k.  October 28, 2014;

    l.  November 4, 2014;

340.     There exists a distinct pattern with regard to the foregoing dates that only became clearly evident to Plaintiff recently, both due to the light shined on the nature of certain methods in use that investigation of CE1's circumstances shed and what Plaintiff's efforts to secure counsel and subsequently write this Complaint unearthed: i.e. in the week or so leading up to every time something was due in 12-11697, a case that involved whether Harmon Law Offices, P.C. dummied up an acceleration letter ex post facto for use in litigation, Plaintiff's practice became mysteriously flooded with matters requiring immediate attention, often with the flavor of what, with the benefit of hindsight, appear to have been "traps for the unwary."  Generally speaking the pattern even seems to involve a pretty steady distribution across "affinity groups" as well and with regard to long time "clients," repetitive appearance by what Plaintiff will describe as "the usual suspects."

341.     Such distribution, with some limited variation, generally includes:

    a.  several Garrity/Philbin sourced "emergencies," in certain instances with regard to a matter of which Plaintiff has never previously heard though is not new, in others where the relief sought was at all times at best ill conceived, often lawfully impossible, yet facts described at inception mysteriously never revealed same;

    b.  A Zicher related mess;

    c.  Several Hyatt matters (the "sources" vary among Flashenburg, Walters, and Mazonson, though the Walters "sourced" matters are particularly problematic) either new "emergencies" or persons who subsequent discovery would inevitably yield "above the law" special treatment in extremely labor intensive messes involving outlandish circumstances;

    d.  A Mazonson related issue or two;

    e.  A variety of requests on matters implicating the facts described in Pattern Four.

342.      The following named JOHN AND JANE DOE CLIENTS, their lenders, or lenders' agents and or attorneys are implicated by the foregoing averment, though as set forth above, such list is not exhaustive:

    a.  JOHN AND JANE DOE CLIENTS 1 &2;

    b.  JOHN AND JANE DOE CLIENTS 3 & 4;

    c.  JOHN AND JANE DOE CLIENTS 5 & 6;

    d.  JOHN OR JANE DOE CLIENT 7;

    e.  JOHN OR JANE DOE CLIENT 10;

    f.  JOHN OR JANE DOE CLIENT 17;

    g.  JOHN AND JANE DOE CLIENTS 28 & 29;

    h.  JOHN AND JANE DOE CLIENTS 30 & 31;

    i.  JOHN AND JANE DOE CLIENTS 32 & 33;

    j.  JOHN OR JANE DOE CLIENT 37;

    k.  JOHN OR JANE DOE CLIENT 41;

    l.  JOHN OR JANE DOE CLIENT 45;

    m. JOHN AND JANE DOE CLIENTS 46 & 47;

    n.  JOHN AND JANE DOE CLIENTS 48 & 49;

    o.  JOHN AND JANE DOE CLIENTS 50 & 51;

p.   JOHN OR JANE DOE CLIENT 52;

q.   JOHN AND JANE DOE CLIENTS 53 & 54;

343.       G.L. c. 271A § 1 defines enterprise and criminal enterprise activity thusly:

a.   "Criminal enterprise activity", the commission, attempt to commit or conspiracy
to commit or the solicitation, coercion, aiding, abetting or intimidation of another
to commit any of the following criminal activities under the laws of the
commonwealth or equivalent crimes under the laws of any other jurisdiction: . . .
a felony offense under chapter 271 . . . assault; assault and battery; assault and
battery in order to collect a loan; assault with intent to rob or murder; . . .
extortion; stalking; criminal harassment; . . . burglary; malicious destruction of
property; commission of a felony for hire; breaking and entering; . . . violation of
constitutional rights under section 37 of chapter 265; . . . gross fraud under section
76 of chapter 266; insurance fraud; . . . perjury; subornation of perjury;
obstruction of justice; money laundering; witness intimidation; bribery; . . .
larceny over $250; larceny by false pretenses or embezzlement; . . . false claims . .
. or any conduct defined as a racketeering activity under Title 18, U.S.C. s.
1961(1)(A)(B) and (D).

b.   "Enterprise", an entity including . . . any unchartered union or group of persons
associated in fact although not a legally-recognized entity.

## PATTERN FOUR: MAIL FRAUD AND MONEY LAUNDERING
## IN MANUFACURED MORTGAE LITIGATION

344.       With reference to several of the "patient zero" cases listed at the outset, averments
made in Plaintiff's preliminary statement regarding statutes of limitations, several of the
cases in the sections which follow regarding the Harmon and Mazonson Defendants and
the cases incorporated by reference in Plaintiff's Exhibit A, Plaintiff is alleging the
emergence of a certain pattern and a practice which appears unique to areas of law that
complement or implicate the servicing of defaulted residential mortgage loans.

345.       The pattern and practice to which Plaintiff refers involves, by and large, lending
and debt servicing cases, usually residential mortgage and servicing cases, which he
analogizes to engineered car accidents, not entirely unlike the actual engineered car
accidents referenced in the foregoing sections, but with some distinct differences, notably
that where the person most damaged by the scam in question, usually Plaintiff's "client,"
realized what he or she or they were in the midst of, instead of simply seeking to be made
whole and moving on, they jumped in on the party (or they were in on the scam from
jump—Plaintiff avers some variation across fact patterns implicated in the timing and
level of witting cooperation by "clients" and their "handlers" in those circumstances
where Plaintiff asserts concerted action on either side of what was supposedly, and to the

extent these matters proceeded before any tribunal, would necessarily need to have been, an adversarial table).

346.     And irrespective of the analogy, what Plaintiff alleges generally is quite simple: Plaintiff was provided a subset of cases wherein at some point during the handling of a matter in which Plaintiff was involved, everyone except Plaintiff behaved in a manner consistent with either pursuit of a predetermined result or in a manner suggestive that the dispute in question was for purposes of the sort of "shadow litigation" of a parallel set of transactions as referenced in Plaintiff's Exhibit A and, as such, the behavior of persons involved in such circumstances became incredible.

347.     As it has now become evident to Plaintiff that the type, quality and "client" cases with which Plaintiff was provided have always been tightly controlled by persons and entities other than Plaintiff, Plaintiff was unaware of the existence of even the possibility of any such state of affairs prior to December of 2014, and at such point in time Plaintiff was misled by the Mazonson Defendants and associates friendly to their network that there could exist cross-table collusion or that the Mazonson Defendants and associates friendly to their network felt injured by anything more complex than incomplete, tardy or unsatisfactory work product in a small subset of matters originating out of their network.

348.     Plaintiff makes these preliminary averments in advance of his allegations as to why such circumstances and the actions of persons and entities involved in these transactions constitute predicate acts giving rise to RICO liability due to a certain category of damages related to Plaintiff's earning capacity and damages for loss of income.

349.     To wit: Plaintiff alleges that due to the foregoing state of affairs, Plaintiff worked on matters so implicated for extended periods of time to no actual resolution of his "client's" or "clients'" situation.  Plaintiff's hours, however, far exceed any monies paid to him, and, though, in and of itself, additional time in a home for which borrowers are remitting no funds to anyone acting on behalf of the beneficial interest holder is not a service for which one could lawfully charge standing alone, i.e. without action in support of a lawful resolution, such a benefit was actually realized by Plaintiff's "clients" so implicated, in every instance in an amount where the monies saved by these persons on housing expenses during this period dwarfed any monies paid to Plaintiff.

350.     Unfortunately, as Plaintiff was affiliated with these "affinity groups" without seeing that one of the services they purport to provide is essentially "protection money" in exchange for "protection," those witting "clients" of Plaintiff with expectations in this regard seem to behave as though they are entitled to actual resolution[55], not simply

---

[55] To be sure, Plaintiff would have liked nothing more than to have obtained a home retention alternative or some tidy form of closure for every person behaving cooperatively and in good faith towards such a result; Plaintiff simply avers that there exists a subset of persons so implicated who at critical points in the processing of any resolution efforts were advised in no uncertain terms that absent proactive independent action by them or a change in their circumstances over which Plaintiff had no control, a loan modification that was not the result of litigation in which an upper hand had been realized was highly unlikely—and with regard to a subset of this subset, certain persons were advised that home retention on the terms they were articulating they would accept would likely only be

Plaintiff's time as in a traditional attorney-client relationship.  More unfortunately, this could only have been lawfully achieved were Plaintiff to continue unaware of the fraudulent nature of the transactions and unaware of any mail fraud or violations of 18 U.S.C. §1956 or §1960 as, to continue with knowledge would make him criminally liable, thus creating circumstances in those instances where the matter in question constitutes "shadow litigation" of parallel transactions involving Plaintiff, i.e. matters specific to Plaintiff's own affairs, are simply languishing in limbo for amounts of time and under factual circumstances that tend to shed light on the fraudulent nature and ulterior motives behind the alleged prior emergencies arising in such actions.

351.    This allegation is necessary and relevant because, notwithstanding the other more straightforward predicate acts or more black and white allegations of fraud, with regard to several of the fact patterns implicated by the foregoing paragraphs, though Plaintiff argues several alternative formulations of his §1964(c) claims, necessary defenses in this action will reasonably yield incredible denials of knowledge by complicit actors in order to avoid potential criminal liability, thus creating circumstances wherein any persons asserting any such lack of knowledge (they will have some interesting hoops to jump through to explain some of their behavior in this regard) will be left unassisted with a defaulted mortgage traditionally ineligible for modification and lender's side representatives scrambling to explain their own decisions in allowing a particular matter to have developed thusly.

352.    Those deemed culpable for damages in this suit may then suggest some form of assumption of risk argument to defray Plaintiff's alleged damages, i.e. Plaintiff complains he has been damaged in his employability, income not realized, and reputation by practicing in this area of law and, by and large, he knew or should have known of the risks and, like those complicit actors who Plaintiff alleges were expressly advised of the risk that home retention may not be an option if they proceeded upon a litigious course, Plaintiff too undertook a similar risk with open eyes.

353.    This is simply not an apt analogy.  If the persons who would benefit from such a defense care to bring forward evidence that by not succeeding in retaining a particular home they are facing or will face crimes against their person and property, criminal harassment, threats, they face being framed for acts which they did not commit or employment opportunities which they do receive will be marked by fraud, criminality and additional efforts at their discredit, then those Defendants so affected are free to become cross-claimants against those actors culpable for such a state of affairs as, like Plaintiff, to the extent anyone has taken any action under unlawful duress, they should be compensated therefor to the extent that they were not culpable enterprise participants possessed of mens rea or negligently and secretly acting at the behest of another in matters of any import.

possible by a favorable judgment in litigation.  Several of these persons pursued no such proactive course, changed their tune with regard to the continuity of their expectations and then turned around and claimed they misperceived clearly articulated risks, and in some instances were afforded exactly what they had purportedly been seeking in no uncertain terms, then took action to destroy their own result.

354.     In terms of "assumption of risk," should any party interested in the outcome of this action like to come forward and make the argument that by becoming a lawyer focused on home retention alternatives, debt resolution and real estate litigation without adequate start-up capital or unwittingly undereducated Plaintiff risked anything more than a failed business venture or the normal professional liability attendant to the practice of law, Plaintiff invites them to do so.  Plaintiff would be interested to hear this argument as to how his actions whether professional, personal or some combination thereof constituted circumstances wherein a reasonable person would perceive they were assuming the risk of any of the type of treatment herein described.  Certainly people get mad, certainly people shade the truth, certainly every so often someone behaves vindictively or a tragic accident occurs—but this?  The sorts of risks herein described are not supposed to exist in these United States and that they do, that Plaintiff now acknowledges that he has had persons approach him through the years complaining of treatment which Plaintiff dismissed as exaggeration or the musings of the disturbed that was, with the benefit of hindsight, likely occurring, well while Plaintiff may not be the smartest or richest man, Plaintiff is certainly better equipped to do what he can to remedy such circumstances than many.

355.     Indeed, Plaintiff finds the results of those inquiries of counsel he did make with regard to any of the issues described herein interesting to say the least.

356.     Plaintiff alleges that the sheer volume of fact patterns wherein Plaintiff can demonstrate persons acting in direct contravention of their own interests coupled with the manner in which a particular matter progressed after Plaintiff's disengagement lends itself more reasonably to a finding of complicit actors essentially posing as "clients" to fraudulent ends, in some instances, on behalf of others, than it does to persons with whom Plaintiff had an actual attorney-client relationship wherein he would be bound to adhere to traditional principles attendant thereto.

357.     Irrespective of what purpose any one of these individual matters was meant to serve, with regard to this pattern four, two facts are common to all:

a.   A financial institution or loan servicer or agent acting therefor used the mails to transmit default servicing correspondence or to exercise purported rights under a mortgage in a targeted manner directed at Plaintiff on facts where such default servicing or mortgage rights would be afforded different treatment absent Plaintiff's involvement;

b.   In the fact patterns so implicated, Plaintiff alleges his "clients" paid funds constituting "affinity group" funds obtained through 1) utilizing the methods discussed in Plaintiff's reference to "constructive shadow mortgages," i.e. by surrendering the use of their legal person to the group in exchange for some benefit or special treatment as regards their home; and/or 2) disguising the source of funds used to pay for Plaintiff's services; and/or 3) in consideration therefor, Plaintiff's practice being so funded, then using Plaintiff's practice as a catalyst for

forcing action in other fraudulent fact patterns that, unbeknownst to Plaintiff, the targets thereof would view similarly to the sort harassment of which Plaintiff complains[56], thus resulting in the transmission of additional funds which promote ongoing criminal activity, i.e. among other things, criminal harassment, violations of 18 U.S.C. §1589, violations of G.L. c. 265 § 37, or G.L. c. 271 § 39, or the use of a scripted or altered factual briefing to Plaintiff to use his practice and law license as an unwitting agent or conduit of the will of another to corruptly persuade, influence or threaten in contravention of 18 U.S.C.§ 1512.

358.    And while the penalties section under Massachusetts law for criminal enterprise activity are clearly most concerned with unlawful interference with licensed gaming businesses and collection of usurious debt[57], the first clause of G.L. c. 271A §2(3) makes no such distinction and criminalizes merely "knowing employ[ment] by or associat[ion] with an enterprise to conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs."

359.    18 U.S.C. §1960 defines criminal liability for an unlicensed money transmitting business as knowingly conducting, managing, supervising, or owning all or part of an entity which affects interstate commerce in any manner or degree that (A) is operated without the appropriate license, (B) fails to comply with the requirements of 31 U.S.C. §5330, and (C) transmits funds known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity.

360.    Plaintiff avers that the fact patterns implicating the following sets of persons and the confidential entities[58] associated therewith involve the foregoing type of impermissible circumstances:

---

[56] With reference to Plaintiff's averments in the first pattern as regards Defendants Garrity and Philbin, Plaintiff avers that, though he cannot be certain as these Defendants kept close to the vest the majority of the dealings internal to the business operations of their various shell entities, based upon certain conduct of tenants and holders of beneficial interests in condominium trusts in which these Defendants also held some interest, Plaintiff believes he may have acted in reliance upon fraudulent misrepresentations by these Defendants in threatening legal process based upon a documentary foundation that excluded source material and was therefore subject to manipulation. Plaintiff did not do so knowingly.

[57] While Plaintiff makes no specific allegation in this regard as his Complaint is largely based upon actions and circumstances wherein secondary verbal agreements, understandings and behavior tends to be indicative of additional layers of consideration than that to which Plaintiff is privy; Plaintiff simply avers that he is being treated like he owes someone something above and beyond debts he incurred in a traditional contractual setting absent fraud and with informed consent.

[58] With regard to CE 7, CE11 and CE13 specifically, analogous to several other matters addressed in this Complaint wherein Plaintiff suggests a limitation on expanding the list of potential Defendants beyond those necessary to state Plaintiff's claims, in anticipation of litigation and the interests of transparency under a unique set of circumstances, Plaintiff has identified for CE11 and CE13 lists of loans that Plaintiff avers have indicia of being "special loans" is currently working on providing a similar list to CE7. Essentially, Plaintiff avers that the loans appearing on these lists, irrespective of whether Plaintiff has named the underlying borrower as a Defendant in advance of obtaining rulings with regard to how this action might proceed, are given special treatment due to "affinity group" complicity, either with lender's specific knowledge or through the conduct of lender's duly authorized agent. Plaintiff seeks not to litigate the manner in which these entities choose to enforce their own contracts, instead Plaintiff simply avers that some of the choices in this regard implicate provision of inducements to engage in independently impermissible, fraudulent or unlawful conduct and in those instances where there is full blown manufacture of points for litigation

    a.  CE1;

    b.  JOHN/JANE DOE CLIENTS 1 & 2;

    c.  JOHN & JANE DOE CLIENTS 3 & 4;

    d.  JOHN & JANE DOE CLIENTS 5 & 6;

    e.  JOHN OR JANE DOE CLIENT 7;

    f.  JOHN OR JANE DOE CLIENT 10;

    g.  JOHN AND JANE DOE CLIENTS 12 & 13;

    h.  JOHN AND JANE DOE CLIENTS 14 & 15;

    i.  JOHN OR JANE DOE CLIENT 16;

    j.  JOHN OR JANE DOE CLIENT 17;

    k.  JOHN OR JANE DOE CLIENT 18 & 19;

    l.  JOHN OR JANE DOE CLIENT 20 & 21;

    m.  JOHN OR JANE DOE CLIENT 23;

    n.  JOHN AND JANE DOE CLIENTS 24 & 25;

    o.  JOHN AND JANE DOE CLIENTS 26 & 27;

    p.  JOHN AND JANE DOE CLIENTS 28 & 29;

    q.  JOHN AND JANE DOE CLIENTS 30 & 31;

---

as a "consolation prize" or panacea for some peripheral wrong and the mails were used in such scheming, such circumstances would impute liability for Plaintiff's damages to these lenders for reliance damages reasonably flowing therefrom. Plaintiff avers that CE12, CE24 and CE34 are engaged in the same practices, however because Plaintiff's exposure to these entities has been more limited, presumably due to the frameworks within which the networks the Mazonson Defendants and Defendant Miller generally operated, Plaintiff thinks he has specifically identified all or close to all fact patterns implicating damages as regards these entities.  With regard to Hyatt Legal Plans matters and most if not all "business" precipitating out of the practices of Defendants Walters and Flashenburg, the averment is similar with regard to the list of formally identified parties, i.e. what Plaintiff discloses at the outset, for logistical reasons, is just a taste of what transpired.  Nevertheless, the underlying facts giving rise to matters from those sources are by and large suspect they are simply not addressed in great detail in this section as the type of manufacture falls all over the spectrum both in case type and motivation and therefore unless these matters also implicate mail fraud or a construct for purposes of the laundering of funds in the context of a mortgage, they are not addressed in this section.

    r.   JOHN AND JANE DOE CLIENTS 32 & 33;

    s.   JOHN AND JANE DOE CLIENTS 35 & 36;

    t.   JOHN AND JANE DOE CLIENTS 38 & 39;

    u.   JOHN OR JANE DOE CLIENT 40;

    v.   JOHN AND JANE DOE CLIENTS 44;

    w.   JOHN AND JANE DOE CLIENTS 46 & 47;

    x.   JOHN AND JANE DOE CLIENTS 48 & 49;

    y.   JOHN AND JANE DOE CLIENTS 53 & 54;

361.    With regard to a large subset of the foregoing matters, Plaintiff can best analogize them to the fake car accidents referenced in the foregoing section, simply in the context of a manufactured dispute with their mortgage servicer or default servicing counsel, events against which, depending upon how one views it, the Trustee of a securitized trust, the federal reserve, or the taxpayer by way of the Treasury will insure to a certain extent.

## HARMON LAW OFFICES, P.C. AND ITS COLLABORATORS

362.    With regard to the lead Defendant, Plaintiff avers that the following persons have comported themselves in a manner akin to "double-agents," purportedly seeking assistance from Plaintiff for a mortgage issue when, in point of fact, they are either "paying back" some sort of "favor" previously provided by the Harmon Defendants or acting in reliance on an expectation either express or implied of future receipt of some form of special treatment, directly from the Harmon Defendants or otherwise, which time bore out they, in fact, later received:

    a.   Adam D. Mazonson;

    b.   JOHN AND JANE DOE CLIENTS 3 & 4;

    c.   JOHN AND JANE DOE CLIENTS 12 & 13;

    d.   JOHN AND JANE DOE CLIENTS 46 & 47;

    e.   JOHN AND JANE DOE CLIENTS 24 & 25;

    f.   JOHN OR JANE DOE CLIENT 20 & 21;

363.    Additionally, Plaintiff avers that the entirety of the matter of JOHN OR JANE DOE CLIENT 17 is the product of fraudulent manufacture from inception insofar as it

constitutes a matter wherein its purpose and factual underpinnings are precisely as those complained of with regard to CE1 – i.e. a person permitting their social security number and real estate holdings to be constructively used in the creation of largely unnecessary paper instruments and docket numbers for use by "affinity group" participants to transmit illicit funds in the light of day.  With regard to the fact pattern so implicated, Plaintiff avers that an employee or former employee of the Harmon Defendants facilitated such fraudulent manufacture at a key point in those proceedings.

364.        Finally, another Harmon employee named Kurt McHugh approached Plaintiff in 2016 (with regard to the averments in both this paragraph and the foregoing paragraphs, Plaintiff is able to plead facts with far greater specificity but does not do so in the body of this Complaint as additional specificity may serve to permit constructive identification of the "clients" in question) and engaged Plaintiff in conversation, (in what Attorney McHugh posits was an organically arising coincidental encounter which was anything but,) the content of which Plaintiff avers constituted both an implied threat and, given the balance of this Complaint, criminal harassment.  Moreover, the gross fraud of Plaintiff's own "client" is the only reason Plaintiff was susceptible to this threat at all (a sideways discussion of Attorney McHugh's knowledge that certain preliminary decisions with regard to a specific matter were factually unsupported for the chosen action).

365.        Indeed, it was the foregoing conversation with Attorney McHugh that first alerted Plaintiff to the possibility his "client's" mistakes and omissions had been engineered with the assistance of others, though reaching this conclusion with any measure of reliability required significant additional time, investigation and review.

366.        In sum, Plaintiff's professional experience with the Harmon Defendants began with the original "patient zero" case (the status of this person's loan has been so long out of a referral to foreclosure counsel that the pattern currently being discussed does not appear to implicate this person) and appears to have evolved over time.

367.        Plaintiff's contention, as alluded to above, is that when Plaintiff originally met Defendant Mazonson, his narrative included that Mark Harmon and Larry Mazonson were family friends and that this had been a lifelong acquaintance.  Plaintiff further avers that when the Mazonson Defendants realized there was money to be made and leverage to be garnered by setting up fake fights between the two firms, such fake fights were engineered (to the Mazonsons' credit, without telling Plaintiff that they were fake,) and from very early on in Plaintiff's relationship with the Mazonsons, Defendant Adam Mazonson made a point of frequently informing Plaintiff that Plaintiff had misperceived his original description of the two families' relationship, that it was far less than Plaintiff had originally understood, and that Adam Mazonson, at least, barely knew the Harmons and that he didn't even know whether Mark Harmon had pulled any strings to allow Defendant Mazonson to avoid foreclosure or whether an auction postponement was simply obtained in the ordinary course.

368.        Plaintiff avers that, as evidenced by Plaintiff's tenacity in pressing the issue of evidentiary manufacture in 12-11697, Plaintiff had believed the Mazonson Defendants

91

and presumed he had simply misunderstood the nature of the relationship, and Plaintiff had no idea anyone was dummying up scenarios for litigation.  And when Plaintiff kept pressing, the Harmon Defendants participated in attempts to ruin Plaintiff's life and career using Plaintiff's own "clients" as a tool. And though Plaintiff has long known the Harmon Defendants have had it out for him[59], Plaintiff was not compelled to even examine the possibility of "clients" actually obtaining benefits from the Harmon Defendants until certain far more recent events involving JOHN AND JANE DOE CLIENTS 25 & 26 and JOHN AND JANE DOE CLIENTS 20 & 21 raised Plaintiff's alarm to the frightening scope of this attack.

369.     Essentially, akin to an allegation Plaintiff levies against CE11 and its affiliates and associates, and Plaintiff's more general allegation of targeted conduct specific to Plaintiff's involvement in a given matter, some of Plaintiff's "clients" appear to have simply been given favors by the Harmon Defendants whereas when Plaintiff was involved in the very same dispute, there was no result to be had.  In short, Plaintiff avers the Harmon Defendants are actively participating in a campaign to fraudulently manufacture the appearance that Plaintiff fails to complete tasks or cannot do his job.

<u>POST SEPARATION MAZONSON "REFERRALS"</u>

370.     In the absence of Plaintiff's knowledge of the sort of destructive influence in which the Mazonson Defendants had actually exercised a direct hand, in December of 2014 Plaintiff listened to Adam Mazonson's averments and advice about aligned interests, "cleaning up the mess," and a stated preference that Plaintiff "get back on his feet" and that Defendant Mazonson would assist Plaintiff in business generation.

371.     What the Mazonson Defendants did in this regard is, quite frankly, unconscionable.

372.     Not only did the Mazonson Defendants attempt to create the appearance of ongoing Plaintiff complicity in fraudulent past matters which Plaintiff clearly did not know had been or were fraudulent, but the three (3) new "cases" Plaintiff undertook sent from the Mazonson Defendants all succeeded in creating new leverage over Plaintiff through fraud and criminality and, with regard to JOHN AND JANE DOE CLIENT 12 & 13[60] and JOHN OR JANE DOE CLIENT 55[61], these persons actively and fraudulently participated in a campaign to create the appearance that Plaintiff had not remedied those

---

[59] Plaintiff would not fault the Harmon Defendants for naturally harboring some ill will given the seriousness of the allegations levied in what Plaintiff believed to be organically arising adversarial circumstances.  The irony is that the ill will almost seems to sound more in contempt for Plaintiff's ignorance as to the fraudulent state of affairs and unwillingness to "play ball" than it does in more honorable concerns like reputational damage or innocence of the allegation levied.

[60] Analogous to Plaintiff;s averments as regards Defendant Mazonson's protestations as regards a relationship with the Harmon Defendants, Plaintiff avers that Defendant Mazonson made conspicuous averments at the outset of this matter with regard to how little he had vetted it that, given Plaintiff's averments contained in Exhibit A as regards what the circumstances actually were, now seem incredible.

[61] The third is JOHN AND JANE DOE CLIENTS 42 & 43.

mistakes he had actually made in the past, remediation which had in fact occurred and continues to this day but for the conduct described above at pattern three.

373.     In short, Plaintiff remediated certain procedural laxities that enterprise associates have taken efforts to manufacture the appearance Plaintiff did not take by breaking in to Plaintiff's home and removing evidence.  This allegation relates to JOHN OR JANE DOE CLIENT 55 – Plaintiff's experiences with JOHN AND JANE DOE CLIENTS 12 & 13 are similar but not precisely the same.

374.     To avoid constructive identification of the persons in question, see Exhibit A for more detail on this issue.

375.     The foregoing averments constitute ongoing and repeated violations of 18 U.S.C. § 1962 and Plaintiff has been damaged in both his business and his property by these violations.

376.     The actions of Defendants have unlawfully harmed Plaintiff in his business and property as lawful responsibilities have compelled disclosure of failures in custodial responsibilities that are solely the result of racketeering activity and no want of diligence on Plaintiff's part.

377.     The actions of Defendants have unlawfully harmed Plaintiff in his business and property as set forth at fn. 64.

378.     The actions of Defendants have unlawfully harmed Plaintiff in his business and property in the form of irreparable reputational damage.

## COUNT II
## Violations of 42 U.S.C. §1985

379.     Plaintiff repeats and realleges the allegations above as if fully set forth herein.

380.     Plaintiff alleges that the facts upon which Plaintiff's claims under 18 U.S.C. §1964(c) similarly state a claim under 42 U.S.C. §1985(2) as the intent of the actions in question constitute a conspiracy to affect the administration and outcomes of various proceedings in various courts of the United States by intimidation and threat.

381.     In addition to the myriad official proceedings to which Plaintiff appeared in the record as counsel and actions by enterprise Defendants to exert influence thereon prior to Plaintiff having filed for Bankruptcy protection, Plaintiff avers that CE1, CE2, CE3 and CE6 have engaged in conduct occurring after institution of Plaintiff's Bankruptcy in 17-11609 seeking to influence Plaintiff's testimony and the manner in which it is administered.

382.     Plaintiff further avers that the Sheff Defendants have conspired with other enterprise associates to forbear from reasonable action post-petition in a manner motivated to corruptly affect outcomes of official proceedings.

383.     Plaintiff alleges he has been damaged by such conspiracy.

## COUNT III
### Common Law Deceit

384.      Plaintiff repeats and realleges the allegations above as if fully set forth herein.

385.     In Massachusetts, to recover in an action for deceit, a plaintiff must prove that the defendant or its agent made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon the representation as true and acted upon it to its damage. Plaintiff must prove either an intention to mislead or words or conduct not consonant with fairness. *Reisman v. KPMG Peat Marwick LLP*, 57 Mass. App. Ct.100, 111 (2002).

386.     One who makes a fraudulent misrepresentation is subject to liability to the persons or class of persons whom he intends or has reason to expect to act or to refrain from action in reliance upon the misrepresentation, for pecuniary loss suffered by them through their justifiable reliance in the type of transaction in which he intends or has reason to expect their conduct to be influenced. *Id.* at 110.

387.     Knowledge of falsehood, reliance and harm are the primary elements of an action for deceit at common law. *New England Foundation, Co. v. Elliott A. Watrous, Inc.*, 306 Mass. 177, 179 (1940).

388.     While Plaintiff acknowledges that actions sounding in fraud generally must be pled with particularity, as alluded to in Plaintiff's Exhibit A, given what Defendants will no doubt allege are circumstances wherein Plaintiff's awareness of certain facts arose in a privileged setting, a contention which Plaintiff plans to refute but out of respect for tradition and in the interests of mitigating potential damages Plaintiff seeks impoundment of certain materials pled with more specificity, Plaintiff refrains from including certain information in the body of the Complaint that could be used to circumstantially identify confidential parties.

389.     Plaintiff further avers that the fraud in these facts is like a series of nesting dolls— small frauds, omissions and conduct not consonant with fairness serving to induce action in reliance thereon as building blocks in ever increasingly larger frauds.

390.     Plaintiff's Exhibit A describes one such fact pattern as a demonstrative template of the scope of Plaintiff's allegations, and this one template implicates participants in several local "affinity groups" and implicates no less than fifteen (15) separate fact patterns, many of which, in turn, branch out in a similar manner implicating a large number of additional fact patterns of their own.

391.     Plaintiff avers that to the extent the facts specifically described in Plaintiff's Complaint and Exhibit A are pled with sufficient particularity to state claims for deceit against those persons and entities upon whose misrepresentations or conduct not consonant with fairness Plaintiff relied to his harm in a manner Defendants could have anticipated Plaintiff would so rely, Plaintiff alleges damages sounding in deceit.

392.     Plaintiff further sets forth an allegation that every Defendant named in the body of the Complaint, Confidential Defendant not implicated by Plaintiff's averments as regards 11 U.S.C. §§101, *et. seq.,* and any party who could potentially receive service in the future should holdings issue indicating the scope of protection to which they are entitled under 11 U.S.C. §§362 and/or 727 does not extend to all sets of facts which implicate them in this action, have made at least one fraudulent statement or engaged in one instance of conduct not consonant with fairness, that they did so either knowingly, under circumstances subject to actual knowledge, or with reckless disregard for the truth, and with an intention to mislead the Plaintiff or acting in an agency capacity for another who had an intention to mislead the Plaintiff, and through such words and or conduct, Plaintiff was indeed misled and in reasonable reliance suffered injury therefrom.

393.     Upon obtaining preliminary rulings on issues of privilege, confidentiality and how to logistically proceed with this action in an equitable fashion, Plaintiff can supplement the foregoing averment consistent with such preliminary rulings.

394.     In addition to Plaintiff's actual damages from such reliance, Massachusetts has long recognized a category of emotional distress damages under appropriate circumstances in a wide array of intangible categories like damage to reputation, indignity, humiliation and hurt feelings.  *See MCAD v. Franzaroli*, 357 Mass. 112, 115 (1970); *Fillebrown v. Hoar*, 124 Mass. 580, 580 (1978); *Meagher v. Driscoll*, 99 Mass. 281 (1868).

## COUNT IV
### Civil Conspiracy

395.     Plaintiff repeats and realleges the allegations above as if fully set forth herein.

396.     Massachusetts also recognizes a claim for civil conspiracy essentially akin to simple joint liability in tort. *See Gurney v. Tenney*, 197 Mass. 457, 84 N.E. 428, 430 (1908); *see also Phelan v. Atlantic Nat'l Bank*, 301 Mass. 463 (1938).

397.     Massachusetts also recognizes a very limited cause of action for civil conspiracy of a coercive type. *See Jurgens v. Abraham*, 616 F.Supp. 1381, 1386 (D.Mass.1985).

398.     In order to state a claim of this type of civil conspiracy, plaintiff must allege that defendants, acting in unison, had some peculiar power of coercion over plaintiff that they would not have had if they had been acting independently. *Id.*(citing *Fleming v. Dane*, 304 Mass. 46, 22 N.E.2d 609 (1939).

399.     The First Circuit, interpreting this Massachusetts civil conspiracy standard has acknowledged that an action for this type of "coercive" conspiracy may properly lie where there is an allegation that any one defendant, acting alone, would have been unable to accomplish a fraud of the type alleged. *Aetna v. P&B Autobody*, 43 F.3d 1546, 1563-64 (1st Cir. 1994).

400.     The facts set forth in this Complaint and the damages flowing naturally therefrom clearly could not have been accomplished by any person acting alone and have had far reaching coercive implications both as to the actions Plaintiff has needed to take in mitigation of new damages and coercion and coercive intent with regard to Plaintiff's choices across all manner of areas of Plaintiff's life.

401.     As to joint liability in tort, in addition to all facts described above and in Plaintiff's Exhibit A which set forth the elements of any intentional tort involving two or more actors, Plaintiff avers that all Defendants named herein owed Plaintiff a duty of care not to make him a party to unlawful conduct, such duty was breached, and Plaintiff was injured thereby.

402.     Plaintiff seeks all damages to which he is entitled as a result of this conspiracy.

### COUNT V
### Tortious Interference with Advantageous Business Relations

403.     Plaintiff repeats and realleges the allegations above as if fully set forth herein.

404.     To make a successful claim for intentional interference with advantageous relations, a complainant must establish: 1) he had an advantageous relationship with a third party; 2) the defendant knowingly induced a breaking of the relationship; 3) the defendant's interference was intentional and improper in motive or means; and 4) injury resulted.

405.     Menacing behavior can constitute sufficient inducement and evidence of improper means. *Shafir v. Steele*, 431 Mass. 365, 368–371, 727 N.E.2d 1140 (2000)[62].  In Massachusetts, actionable interference can lie where the inducement succeeds in breaking the relationship by either party. *Id.*

406.     In light of the balance of the averments in this Complaint, the viability of claims with regard to the existence of various advantageous relationships will be predicated upon holdings as regards the legitimacy of such relationships.  Certainly Plaintiff makes no claim to damages from tortious interference in business transactions which could not have been lawfully conducted.  Nevertheless, in the event transactions Plaintiff avers

---

[62] Interestingly, the case cited involves an allegation of a Defendant standing "a little too close" to the Plaintiff and conveying "a sense of menace."  One of each of JOHN AND JANE DOE CLIENTS 3 & 4, 42 & 43, and 24 & 25 are alleged to have engaged in precisely this conduct and JOHN OR JANE DOE CLIENT 44 engaged in conduct that is not the same but was similarly a physical expression intended to convey menace.

were impermissible but it is held that such transactions were lawful, Plaintiff avers that he is entitled to damages from and improperly motivated or methodical inducements which caused Plaintiff a loss of a monetary interest or opportunity.

407.    With regard to relationships that, absent third party interference, are traditionally just employment relationships or matters of professional licensure, Plaintiff clearly is the holder of a Massachusetts bar card, had a job at Cumberland Farms and had an advantageous direct sales relationship with Gatehouse Media for newspaper delivery.

408.    Of these latter two relationships, Plaintiff concedes he terminated the relationship in both instances, but he did so in response to targeted, methodical and improperly motivated conduct that Plaintiff avers was occurring at the behest of CE 11 and others[63]. With regard to the paper-carrier relationship, Plaintiff avers damage not only in the form of the need to break the relationship completely, but Plaintiff avers diminished income and increased expenses from the ongoing harassment of both Undisclosed Supervisor 2, those in his charge, and enterprise associates along his route.

409.    With regard to Plaintiff's relationship with the Board of Bar Overseers and his endeavors to practice law, the Harmon Defendants, the Mazonson Defendants, the Hyatt Legal Plans and elements within their networks have inflicted damage on this advantageous relationship through employment of malicious and improperly motivated methods, the extent and duration of such damage as yet to be determined.  However, in light of the totality of the circumstances and until such time as remedial measures can be taken with regard to Plaintiff's reasonable security concerns, these Defendants, elements within their networks, and other enterprise associates have rendered this privilege valueless and Plaintiff has suffered both loss of income and loss of future earning capacity resulting directly therefrom.

<u>NOTICE OF RESERVATION OF RIGHTS RE: STATE ACTION</u>

410.    As alluded to herein, Plaintiff has sent certain inquiries and demands to both the United States Attorney's Office and the Massachusetts Attorney General's Office with regard to the conduct of certain persons and entities referenced in this Complaint who have, at all times relevant hereto, held themselves out as private actors.  To the extent that any such inquiry, discovery in this action, or affirmative defenses raised in this action sound in theories tending to implicate impropriety by governmental actors, whether in enforcing their police powers or otherwise, Plaintiff alerts the Court to the potential propriety of amending this Complaint to include theories implicating impermissible state action.

---

[63] Plaintiff avers that Defendant Douglas made statements and indications on April 13, 2017 suggestive of an association with enterprise associates and connection to persons and entities with a pecuniary interest in a matter involving JOHN OR JANE DOE CLIENT 7.

<u>PRAYER FOR RELIEF</u>

WHEREFORE Plaintiff requests the following relief:

a. Judgment against Defendants for statutory violations of 18 U.S.C. §§ 1964(c) and 42 U.S.C. §1985.

b. An award of damages in all compensable categories including lost income, loss of future earning capacity, emotional distress, mental anguish, actual damages[64], reputational damage, humiliation, discredit and lost wages.

c. An award of treble damages as traceable to unlawful racketeering activity pursuant to 18 U.S.C. §1964(c).

d. Injunctive relief tailored to curtail property crimes, invasions of Plaintiff's property, and intrusions upon Plaintiff's liberty interests.

e. Plaintiff's reasonable attorneys' fees.

f. The reasonable costs of suit.

g. An award of prejudgment interest.


Respectfully submitted,


<u>/s/ Evan P. Lowney</u>
Evan P. Lowney
234 Tripp St. #2E
Fall River, MA 02724
847.452.2180 -TEL

DATE: August 17, 2017

---

[64] Pursuant to the Internal Revenue Code of 1986 as amended and the interpretive guidance flowing therefrom, where Plaintiff believed he had an absolute right to entitlement to the funds in question when the liability accrued, Plaintiff has massive income tax liabilities on income which Plaintiff only recently realized was questionably sourced.  Plaintiff has other actual damages as well.